1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| **L.H. MEEKER, et al.,**<br><br>                    **Plaintiffs,**<br><br>          **v.**<br><br>**BELRIDGE WATER STORAGE**<br>**DISTRICT, et al.,**<br><br>                    **Defendants.** | **1:05-CV-00603 OWW SMS**<br><br>**ORDER GRANTING IN PART AND**<br>**DENYING IN PART DEFENDANTS'**<br>**MOTION TO DISMISS (DOC. 16)**<br>**AND DENYING PLAINTIFFS' MOTION**<br>**TO DISQUALIFY (DOCS. 23 & 24).** |

11
12
13
14
15
16
17
18

## I.   <u>INTRODUCTION</u>

This case concerns water entitlements appurtenant to lands located in the Belridge Water Storage District ("Belridge") in Kern County, California.  Plaintiffs L.H. Meeker, Debra Wood Brants, James M. Shaffer, and Robert E. Sweeney, all residents of Texas, own lands within Belridge along with appurtenant water rights.  Some of Plaintiffs' lands are serviced by Belridges' water supply system ("Service Area" or "SA" lands) while some are not ("Non-Service Area" or "NSA" lands).  Plaintiffs assert, generally, that Belridge and certain members of Belridge's Board

19
20
21
22
23
24
25
26
27
28

**1**

of Directors, namely William D. Phillimore, Robert E. Baker, and
Larry Starrh ("Defendants"), violated various provisions of
California law and effected takings of their property (water)
without just compensation by passing a resolution that prohibited
the transfer of water entitlements from NSA lands to SA lands.

Defendants now move to dismiss the entire complaint. (Doc.
16, filed May 31, 2005.)  Plaintiffs oppose (Doc. 22, filed July
22, 2005), and move to disqualify two lawyers representing
Defendants, Joseph Hughes and Nichole Tutt, along with Mr.
Hughes' law firm, on the grounds that the two attorneys may be
required to appear as witnesses in this case (Docs. 23 & 24,
filed July 22, 2005).[1]  During oral argument on the motion to
dismiss, Defendant was invited to submit supplemental information
concerning one of their arguments.  The court has considered that
supplemental filing (Doc. 43, Oct. 13, 2005), Plaintiff's
opposition to it (Doc. 45, filed Nov. 24, 2005), as well as two
responsive letter briefs (Docs. 46 and 47).

Plaintiffs also attached to their opposition a proposed
first amended complaint.  Plaintiffs' have not formally moved for
leave to amend, nor have they set their motion to amend for
hearing.  Defendants have a right to have their motion to dismiss
heard.  The proposed amended complaint will not be considered at
this time.

---

[1]    Because the ethical violations alleged in the motion to
disqualify are not germane to the lawyers' ability to participate
in this case at the motion to dismiss stage, it is appropriate to
decide the instant motion to dismiss at the same time as the
motion to disqualify.

1

## II.   **BACKGROUND**

2   Plaintiffs own land within the jurisdiction of the Belridge

3 Water Storage District ("Belridge").  Belridge contracts with the

4 Kern County Water Authority ("KCWA") to receive water.  KCWA in

5 turn contracts with the State Department of Water Resources

6 ("DWR") to receive a supply of water from the State Water Project

7 ("SWP").  Jurisdiction is invoked under 28 U.S.C. § 1332, because

8 there is complete diversity and the amount in controversy is more

9 than $75,000.00 exclusive of costs.

10   KCWA entered into a contract with DWR in the early 1960s,

11 pursuant to which KCWA was granted a maximum entitlement of

12 1.1534 million acre feet per year.  Belridge's contract with KCWA

13 grants Belridge an allocation of 163 thousand acre feet per year

14 from KCWA's maximum annual entitlement.

15   Belridge's distribution of its 163 thousand acre feet per

16 year annual entitlement to users is subject to, among other

17 things, the California Water Storage District Law, which requires

18 equitable allocation to the lands within Belridge, subject to

19 other existing priorities of use.  There are no "priority" zones

20 within Belridge that might entitle certain lands to higher

21 priority than other lands.

22   Belridge is a landowner voting Water Storage District

23 governed by a five-member Board of Directors ("Board").  *See*

24 Water Code § 41000.  The members of the Board are "public

25 officials" for the purposes of the Political Reform Act.  *See*

26 Gov. Code § 87100.

27 //

28 //

**3**

A.   **The Landowner Contracts**.

Belridge encompasses lands that are currently served by the Belridge water distribution system ("Service Area" or "SA" lands) and land that is entitled to receive water but is not currently served by the distribution system ("Non-Service Area" or "NSA" lands).  Plaintiffs own both SA and NSA land in Belridge.  All SA and NSA lands are entitled to receive water pursuant to recorded contracts ("Landowner Contracts") with Belridge.

The Landowner Contracts ("LCs") were first entered into in 1966, but have been amended several times, most recently in 2004. The initial LC was between the Belridge Water Storage District and the Occidental Land & Development Co., Ltd.  (*See* Doc. 39, Carlson Suppl. Decl., Ex. 1 at 1.[2])  Article 5(b) of the LC sets forth the method for calculating the volume of a Buyer's entitlement to water under the contract:

> Commencing with the year of initial delivery, [Belridge], each year, shall make available for delivery to Buyer in each Zone of Benefit, as such zones are shown on the plan attached hereto as Exhibit "A", the amount of Project Water expressed in acre feet which is the product of Buyer's acre foot per acre antitlement in such Zone of Benefit for such year as set forth in Exhibit "C" hereto attached multiplied by the number of "owner acres" included within the portion of Said Land in said Zone of benefit.  The total of all such amounts, for any year is referred to in this Contract as Buyer's annual entitlement for such year.

Article 6 explains that Belridge's delivery obligation is limited to the delivery of Project Water to specified locations (set forth in Exhibit D to the LC):

---

[2]    The obligations contained within the LC were made subject to the obligations and limitations imposed upon the District by the contract between the State of California Department of Water Resources and the Kern County Water Agency.

**4**

> Project Water made available to Buyer pursuant to this Contract shall be delivered to and accepted by Buyer **only at the locations specified on Exhibit "D"** hereto attached at which District has installed delivery structures in accordance with Article 7 hereof

(LC Art. 6 (emphasis added).)   Article 7 sets forth additional rights and obligations regarding the delivery of water to the locations specified in Exhibit D:

> District shall, on six (6) months written request from Buyer and upon payment by Buyer to District of the connection service charge of District then in effect, install and thereafter maintain during the term of this Contract delivery structures **at such of the locations designated on Exhibit "D"**, as Buyer shall direct.  Said delivery structures shall be and remain the property of District.  The cost of repairing any such structure damages by cause other than normal wear or negligence of District shall be paid by Buyer to District promptly upon written demand.

(LC Art. 7 (emphasis added).)   Nothing in the record clearly explains the relationship between the locations designated on "Exhibit D" and the locations of Plaintiffs' lands.   However, Plaintiffs do not allege that their NSA lands are serviceable by delivery structures at any of the locations designated in Exhibit D as points of delivery.

The right to receive water under the LC is "appurtenant to [the] land," (LC Art. 21), but a Buyer's ability to transfer the appurtenant water entitlement to other lands is limited:

> Project water delivered to Buyer pursuant to this Contract shall not be sold or otherwise disposed of by Buyer for use other than on Said Land without the prior written consent of District.

(LC Art. 20.)

//

//

//

**5**

**B.   <u>Plaintiffs' Lands and Water Entitlements</u>.**

The parcels in question in this suit passed from Occidental to a series of subsequent landowners, each of whom specifically assumed the duties and rights under the LC by signing an "Agreement Amending the Landowner Contract with Belridge Water Storage District for a Water Supply." (Doc. 39, Exs. 3, 4, 5 & 7.)  On February 1, 2000, Plaintiffs assumed the terms of the LC for six parcels of land totaling 1599.16 acres, with associated water entitlements of slightly more than 27,000 acre feet. (*See id*. Ex. 7.)

Also on February 1, 2000, Plaintiffs' entered into an additional agreement amending their water supply contract.  This amendment permits the permanent transfer of an unspecified volume of Plaintiffs' water entitlement so that Belridge could permanently transfer such water entitlement (along with other water entitlements secured from other landowners) to urban users pursuant to a separate agreement. (*See id*. Ex. 6.)  This was a one-time transfer for which Plaintiffs were compensated.

Finally, at some point in early 2004, Plaintiffs appear to have purchased an additional 471.27 acres within Belridge.  On February 3, 2004, Plaintiffs entered into an agreement with Belridge assuming the rights and duties under the LC for those parcels. (*See id.* at Ex. 7.)  The record reflects no additional agreement transferring any portion of the water entitlement appurtenant to these 471.27 acres to other lands.

//

//

//

**6**

**C.** **The Agricultural Interests of the Defendant Directors**.

Belridge Directors William Phillimore, Robert Baker, and Larry Starrh are connected with various agricultural enterprises operating within Belridge.

Mr. Phillimore is the President of the Belridge Board.  He is also affiliated in one way or another with the following agricultural enterprises:

- Paramount Farming Enterprises, Inc. ("PFE"), Executive Vice President and Chief Financial Officer.
- Paramount Land Company, L.P. ("PLC"), Executive Vice President and Chief Financial Officer.
- Belridge New Farming, LLC ("BNF"), Executive Vice President and Chief Financial Officer.
- Paramount Orchards Partners VI, LLC ("POP"), Executive Vice President and Chief Financial Officer.
- Paramount Farming Company, LLC ("PFC"), Executive Vice President and Chief Financial Officer.[3]

These entities, collectively referred to as the "Paramount Business Entities" are connected to one another in a variety of ways.  For example, PFE is the managing partner of PLF, while PFC manages PLC and POP pursuant to a farm management agreement.  PLC and POP own land in Belridge.

Mr. Phillimore is also the Executive Vice President and Chief Financial Officer of West Valley Acquisition Corporation and Westside Mutual Water Company, LLC, from each of which Mr. Phillimore receives a salary in excess of $100,000 per year.  Plaintiffs assert that these two additional entities may be related to the Paramount Business Entities.

Robert E. Baker is the Secretary of Belridge's Board.  He is also employed by PFC as "Ranch Manager" for which employment he

---

[3]     According to the complaint, Mr. Phillimore receives a salary in excess of $100,000 from PFE, BNF, POP and PFC.

receives a salary of $100,000 per year along with an annual bonus based on the overall profitability of the Paramount Business Entities.

Larry Starrh is the Belridge Board's Treasurer.  Mr. Starrh is also a partner in Starrh & Starrh Cotton Growers, which pays Mr. Starrh a salary in excess of $100,000 per year.

**D.    The Top Contract.**

Certain entities in Belridge, including entities connected to the three individual Defendants in this case, are parties to a 1999 contract with Belridge, known as the "Top Contract."  This agreement allows contracting parties to purchase water that is allocable (but undeliverable) to the NSA lands.  The water available for purchase under the Top Contract is known as "Top Water."  The parties to the Top Contract purchase Top Water from Belridge and use it on their SA lands.

Specifically, parties to the Top Contract purchase from Belridge portions of the annual entitlement associated with NSA lands as of January 1, 1999, less any portion transferred outside the NSA after January 1, 1999.  Each party to the Top Contract is entitled to purchase a certain percentage of the NSA entitlement. The parties to the Top Contract are not required to pay any transfer charges to change the place of use of Top Water from NSA to SA lands.

In exchange, the parties to the Top Contract agreed to make annual payments to Belridge (the "Buyer's Agency Charge," the "Buyer's District Capital Charge," "The Buyer's Delivery Charge," and the "Buyer's Overhead Charge").  These fees help to cover Belridge's costs (under Belridge's KCWA contract) and the costs of delivering water to the SA lands.

**8**

1    The Top Contract gives each Buyer a right of termination

2 under certain circumstances by specified dates.  These dates have

3 expired and no Buyers exercised their right of termination.

4    Belridge New Farming LLC (62.84%), Starrh & Starrh Cotton

5 Growers (16.61%), and Paramount Land company (14.46%) are the

6 three largest parties to the Top Contract.  The remainder is held

7 by others.

8    The operative effect of Plaintiffs' proposed transfer from

9 NSA to SA lands would be to decrease the volume of water

10 available for distribution under the Top Contract.

11    **E.   Plaintiffs' request to use NSA water on SA lands**.

12    Plaintiffs requested permission to use the water

13 entitlements associated with their NSA lands on SA lands.  In

14 order to obtain permission to use NSA-attributable water on SA

15 land, Plaintiffs' Landowner Contracts must be amended.  If such

16 amendment is not permitted, Plaintiffs cannot use their water

17 entitlements.

18    On January 10, 2005, Plaintiffs sent a letter to the Board,

19 notifying the Board that they intended to "request to have

20 [their] non service area water activated into the service area.

21 More specifically, [they] plan on farming with this water with

22 Sandridge Farms and or other existing land owners and we depend

23 on this water for the economic use of our lands in the district."

24 (Doc. 18, Hughes Decl., Ex. D.)  The letter went on to state:

25         We have been informed of a series of meetings the
          district has had regarding two requests that land
26        owners have made in early 2004.  The two land owners
          are Sandridge and Chevron.  We have been made aware of
27        an identical request from a land owner, Stiefvater,
          which was approved under the same Board Policies that
28        are currently in place.  I have been informed that
          several of the current Board Members have been

**9**

> participating in discussions, talked to the manager and
> have voted to delay the transfer of this water.  It
> appears these Board members currently may have free use
> of about 10,000 acre feet of water of this character
> through a unique arrangement set up by the Board and
> called top contracts.  If the foregoing is true, the
> value of the top contracts of these Board Members is in
> excess of 10 million dollars assuming a value of $1,000
> per acre foot.

(*Id.*)

**F.    The Allegedly Improper/Unlawful Vote.**

On January 11, 2005, the Board held a regularly scheduled board meeting.  The agenda for that meeting referenced the following item:

> Legal Counsel:
>
> (a) Report re: Charge for Permanent Transfers from
> Non-service Area to Service Area.

(Doc. 25, Carlson Decl., Ex. 7).  No vote on this issue was taken during the January 11, 2005 meeting.  Instead, the meeting was adjourned until February 16, 2005 to allow time for public comment and for the board to consider the matter.

The agenda for the February 16, 2005 meeting includes the following modified agenda item:

> Other Business:
>
> a. Policy re: Permanent Transfer of Annual
> Entitlement from Non-Service Area to Service area.

(Doc. 19, Req. for Judicial Notice, Ex. C.)

On February 16, 2005, the Board voted 3-2 to <u>prohibit</u> amendments to Landowner Contracts that would transfer water from NSA land to SA land.  The three votes in favor of the prohibition were Defendant Directors William Phillimore, Robert Baker and Larry Starrh.

On March 18, 2005, in accordance with the exhaustion

**10**

requirements of the Brown Act, Cal. Gov. Code § 54960.1, Plaintiffs sent a letter to the Board demanding that the action be nullified because the vote violated the terms of the Brown Act.  On April 18, 2005, the Board refused to nullify the vote.

### III.   **SUMMARY OF THE COMPLAINT**

Plaintiffs allege that the Belridge Board's February 16, 2005 decision to prohibit intra-district transfers of water from NSA to SA lands:

(1)   Should be declared void because it violated the Political Reform Act, Cal. Gov. Code § 87100, which prohibits any public official from making decisions in which he or she knows or has reason to know that he or she has a financial interest.

(2)   Should be declared void because it violated California Government Code § 1090, which prohibits public officials from being financially interested in any contract made by them in their official capacity.

(3)   Should be declared void because it violated the Ralph M. Brown Act, Cal. Gov. Code §§ 54950-54963, which requires that local legislative bodies hold open meetings and public agendas of topics to be discussed at those meetings in accordance with the requirements of the Act.

//
//
//
//

**11**

(4)     Constitutes a taking of property without just
        compensation in violation of the Fifth Amendment to the
        United States Constitution and subjects Belridge to
        inverse condemnation exposure under state law,
        entitling Plaintiffs to damages and prejudgment
        interest in excess of $75,000.

(5)     Constitutes unfair competition based on an unlawful
        business practice, entitling Plaintiffs to injunctive
        relief.

Plaintiffs also seek costs of suit and reasonable attorney's fees in accordance with several provisions of California law.

## IV.   STANDARD OF REVIEW - MOTION TO DISMISS

Fed. R. Civ. P. 12(b)(6) provides that a motion to dismiss may be made if the plaintiff fails "to state a claim upon which relief can be granted." However, motions to dismiss under Fed. R. Civ. P. 12(b)(6) are disfavored and rarely granted. The question before the court is not whether the plaintiff will ultimately prevail; rather, it is whether the plaintiff could prove any set of facts in support of his claim that would entitle him to relief. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). "A complaint should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Van Buskirk v. CNN, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) (citations omitted).

In deciding whether to grant a motion to dismiss, the court "accept[s] all factual allegations of the complaint as true and draw[s] all reasonable inferences" in the light most favorable to

**12**

the nonmoving party.  *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999); *see also Rodriguez v. Panayiotou*, 314 F.3d 979, 983 (9th Cir. 2002).  A court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

## V.  **DISCUSSION**

### A.  **Motion to Dismiss**.

#### 1.  **Request for Judicial Notice**.

Plaintiffs request that the district court take judicial notice of the following documents: The "Top Contract"; Board of Directors' Minutes of May 3, 1999; Board of Directors' Minutes and Agenda of February 16, 2005; A portion of the Board of Directors' Packet for Board Meeting of February 16, containing a letter dated January 10, 2005.

A court may take judicial notice of facts "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b).  Under certain circumstances, a court may take judicial notice of a document relied upon in the complaint and/or matters of public record outside the pleadings, without converting a motion to dismiss into a motion for summary judgment.  *See In re Silicon Graphics Inc. Secs. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999); *MGIC Indem. Corp v. Weisman*, 803 F.2d 500, 503 (9th Cir. 1986).

**13**

1    Under this rule, the Top Contract is judicially noticeable

2  because it is referenced in Plaintiffs' complaint and its

3  authenticity is not challenged.[4]

4    Minutes from an irrigation district's board meeting are

5  public records subject to judicial notice in a motion to dismiss,

6  *see Sumner Peck Ranch, Inc. v. Bureau of Reclamation*, 823 F.

7  Supp. 715, 724-25 (E.D. Cal. 1993), but only if "the accuracy of

8  the minutes cannot be reasonably questioned," Fed. R. Evid.

9  201(b)(2).  Plaintiffs object to the district court taking

10 judicial notice of the Board minutes on a variety of grounds.

11 Plaintiffs assert that the minutes from the February 16, 2005

12 meeting are "considerably embellished" in comparison with the

13 handwritten notes of the February 16, 2005.  (Doc. 25 at 14.)

14 Plaintiffs also suggest that the February 16, 2005 meeting

15 minutes are misleading when not viewed alongside minutes from the

16 February 1, 2005 meeting and agenda.[5]  (*Id*. at 5.)  Although

17 Plaintiffs' objections may be relevant to the weight accorded

18 these documents, these arguments do not call into doubt the

19 district court's authority to take judicial notice of these

20 minutes, which are records of a public entity's proceedings kept

21 pursuant to a duty, under Federal Rule of Evidence 201.

22

23 ───────────────

24    [4]    Plaintiffs note that the copy attached to Defendants'
   motion to dismiss is not certified, but do not object to the
25 court taking judicial notice of this document.

26    [5]    Plaintiffs also questioned the genuineness of the May
   3, 1999 minutes because they were not signed by Belridge's
27 Secretary, but Defendants submitted a signed copy along with
   their reply memorandum, (*see* Doc. 34, Ex. 1), rendering this
28 objection moot.

**14**

Defendants also submit for judicial notice a letter from Plaintiffs to Defendant dated January 10, 2005.  This letter was contained within an agenda packet distributed to Belridge's Board.  As such, it is part of the public record of the Board's proceedings and is subject to judicial notice.  Plaintiffs object that the letter "without context, distorts the issues," and protest that "[i]f this document is considered, all documents prepared for and distributed at the January 11, 2005 meeting should be considered."  Plaintiffs' argument is a logical one, but they do not dispute the authenticity or accuracy of the letter or that it was part of the agenda packet for the Board meeting. The proper remedy is for the district court to consider the additional documents.  Plaintiffs, however, have not provided any.

Defendants request for judicial notice is **GRANTED** as to all documents for which such notice was requested.  As a practical matter, judicial notice recognizes the authenticity and existence of these documents.  Where a dispute exists as to the accuracy of the underlying matters in the writings, such matters are "subject to reasonable dispute."  As such, they will be considered, but not for their truth.

## 2.   Subject Matter Jurisdiction.

"Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction over the subject matter, the court shall dismiss the action."  Fed. R. Civ. P. 12(h)(3).  This court has "federal question jurisdiction" over civil actions "arising under the Constitution, laws, or treaties

**15**

of the United States." 28 U.S.C. § 1331. Alternatively, federal district courts possess "diversity jurisdiction" over civil suits where the parties are citizens of different states and the dispute involves more than $75,000.00, exclusive of interests or costs. 28 U.S.C. § 1332.

In this case, Plaintiffs arguably allege both a Fifth Amendment takings claim and a state-law inverse condemnation claim. If the federal takings claim does not survive this motion to dismiss, the only alleged basis for this court's jurisdiction is diversity of citizenship. If the state-law inverse condemnation action also does not survive this motion to dismiss, whether Plaintiffs will be able to satisfy the $75,000 amount-in-controversy requirement becomes a significant question. None of Plaintiffs' other state-law claims seek monetary damages, as the statutes upon which these claims are based do not provide for monetary damages as a remedy. Accordingly, because the district court's jurisdiction may turn on the viability of one or both of the closely-related takings claims, they are analyzed before Plaintiffs' other state-law claims.[6]

---

[6] Should the Fifth Amendment takings claim be dismissed, the Complaint would contain no federal question. Diversity Jurisdiction may exist. All Plaintiffs are residents of Texas, while all defendants are residents of California. However, it is not clear whether Plaintiffs can satisfy the amount in controversy requirement without their takings claim, as the takings allegation is the only claim providing for damages as a remedy. A claim for attorneys fees may be counted toward the amount in controversy if fees are recoverable under a statute or contract. Both the PRA and the Brown Act so provide, but Plaintiffs have not alleged an estimate of the amount of attorneys fees claimed.

### 3.   Takings Claim(s).

Plaintiffs assert that:

> [t]he District's actions, through the actions of its Board, in banning the amendment of Plaintiffs' Landowner Contract to prevent Plaintiffs from transferring the NSA entitlement from their land to other lands in the Service Area of the District, which amounts to a total deprivation of Plaintiffs' investment-backed expectations, and deprives Plaintiffs of any reasonable return on their investment, constitutes a seizure of the water attributable to the NSA entitlement of Plaintiffs' land; and therefore, constitutes a taking of Plaintiffs' property under California law.

(Compl. at ¶94.)

Plaintiffs appear to assert that the "taking" in this case was the passage of the resolution/ordinance on February 16, 2005, prohibiting plaintiffs from transferring water from NSA to SA lands.  This, according to plaintiffs, was a regulation that deprived them of all economically beneficial use of their property and was, therefore, the equivalent of a physical taking. To put it another way, Plaintiffs allege that their NSA water was seized by Belridge without compensation for sale to other Belridge entities.  Plaintiffs emphasize that this is not a situation in which "almost all uses are taken."  Instead plaintiffs assert that:

> the very property (water entitlement appurtenant to real property) was taken.  It is well established that real property rights encompass a "bundle of rights" and included in Plaintiffs' bundle is the right or entitlement to receive water from Belridge.  It is this property that has been taken without any compensation.

(Doc. 25 at 16-17.)

### a.   Ripeness of the Federal Takings Claim.

Although Plaintiffs' takings allegation is titled "inverse condemnation" and appears to be grounded in state law, Plaintiffs

**17**

assert in their opposition that they have properly alleged a taking under federal law. (Doc. 25 at 15.)  To the extent that any such claim is impliedly asserted in the complaint, it is unripe.

In most cases, where a state provides an adequate procedure for seeking just compensation, such as through a state action in inverse condemnation, a facial regulatory takings claim based on the Fifth Amendment is not considered ripe until the property owner has exhausted available state remedies. *Hacienda Valley Mobile Estates v. City of Morgan Hill*, 353 F.3d 651, 655 (9th Cir. 2003); *Richardson* v. Honolulu, 124 F.3d 1150, 1165 (9th Cir. 1997)(citing *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 195 (1985)).

In certain circumstances, such as when a Fifth Amendment takings claim is based on a theory that the challenged regulation does not substantially advance a legitimate state interest, a facial challenge may be deemed ripe even if the plaintiff has failed to exhaust state remedies. *See Sinclair Oil Corp v. County of Santa Barbara*, 96 F.3d 401, 405-06 (9th Cir. 1996); Spoklie v. Montana, 411 F.3d 1051, 1057 (9th Cir. 2005).

Here, Plaintiffs' do not allege that the February 16, 2005 decision fails to advance a legitimate interest of Belridge. Plaintiffs must exhaust their state judicial remedies prior to bringing a federal takings claim.  Nothing in the record indicates that Plaintiffs have pursued state judicial remedies (save for their efforts to do so with their state-law inverse condemnation action in this case).  Accordingly, Plaintiffs' federal takings claim is **DISMISSED WITHOUT PREJUDICE.**

**18**

### 4.   District Court Jurisdiction Over the State-law Inverse Condemnation Claim.

It is proper for a federal district court to assume jurisdiction over a state-law claim of inverse condemnation in a diversity action, provided the claim would be ripe under state law. *Sinclair*, 96 F.3d at 408 (assuming jurisdiction over state law inverse condemnation claims but finding claims unripe under California law).

As a general rule in California, an inverse condemnation claim based on an as-applied challenge to a regulation is not ripe until plaintiffs have exhausted the available administrative remedies (e.g., seeking a variance). However, where the inverse condemnation claim is based on a facial challenge to a regulation, there is no need to pursue administrative remedies; plaintiff may proceed directly to court. *Hensler v. City of Glendale*, 8 Cal. 4th 1 (1994)(en banc). A regulation can only be challenged facially if its terms will not permit administration that avoids unconstitutionality. *Tahoe Sierra Preservation Council v.* State Water Resources Control Bd., 210 Cal. App. 3d 1421, 1442 (1989); *see also Del Oro Hills v. City of Oceanside*, 31 Cal. App. 4th 1060, 1076 (1995) ("an ordinance is safe from a facial challenge if it preserves, through some permit procedure or otherwise, some economically viable use of the property"). However, according to the California Supreme Court's *Hensler* decision, a property owner may bring an action to set aside or void a regulation, but may only bring a <u>damages</u> claim <u>after successfully challenging the regulation</u>. See Hensler, 8 Cal. 4th at 7, 26; *see also Kavanau v. Santa Monica Rent Control Bd.*, 16

**19**

1  Cal. 4th 761, 779 (1997).

2      Here, Plaintiffs allege that the February 16, 2005 decision

3  completely prohibited the permanent transfer of water

4  entitlements from NSA lands to SA lands.  The Board did not

5  provide any mechanism (e.g., a permit process, rule, or by-law)

6  that would preserve a landowner's "right" to transfer his or her

7  water entitlement under certain circumstances.  This is a facial

8  challenge.  There is therefore no requirement that Plaintiffs

9  pursue administrative remedies prior to the initiation of an

10 inverse condemnation action.  The district court may assume

11 jurisdiction over this state law inverse condemnation claim, but

12 under *Hensler*, may only issue declaratory or injunctive relief at

13 this stage.

14     The question then becomes: Have Plaintiffs' stated a valid

15 claim for inverse condemnation under the United States

16 Constitution or California law?

17
          **5.  Does the Complaint State a Valid Inverse**
18             **Condemnation Claim.**

19     California inverse condemnation law largely parallels the

20 standards that apply to a federal takings claim.  The California

21 Constitution, article I, section 19, provides that property may

22 be taken or damaged for public use only where just compensation

23 is paid to the owner.

24             [Article I, section 19] authorizes both eminent domain
              proceedings instituted by a public entity to acquire
25            private property, as well as inverse condemnation
              proceedings initiated by a landowner to obtain
26            compensation for a claimed taking or damaging of his or
              her property. Both types of actions are governed by the
27            same principles.

28 *San Diego Metro. Transit Dev. Bd. v. Handley Hotel*, *Inc.*, 73

**20**

1  Cal. App. 4th 517, 529 (1999).

2      A local government regulation which "'goes too far' may
3  constitute a taking even though the property remains in private
4  hands." *Massingill v. Dept. of Food & Agric.,* 102 Cal. App. 4th
5  498, 508 (2002) (*citing Kavanau v. Santa Monica Rent Control Bd.*,
6  16 Cal. 4th 761, 773, (1997)).  "The property owner may bring an
7  inverse condemnation action and, if successful, the regulatory
8  agency must either withdraw the regulation or pay just
9  compensation."  *Kavanau*, 16 Cal. 4th at 773.

10     Two categories of regulatory action are considered  "per se"
11  regulatory takings (i.e., they are automatically deemed to have
12  gone "too far"):  (1) where the property owner has suffered a
13  physical invasion of his property and (2) where the regulation
14  denies all economically beneficial or productive use of land.
15  *Lucas v. So. Carolina Coastal Council*, 505 U.S. 1003, 1015
16  (1992).  If neither of those per se categories apply, a court
17  must analyze the *Penn Central* factors to determine whether a
18  regulation nevertheless constitutes a taking:

19         (1)   the economic impact of the regulation on the
20               claimant;

21         (2)   the extent to which the regulation has interfered
22               with distinct investment-backed expectations; and

23         (3)   the character of the governmental action.
24  *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124
25  (1978).

26     The California Supreme Court, in *Kavanau*, enunciated the
27  following ten additional factors, building upon *Penn Central's*
28  analysis:

**21**

(1)  whether the regulation interferes with interests
     that are sufficiently bound up with the reasonable
     expectation of the claimant to constitute property
     for Fifth Amendment purposes;

(2)  whether the regulation affects the existing or
     traditional use of the property and thus
     interferes with the owner's primary expectation;

(3)  the nature of the state's interest in the
     regulation, in particular, whether the regulation
     is "reasonably necessary to the effectuation of a
     substantial public purpose";

(4)  whether the property owner's holding is limited to
     the specific interest the regulation abrogates or
     is broader;

(5)  whether the government is acquiring resources to
     permit or facilitate uniquely public functions,
     such as government's "entrepreneurial operations";

(6)  whether the regulation permits the property owner
     to profit and obtain a reasonable return on
     investment;

(7)  whether the regulation provides the property owner
     benefits or rights that mitigate whatever
     financial burdens the law has imposed;

(8)  whether the regulation prevents the best use of
     the land;

(9)  whether the regulation extinguishes some
     fundamental attribute of ownership; and

(10) whether the government is demanding the property
     as a condition for the granting of a permit.

*Kavanau*, 16 Cal. 4th at 775-76.  The list is not comprehensive,

and the factors should be applied as appropriate rather than used

as a checklist.  *Id.* at 776.

        Before any of these standards come into play, however, the

court must as a threshold matter, determine whether Plaintiffs

possess a vested property right:

        The first step in [a] taking analyses is to determine
        whether there is a property right that is protected by
        the Constitution.  *See, e.g., Bowen v. Public Agencies
        Opposed to Social Security Entrapment*, 477 U.S. 41,
        54-55 [additional citations].  In *Public Agencies*, a

**22**

> taking case, the Court held that the contractual right at issue "\"did not rise to the level of 'property'" and "[could] not be viewed as conferring any sort of 'vested right.'" 477 U.S. at 55.  Without a property right, there could be no "taking within the meaning of the Fifth Amendment." *Id*. at 55-56.

*Peterson v. United States Dept. of Interior*, 899 F.2d 799, 807 (9th Cir. 1990).

The parties expend a great deal of energy discussing whether Belridge's conduct in this case constitutes a per se taking or satisfies the requirements of the *Penn Central* test.  The parties totally neglect, however, to address the threshold question of whether the right Plaintiffs claim was condemned by Belridge is of a type that is protected by the California or United States constitutions.

Unless Plaintiffs possess water rights separate and distinct from those granted to them under their landowner contracts, Plaintiffs' entitlement (or "right") to SWP water is defined exclusively by that contract.  Here, Plaintiffs do not claim to possess any vested water rights other than their entitlement as a District landowner to contract for water service under the landowner contracts, nor do they claim that any provision of state law conveys upon them or creates any other form of water right.  The terms of the contracts solely determine the nature of any water rights Plaintiffs hold.

Here, Plaintiffs claim that they have been injured by Defendants decision to prohibit transfers from the parcels of land designated in the landowner contracts to other parcels of land within Belridge.  Yet, the Landowner Contracts specifically prohibit the transfer of water entitlements without express

**23**

written permission from Belridge.

> Project water delivered to Buyer pursuant to this Contract **shall not be sold or otherwise disposed of by Buyer for use other than on Said Land without the prior written consent of District**.

(LC Art. 20.)   The contract does not contain a provision that the District's consent to a requested transfer shall not be unreasonably withheld

Plaintiffs purchased 1599.16 acres of NSA land in early 2000 and an additional 471.27 acres of NSA land in 2004.   At the time Plaintiffs executed the LC for the lands purchased in 2000, Plaintiffs entered into an agreement with Belridge that permitted Plaintiffs to transfer some of their NSA water to urban uses. This, however, was a limited, one-time transfer as part of a larger negotiated transfer of agricultural water entitlements to urban water users.

Plaintiffs assert that Defendants have "seized" their NSA water and suggest that this amounts to a "per se" physical taking of their property.   But, again, Plaintiff's right to water is defined by the LC and any applicable amendments.   According to these documents, Plaintiffs only right to water is for their lands in Zones of Benefits (Art. 5(b)), which may be qualified to receive water by following the service connection procedure of Article 7 for locations specified on Exhibit D.   Plaintiffs' right to receive and use water under the LC is subject to the further condition that if any water to be delivered is not for use on the lands specified in Plaintiffs' LC, the District's consent must be obtained under Article 20.   Plaintiffs have no absolute vested right to transfer their water away from their NSA

**24**

1  lands.  (Plaintiffs do not allege that they were wronged by

2  Belridge's failure to <u>deliver</u> water to their NSA land.)

3       Plaintiffs argue in the alternative that they have alleged a

4  regulatory taking because the Board's vote has deprived them of

5  "all economically beneficial use of their property."  Plaintiffs

6  suggest that the district court should follow the holding in,

7  *Tulare Lake Basin Water Storage Dist. v. United States*, 49 Fed.

8  Cl. 313, 318 (2001), where Judge Wiese held that "the federal

9  government, by preventing plaintiffs from using the water to

10 which they would otherwise have been entitled, [has] rendered the

11 usufructuary right to that water valueless, [and has] thus

12 effected a physical taking."  The Court of Claims decision has no

13 binding effect in the Eastern District of California.  Moreover,

14 the conclusory reasoning in the *Tulare Lake Basin* case is without

15 analytical foundation and is suspect, as it has been criticized

16 in the Court of Claims.  *See Klamath Irrigation Dist. v. United*

17 *States,* 67 Fed. Cl. 504, 513 (2005) (criticizing *Tulare Lake*

18 *Basin* for its failure to engage in any analysis of the contracts

19 which establish the rights in question).  In the Ninth Circuit

20 and California, it is the contract that defines the nature and

21 terms of the water right possessed by users of water from the CVP

22 or SWP.  *Peterson*, 899 F.2d at 807 ("The first step in both due

23 process and taking analyses is to determine whether there is a

24 property right that is protected by the Constitution."); *Planning*

25 *and Conservation League v. DWR*, 83 Cal. App. 4th 892, 899 (2000)

26 (SWP contractors are obligated to pay for their contractual

27 entitlements to water "whether the water is delivered or not").

28      Here, Plaintiffs' contract specifically withholds the right

**25**

to transfer water without written permission from Belridge.   In essence, Belridge's vote amounts to an announcement that no such written permission will be granted until further notice. Plaintiffs were offered an opportunity at oral argument to point to any alternative source of a vested property right in this case and were unable to do so.   Plaintiffs do not state a claim for inverse condemnation under California law.   Accordingly, Defendants' motion to dismiss the state law inverse condemnation claim is **GRANTED WITH LEAVE TO AMEND, subject to Rule 11's requirement that a good faith investigation and analysis provide a basis for the claim of a vested property right in District water.**

> ### 6.    Without the Inverse Condemnation Claim, Plaintiffs Must Demonstrate Satisfaction of the Amount-In-Controversy Requirement.

Whether the district court may assert jurisdiction over the remaining claims depends upon the amount in controversy, which will primarily be attorney's fees Plaintiffs may be able to recover as damages under their other state-law claims.   Although none of the other statutes invoked by Plaintiffs provide for damages, several provide for the recovery of attorney's fees and/or costs of suit by successful litigants.   Where a state statute so provides, such fees can be considered as part of the amount in controversy for the purposes of establishing diversity. *Missouri State Life Ins. Co. v. Jones*, 290 U.S. 199, 202 (1933); *Suber v. Chrysler Corp.*, 104 F.3d 578, 585 (3d Cir. 1997).

//

//

**7.   Political Reform Act Claim.**

The California Political reform Act ("PRA"), Cal. Gov. Code § 87100, prohibits a public official from participating in decision-making that will affect the official's own financial interest.   Essentially, this is a prohibition against conflicts of interest:

> No public official at any level of state or local government shall make, participate in making or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest.

Cal. Gov. Code § 87100.   A public official has a conflict of interest "if the decision will have a reasonably foreseeable material financial effect on one or more of his/her economic interests, unless that effect is indistinguishable from the effect on the public generally."   2 Cal. Code Regs. § 18700.

**a.   Standing.**

A private right of action to enforce the PRA is created by California Government Code § 91003:

> Any person <u>residing in the jurisdiction</u> may sue for injunctive relief to enjoin violations or to compel compliance with the provisions of this title.

(emphasis added).   Defendants argue that Plaintiffs, all of whom are residents of Texas, are not persons "residing in the jurisdiction," for purposes of § 91003.

Plaintiffs rejoin that the political reform act is to be liberally construed, to effectuate the purpose of the act: "to preclude a government official from participating in decisions where it appears he may not be totally objective because the outcome will likely benefit a corporation or individual by whom he is also employed."   Cal. Gov. Code § 81003.   Plaintiffs cite

**27**

*Kunec v. Brea Redevelopment Agency*, 55 Cal. App. 4th 511 (1997)

for the proposition that the Political Reform Act is intended to

extend, not limit, standing to bring a private civil action.

Although the *Kunec* court did not address the specific question

here presented, it noted in dicta:

> [W]e doubt whether the PRA actually requires condemnees
> to be residents of the jurisdiction where the affected
> property is located to challenge the validity of the
> governmental decision. The PRA on its face is intended
> to extend standing, not limit it. Its legislative
> findings expressly speak of the need to afford private
> citizens as well as public officials such "[a]dequate
> enforcement mechanisms" to ensure "this title will be
> vigorously enforced." (Gov. Code, § 81002, subd. (f).)
> It is absurd to allow the 35,122 residents in Brea
> standing to challenge the Agency's decision, but not
> the person with the greatest beneficial interest.
>
> Under the common law, "...those who are adversely
> affected by the operation of an ordinance may question
> its validity."  For example, in *Clark v. City of
> Hermosa Beach* (1996) 48 Cal. App. 4th 1152, 1170, a
> husband and wife whose primary residence was in
> Phoenix, but who owned a duplex in Hermosa Beach,
> challenged the validity of a city decision affecting
> their beach property. The council member who cast the
> deciding vote lived a block away and admittedly would
> lose some of his ocean views. Speaking of the
> plaintiffs' right to a fair hearing by impartial
> officials, the Clark court stated, "[T]he common law
> doctrine against conflicts of interest ... prohibits
> public officials from placing themselves in a position
> where their private, personal interests may conflict
> with their official duties." (*Id*. at p. 1171.)

*Id*. at 519 (emphasis added).

Defendants do not point to contrary authority, but rather to

reasoning more closely associated with the actual holding from

*Kunec*.  In *Kunec*, the plaintiff in a PRA case owned property in

Brea that was the subject of a condemnation action.  Although

Kunec resided initially in Anaheim, he later acquired residency

in Brea.  Defendants insisted that Kunec needed to have been a

resident when the condemnation resolution was adopted.  The *Kunec*

1  court rejected this argument:

2          [W]e reject the [defendants'] efforts to rewrite the
           PRA to insert a durational residency requirement....
3          Section 91003 contains no specific time reference for
           the residency provision, and we will not add one....
4          Our interpretation of the PRA does not render the
           residency requirement "utterly meaningless" nor does it
5          encourage "political bounty hunters" to "move about
           from jurisdiction to jurisdiction, filing lawsuit after
6          lawsuit, attempting to extract money from public
           officials." As the [defendant] itself points out,
7          Kunec can only be a resident of one jurisdiction.
           Having physically relocated from Anaheim to Brea, Kunec
8          was precluded from voting in Anaheim elections or from
           bringing PRA lawsuits within that city as a resident.
9          That is a fairly significant price to pay.

10  *Id.* at 518 (emphasis added).  Defendants suggest that this

11  passage establishes that only <u>actual residents</u> have standing

12  under the PRA.  Although it is a close call, in light of the

13  additional discussion (albeit in dicta) the underscored passage

14  is more faithfully interpreted as an acknowledgment of the need

15  to safeguard against "political bounty hunters."  Here, the

16  ownership of property is an additional safeguard against this

17  problem.  Plaintiffs own property in Belridge, within the

18  territorial jurisdiction of the court, and allege that the

19  Board's action has injured them with respect to this property.

20  Plaintiff has been "adversely affected by the operation" of this

21  vote and should be permitted to "question its validity."

22  Plaintiffs have standing to raise a challenge to the Board's

23  actions under the PRA.

24              **b.   The "public generally" exception.**

25      Defendants argue that Plaintiffs' PRA claim should be

26  dismissed as a matter of law because their actions were proper

27  under a provision of the PRA which exempts from its prohibitions

28  decisions made by Directors who are affected by the subject

**29**

matter of their vote in the same manner as the "public

generally." Cal. Gov. Code § 87103. The PRA's implementing

regulations contain a number of provisions further explaining the

application of the "public generally" exception. Defendants

point specifically to Title 2 of the California Code of

Regulations § 18707.2, titled "Special Rule for Rates,

Assessments, and Similar Decisions," which provides:

> The financial effect of a governmental decision on the
> official's economic interest is indistinguishable from
> the decision's effect on the public generally if any of
> the following apply:
>
> (a)   The decision is to establish or adjust
>       assessments, taxes, fees, charges, or rates or
>       other similar decisions which are applied on a
>       proportional basis on the official's economic
>       interest and on a significant segment of the
>       jurisdiction, as defined in 2 Cal. Code of
>       Regulations, section 18707.1(b).
>
> (b)   The decision is made by the governing board of a
>       landowner voting district and affects the
>       official's economic interests and ten percent of
>       the landowners or water users subject to the
>       jurisdiction of the district in proportion to
>       their real property interests or by the same
>       percentage or on an "across-the-board" basis for
>       all classes.
>
> (c)   The decision is made by the governing board of a
>       water, irrigation, or similar district to
>       establish or adjust assessments, taxes, fees,
>       charges, or rates or other similar decisions, such
>       as the allocation of services, which are applied
>       on a proportional or "across-the-board" basis on
>       the official's economic interests and ten percent
>       of the property owners or other persons receiving
>       services from the official's agency.

The decision in question, the February 16, 2005 vote to

prohibit the transfer of NSA water to SA lands, is not even

arguably an assessment, tax, charge, fee, rate, or other similar

decision, so sub-parts (a) and (c) do not apply.[7]   Defendant

strenuously maintains, however, that subpart (b) does apply to

the facts of this case.[8]   The parties point to no authority

---

[7]     Plaintiffs also suggest that subsection (b) should not apply here because the vote in question did not concern the increase, decrease or change in any rate or assessment.   Although the title of the provision does imply applicability to only "Rates, Assessments, and Similar Decisions" the plain language of the entire provision suggests that subsection (b) should not be so narrowly construed.   On the one hand, subsection (a) explicitly applies to decisions to "establish or adjust assessments, taxes, fees, charges, or rates or other similar decisions" and subsection (c) applies to decisions to "establish or adjust assessments, taxes, fees, charges, or rates or other similar decisions, such as the allocation of services."   In contrast, subsection (b) omits any mention of assessments, taxes, fees, or related terms, but rather applies to all decisions of a "landowner voting district" that "affect[] the official's economic interests and ten percent of the landowners or water users subject to the jurisdiction of the district in proportion to their real property interests or by the same percentage or on an 'across-the-board' basis for all classes."   Subsection (b) is not limited to rates, fees, assessments, and the like.

[8]     Defendants also suggest that Plaintiffs bear the burden of proving, at this pleading stage of the case, that the public generally exception does not apply.   Defendants point to the Minutes from the February 16, 2005 Board meeting, which have been judicially noticed, to support the assertion that the public generally exception operates to shield Defendants from liability in this case.   The Minutes state:

> [E]ven if focus is made on the Top Contract, there is no disqualifying conflict of interest since any financial effect with respect to the Top Contract would be on a Director's economic interest in proportion to the interest of the Top Contract and at least ten percent of all water users since the number of water users who are parties to the Top Contract other than [the companies associated with the Defendant Directors] exceeds ten percent of all water users in the District.

Defendants suggest that this document shows that "the Directors' vote was premised upon the 'public generally' rule contained in the PRA.... Since that was the basis for the Directors' vote, the

construing the language of §§ 18707.2(b).  The applicability of
this provision to the facts of this case presents several unique
questions that have not yet been addressed by any court.

Specifically, Defendants maintain that the February 16, 2005
vote affected at least ten percent of the other "landowners or
water users subject to the jurisdiction of the district in
proportion to their real property interests or by the same
percentage or on an 'across-the-board' basis for all classes."
Defendants make a critical assumption in support of this
assertion:  that the February 16, 2005 decision, affects all
District landowners[9] in the same way, because it prohibits <u>all</u>
landowners from transferring their NSA water to SA lands.
Operating under this assumption, Defendants present various
arithmetical analyses of the individual Defendants' property
interests vis-a-vis all other Belridge landowners.  Based on
these analyses, Defendants contend that the decision affects at
least ten percent of the non-voting landowners.  Assuming,
arguendo, the validity of Defendants' fundamental assumption,

Complaint should set forth facts that show Directors do not fall
under the public generally rule."  (Doc. 17, at 7.)  Defendants
also argue that "[b]ecause no such allegations are made, the
Complaint fails to state a claim upon which relief can be
granted."  (*Id*.) However, Defendants point to no authority that
suggests the wel l-accepted liberal pleading standard set forth
in Federal Rule of Civil Procedure 8 should be disregarded here.
Even if a different pleading standard did apply, as discussed, §
18707.2 is inapplicable to the facts of this case.

[9]    Although the regulation references "landowners or water
users," all landowners subject to Belridge's jurisdiction hold
water entitlements in proportion to their acreage.  Accordingly,
it is sufficient to refer to individuals under Belridge's
jurisdiction simply as "landowners."

1   their calculations appear to satisfy the ten percent rule.

2       Plaintiffs argue, however, that Defendants' fundamental

3   assumption is flawed, and maintain that the February 16 decision

4   does <u>not</u> affect all District landowners in the same way, because

5   it financially benefits those district landowners who are parties

6   to the Top Contract while not providing similar financial

7   benefits to other district landowners.

8       Plaintiffs' view of the effect of the February 16 decision

9   is the more persuasive, particularly in light of the purpose of

10  the PRA.  Here, the Plaintiffs allege (and Defendants do not

11  appear to dispute) that the operative effect of individual

12  landowners transferring NSA entitlement to SA lands is to

13  diminish the amount of water available under the Top Contract.

14  Accordingly, prohibiting such transfers (permanently or

15  temporarily) will ensure that the parties to the Top Contract

16  have exclusive access to these (valuable) surplus water

17  entitlements.  The PRA is designed to ensure that "[n]o public

18  official at any level of state or local government shall make,

19  participate in making or in any way attempt to use his official

20  position to influence a governmental decision in which he knows

21  or has reason to know he has a financial interest."  Cal. Gov.

22  Code § 87100.  Although the February 16, 2004 decision does not

23  directly reference the Top Contract, the beneficial effect of the

24  decision upon parties to the Top Contract is undeniable as the

25  vote ensures that Plaintiffs' NSA water is available to be

26  allocated to the Directors' Top Contract claims.

27      Assuming that the February 16, 2005 decision affects the

28  parties to the Top Contract differently from the remaining

**33**

1  landowners, the question then becomes whether § 18707.2(b)

2  nevertheless shields Defendants.  With respect to this inquiry

3  Plaintiffs raise an important threshold question: Does

4  § 18707.2(b) even apply to a decision that affects one group of

5  landowners differently from its effect on other landowners.  The

6  plain language of the provision, suggest that it does not.

7  Section 18707.2(b) provides for an exception from the PRA when:

> The decision is made by the governing board of a
> landowner voting district and affects the official's
> economic interests and ten percent of the landowners or
> water users subject to the jurisdiction of the district
> in proportion to their real property interests or by
> the same percentage or on an "across-the-board" basis
> for all classes.

12  According to the plain language of the provision, an official may

13  participate in making a decision, even if the decision affects

14  the official's economic interests, if the decision also affects

15  ten percent of the landowners or water users subject to the

16  jurisdiction of the district in a proportional manner.  The

17  provision offers three alternative ways to calculate whether ten

18  percent of other landowners are affected: (1) in proportion to

19  their real property interests; (2) by the "same percentage"; or

20  (3) on an "across the board basis."  No further definitions or

21  guidance is provided.  The "across the board" option is fairly

22  self-explanatory and applies only if all landowners are affected

23  equally by a decision.  For example, if all landowners were

24  assessed a flat fee for a particular administrative service.

25     Although the wording is not particularly clear, a similar

26  interpretation is appropriate for the "by the same percentage"

27  language.  For example, if a fee was levied at one percent of the

28  value of a landowner's water entitlement or at a fraction of the

**34**

total acres owned.  The February 16, 2005 decision affects parties to the Top Contract differently from other landowners, and neither the "by the same percentage" nor the "across-the-board" language is applicable here.

A more difficult question is whether the February 16, 2005 decision affects the Defendant Directors' "economic interests and ten percent of the landowners or water users subject to the jurisdiction of the district <u>in proportion to their real property interests</u>...."  § 18707.2(b)(emphasis added).  Both parties submit sets of calculations addressing whether or not the ten percent threshold is met, but Plaintiffs assert that these "various arithmetical scenarios" assume too much.  (Doc. 45, Pltf's Suppl. Brief, at 2.)  Plaintiffs maintain that the "in proportion to their real property interests" language of § 18707.2(b) does not apply because the allocation of benefits under the Top Contract <u>does not track the parties' proportional landownership interests in the District</u>.  Plaintiffs appear to be correct.

The chart below compiles information from various exhibits in the record.  The first two columns list the parties to the Top Contract and which, if any, Defendant is affiliated with those entities.  The third column lists the various entities' share of water under the Top Contract.  The Fourth presents the entities' share of the total land in Belridge, both in Acreage and as a percentage share of the total.  Finally, the Fifth column shows the entities' share of the total water entitlement actually used in Belridge, exclusive of any entitlement gained under the terms of the Top Contract.

| | Parties to Top Contract | Share of Top Contract[10] | Share of Total Land in Belridge[11] | Share of Total Belridge Water Entitlement (actually used)[12] |
|---|---|---|---|---|
| Defendants Phillimore & Baker[13] | Paramount Business Entities:[14] | | | |
| | Paramount Land Company | 14.46% | 6,962.71 A (7.26%) | 2,456.17 AF (2.37%) |
| | Paramount Citrus Association | 0 | 2,833.75 A (2.95%) | 8,758.14 AF (8.45%) |
| | Paramount Orchards | 0 | 21,257.33 A (22.16%) | 52,088.69 AF (50.28%) |
| | Paramount Farms | 0 | 396.42 A (0.41%) | 0 |
| | Belridge New Farming LLC | 62.84% | 0 | 0 |
| *Total for Phillimore & Baker* | | *77.3%* | *32.78%* | *61.1%* |
| Defendant Starr | Starrh & Starrh Cotton Growers | 16.61% | 6,444.91 A (6.72%) | 13,289.39 AF (12.84%) |
| Non-Defendant Parties to the Top Contract | BLC Farmlands, LLC | 0.16% | 80.00 A (0.08%) | 159.20 AF (0.15%) |
| | California Pistachio, Inc. | 0.19% | 87.17 A (0.09%) | 190.81 AF (0.18%) |
| | Chaparral Industries, Inc. | 2.02% | 965.93 (1.01%) | 2,047.77 AF (1.98%) |
| | Rod Steifvater | 1.00% | 2,446.90 A (2.55%) | 1,113.83 AF (1.08%) |
| | Steifvater et al. | 1.79% | 1277.06 (1.33%) | 4,256.24 AF (4.11%) |
| | Theta Oil and Land Company | 0.93% | 796.36 (0.83%) | 947.96 AF (0.91%) |

[10] Figures for this column taken from the Top Contract.  (Hughes Decl., Ex. A.)

[11] Figures for this column taken from Defendants' supplemental brief.  (Doc. 44, Hammett Decl., Ex. G.)

[12] Figures for this column taken from Plaintiffs' supplemental brief.  (Doc. 45 at 13.)

[13] Defendants Phillimore and Baker are grouped together for purposes of this analysis because their interests appear to be intertwined.  Defendants own briefing concedes as much.  (*See* Doc. 43 at 6.)

[14] Although Paramount Land Company is the only Paramount entity that is a party to the Top Contract, all of the Paramount entities are considered together in this analysis because they are clearly intertwined and controlled by the same individuals.

1    Without even attempting to apply the ten percent rule, it is

2  evident that the Defendants' share of water under the Top

3  Contract (and therefore the parties' share of the benefits of the

4  Top Contract) does not track either their proportional land

5  ownership or their water entitlement.  For example, Defendant

6  Starr holds a 16.61% share of water under Top Contract, but 6.72%

7  of the total land in Belridge and 12.84% of the total used water

8  entitlement.  Similarly, Defendants Pillimore and Baker, who are

9  together affiliated with the Paramount entities and Belridge New

10  Farming, hold a 77.3% interest in the Top Contract, but (counting

11  all of their related entities) only 32.78% of the total acreage

12  in Belridge and 61.1% of the total used water entitlement.  Some

13  of the non-defendant parties to Top Contract hold shares in the

14  Top Contract that are similar to their overall share of

15  Belridge's used water entitlement (for example, BLC Farmlands,

16  California Pistachio, Chaparral, and Theta Oil), but such is not

17  the case with the Steifvater entities.  Overall, the record

18  reveals that Defendants' collective share in the Top Contract is

19  disproportionately larger than their share of either the land in

20  Belridge or of the used water entitlement.  It is inappropriate

21  to apply § 18707.2(b), which is supposed to exempt officials who

22  make decisions affecting their own economic interests only if the

23  decision also affects "ten percent of the landowners or water

24  users subject to the jurisdiction of the district in proportion

25  to their real property interests...."  (emphasis added).

26    Under the facts and circumstances of this case, applying the

27  § 18707.3(b) exemption would not comport with the over-arching

28  purpose of the PRA: to ensure that "[n]o public official at any

**37**

1  level of state or local government shall make, participate in

2  making or in any way attempt to use his official position to

3  influence a governmental decision in which he knows or has reason

4  to know he has a financial interest."  Cal. Gov. Code § 87100.

5  Although the parties have not pointed to any legislative history,

6  judicial interpretation, or administrative guidance on the

7  intended scope and purpose of § 18707.2(b), it is reasonably

8  inferred that the purpose of the exception is to permit

9  interested directors to only make decisions for landowner voting

10  districts when these decisions affect all landowners in a fair

11  and even-handed manner.  The complaint alleges that Defendants;

12  actions have preferred their economic self-interest to the

13  detriment of other district members.

14      Defendants' motion to dismiss Plaintiffs' PRA claim is

15  **DENIED.**

16

17               **8.   California Government Code § 1090.**

18      Section 1090 of the California Government Code prohibits

19  Directors of a water district from being "financially interested

20  in any <u>contract made by them</u> in their official capacity, or by

21  any body or Board of which they are a member."  Cal. Gov. Code

22  § 1090 (emphasis added).  Section 1090 "encompass such

23  embodiments in the making of a contract as preliminary

24  discussions, negotiations, compromises, reasoning, planning,

25  drawing of plans and specifications and solicitations for bids."

26  *Millbrae Assoc. for Residential Survival v. Millbrae*, 262 Cal.

27  App. 2d 222, 237 (1968).

28      Plaintiffs appear to concede that the Defendant directors

**38**

did not actually cause the Top Contract to be created.  The Top
Contract was drafted and signed prior to any of the Defendant
Directors becoming members of the Board.

Plaintiffs also appear to concede that the February 16, 2005
vote did not expressly "make" a contract.  Rather, Plaintiffs
assert that:

> The Board's action at the February 16, 2005 special
> Board meeting amended the Top Contract into a permanent
> contract whereby all of the NSA entitlement is
> permanently made available to the Buyers under the Top
> Contract, effectively transforming the Top Contract
> from an interim or temporary measure into a permanent
> arrangement.

(Doc. 1, Compl., at ¶77.)  Essentially, Plaintiffs argue that the
adoption of the policy was a de facto contract amendment,
"insuring a supply of seized NSA water to Top Contract buyers."
(Doc. 25 at 12.)  Plaintiffs offer no legal support for the
proposition that liability under § 1090 may be triggered by such
an implied amendment.  (The appropriate legal remedy appears to
be under the PRA.)

Plaintiffs also suggest that *Milbrae* and its progeny call
upon courts to read of the statutory language liberally.  For
example, in *Thomson v. Call*, 38 Cal. 3d 633 (1985), a complex,
multi-party contract transaction was found to be "part of a
single multiparty agreement."  It was therefore improper for a
city councilman, whose own property was acquired in one of the
more tangential transactions, to have participated in the making
of any of the interrelated contracts:

> [T]he prospect that performance of the contract would
> involve acquisition of the [councilman's land and
> conveyance of that land to the city was contemplated by
> all parties....[T]he policy goals of section 1090
> support the rule that public officers "are denied the
> right to make contracts in their official capacity with
> themselves or to become interested in contracts thus
> made."

*Id.* at 645.  A similarly broad view of the meaning of the term

"contract" was taken in *People v. Honig*, 48 Cal. App. 4th 289

(1996).  In that case, a state educational official was married

to the founder and director of a nonprofit corporation involved

in education.  At this official's direction, grants were made by

the state to certain school districts.  But, these funds were

actually used to pay the salaries of employees who worked for his

wife's nonprofit organization.  The official was found to have

violated § 1090 because he had indirectly caused the improper

contracts to be made.  The *Honig* court reasoned:

> In considering conflicts of interest we cannot focus
> upon an isolated 'contract' and ignore the transaction
> as a whole. It appears clear that the payment of DOE
> funds to the school districts, the districts' payment
> of those funds to QEP employees in the form of
> continued salaries and benefits, and the employees'
> work for QEP, were in performance of single multiparty
> agreements. In short, defendant simply used the school
> district contractors as conduits to funnel DOE funds to
> individuals as compensation for working for his wife's
> corporate employer. The use of a third party as a
> contractual conduit does not avoid the inherent
> conflict of interest in such a transaction.

*Id.* at 320.  *See also People v. Gnass*, 101 Cal. App. 4th 1271,

1293 (2002)("[T]he test is whether the officer or employee

participated in the making of the contract in his official

capacity.").

     Although these cases take a broad view of the term contract,

Plaintiffs suggest an even broader interpretation of § 1090.

Under Plaintiffs' interpretation, any vote of a government

official that advances an independent existing contractual

interest held by that government official would be prohibited by

§ 1090.  Plaintiffs essentially argue that § 1090 should be read

**40**

to subsume any action that advances a contractual interest.  This in effect rewrites § 1090.  (Noticeably, § 1090 lacks the "public generally" exception which threatens Plaintiffs' PRA claim.)  The Belridge Board's vote on the transfer of NSA water is not a "contract made" by the Board, unless an agreement between the district and the Top Contractors results from the vote.  Defendants' motion to dismiss the § 1090 claim is **GRANTED WITH LEAVE TO AMEND.**

### 9.    Brown Act Claims.

The Brown Act is California's local government open meeting law.  Belridge is a "local agency" covered by the Brown Act.  Cal. Gov. Code §§ 54950.5, 54951.  Among other things, the Brown Act sets forth various procedural requirements for local government meetings, including requirements for the posting of agendas prior to such meetings.  For example, at least 72 hours before a "regular meeting," a local legislative body must post an agenda containing a "brief general description of each item of business to be transacted or discussed at the meeting...." § 54954.2.  Other types of meetings are subject to different notice requirements.  For example, "special meetings" must be "posted at least 24 hours prior to the special meeting in a location that is freely accessible to members of the public." § 54956.

The parties dispute whether the February 16, 2005 meeting was an "adjourned regular meeting" or a "special meeting." Defendants contend that it was an "adjourned regular meeting," pointing to the minutes from the February 16th meeting.  As such,

1   Defendants submit the meeting was subject to the regular
2   notification procedures under the Brown Act.

3       Plaintiffs insist that the meeting was actually a "special
4   meeting" pointing to passages from the appointment calendar of
5   Belridge's manager, Greg Hammett, which indicates that a "Special
6   Board Meeting" was held on February 16, 2005 at 1:30 pm.
7   Plaintiffs also submit that the February 16th meeting must be
8   considered a special meeting because Defendants altered the
9   agenda item from that which was posted for the January 11, 2005
10  meeting.  Plaintiffs argue that "such an impermissible change in
11  the agenda without following the procedures for a Special Meeting
12  appears to be a clear violation of the Brown Act...."  (Doc. 25
13  at 14.)  However, Plaintiffs cite no authority for this
14  proposition.  Nothing in the Brown Act explicitly prohibits
15  alteration of an agenda prior to holding re-adjourned regular
16  board meeting.  What seems to be required prior to the re-
17  adjourned regular meeting is the re-posting of some agenda that
18  complies with the Brown Act's provisions.  Here, such an agenda
19  was posted.  The agenda announced that the following topic would
20  be considered "Policy re: Permanent Transfer of Annual
21  Entitlement from Non-Service Area to Service Area."  This is a
22  "brief general description of each item of business to be
23  transacted or discussed at the meeting...."  § 54954.2.  Absent
24  any other procedural objection, Plaintiffs have failed to state a
25  claim under the Brown Act.

26      Defendants motion to dismiss the Brown Act Claim is **GRANTED**
27  **WITH LEAVE TO AMEND.**

28

**42**

**10.  Unfair Competition Claim.**

California's Business and Professions Code § 17203 allows any "person" to sue for an injunction to prevent any other "person" from engaging in "unfair competition."  Section 17200 defines unfair competition:

> [U]nfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

Essentially, an action based on the Unfair Competition Statute "to redress an unlawful business practice 'borrows' violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under [] § 17200 et seq., and subject to the distinct remedies provided thereunder." *Farmers Ins. Exch. v. Superior Court*, 2 Cal. 4th 377, 383 (1992)

Defendants first assert that plaintiffs have not alleged violations of any other statute.  As discussed above, at least one other statutory claim remains.

Defendants argue in the alternative that public entities are not "persons" under § 17201.[15]  *See Cal. Med. Ass'n Inc. v. Regents of the Univ. of Calif*, 79 Cal. App. 4th 542, 550-51 (2000).  Plaintiffs concede this with respect to Belridge itself, but maintain that the individual defendants are not immune from

---

[15]   Section 17201 provides that "As used in this chapter, the term <u>person</u> shall mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons."

**43**

liability.  Plaintiffs point to several cases which have held
public officials liable for violations of the PRA and California
Government Code § 1090.  (*See* Doc. 25, at 17:25.)  Plaintiffs
point to no similar authority holding public officials liable for
their decisions under the Unfair Competition Statute.  By analogy
to the federal RICO laws, which prohibit unlawful racketeering
acts, which include violations of the antitrust laws, individual
public officials can be liable.  *United States v. Thompson*, 685
F.3d 993 (6th Cir. 1982).  Moreover, a public entity can be a
racketeering enterprise for RICO purposes.  *United States v.
Freeman*, 6 F.3d 586, 597 (9th. Cir. 1993).  It is not unwarranted
to apply the Unfair Competition law to unlawful anti-competitive
conduct by public officials in the performance of their official
duties.  Defendants' motion to dismiss the Unfair Competition
Claim is **DENIED.**

### B.   <u>Motions to Disqualify.</u>

Plaintiffs move to disqualify attorneys Joseph Hughes, of
Kuhs, Parker & Hughes ("KPH"), and Nicole Tutt, of Nossaman,
Gunther, Knox & Elliot L.L.P.  (Docs. 23 & 24.)

Mr. Hughes is the Assistant Secretary of Belridge and has
appeared in this case as an advocate on behalf of both Belridge
and Defendant Starrh.  Plaintiffs submit that Mr. Hughes may be
subject to deposition and giving testimony because Defendant
Starrh apparently asserts that he acted on Mr. Hughes' legal
advice.  Plaintiffs note that Mr. Hughes has submitted sworn
declarations in this case concerning the authenticity of various
documents in dispute.  Finally, Plaintiffs assert that Mr. Hughes

**44**

may have played a role in preparing and negotiating the Top
Contract, and in preparing the Minutes and Agenda for the
February 6, 2005 meeting, all of which are at issue in this case.

Ms. Tutt prepared a memorandum regarding conflict of
interest issues involving Belridge and Defendants Phillimore and
Baker.  This memorandum was distributed as part of the "agenda
packet" for the February 16, 2005 Board meeting and was
referenced in the Minutes from that meeting.  Specifically, the
memorandum concludes that Defendants Phillimore and Baker do have
a conflict of interest under the PRA but that they "likely" would
qualify under the "public generally" exception.   The memorandum
states that the "Board is considering a water transfer policy
that would apply equally to any and all persons within the
district."  But, according to Defendants, the policy Tutt
analyzed in her memorandum was one that would impose a fee upon
transfers, not one that would bar transfers altogether.
Plaintiffs believe that Defendants will assert advice of counsel
as a defense.  Plaintiffs assert that they have the right to
conduct discovery concerning this defense, and that this
discovery will require both Mr. Hughes and Ms. Tutt to appear as
witnesses.

Plaintiffs point to rules from the ABA Model Code of
Professional Responsibility and the ABA Model Rules of
Professional Conduct, which generally prohibit advocates from
appearing as witnesses in a case.  These rules make exception for
certain extreme circumstances which do not apply in this case.
As a threshold matter, Plaintiffs point to the wrong set of
rules.  The rules which apply here are the Rules of Professional

**45**

conduct of the State Bar of California ("State Rules").  *See*

Local Rule 83-180(e).

The State rules permit an advocate to appear as a witness if

<u>either</u> the testimony would pertain to an uncontested matter <u>or</u> if

the advocate has the informed, written consent of the client.

*See* State Rule 5-210.[16]  Defendants have given their written

consent in this case.  Defendants also maintain that there is no

reason either lawyer will be required to testify before a jury on

a contested matter.  Defendants insist that there are many other

witnesses who can speak to the same set of facts.  If any

conflict exists, it is between Defendant Starrh and the two

lawyers who gave him advice.  Plaintiffs are not injured by the

existence of such a conflict.  If facts developed in discovery

show otherwise, Plaintiff may resubmit the issue of any conflict

of counsel.  Plaintiffs' motion to disqualify is **DENIED WITHOUT**

**PREJUDICE**


## VI.   <u>CONCLUSION</u>

For the reasons set forth above,

(1)   Defendants' motion to dismiss the federal takings claim

and state-law inverse condemnation claim is **GRANTED**

**WITH LEAVE TO AMEND subject to Rule 11's requirement**

**that a good faith investigation and analysis provide a**

**basis for the claim of a vested property right in**

**District water**.

(2)   Defendants' motion to dismiss the Political Reform Act

claim is **DENIED**.

---

[16]   Available at http://www.calbar.ca.gov.

(3)   Defendants' motion to dismiss the California Government Code § 1090 claim is **GRANTED WITH LEAVE TO AMEND.**

(4)   Defendants motion to dismiss the Brown Act Claim is **GRANTED WITH LEAVE TO AMEND.**

(5)   Defendants' motion to dismiss the Unfair Competition claim is **DENIED.**

(6)   Plaintiffs' motions to disqualify are **DENIED WITHOUT PREJUDICE.**

Plaintiff shall file any amended complaint within **twenty (20) days** of the date of service of this order.

**SO ORDERED**

**___/S/ Oliver W. Wanger___**
**OLIVER W. WANGER**
**United States District Judge**

47