1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **L.H. MEEKER, et al.,**<br><br>                    **Plaintiffs,**<br><br>            **v.**<br><br>**BELRIDGE WATER STORAGE**<br>**DISTRICT, et al.,**<br><br>                    **Defendants.** | **1:05-CV-00603 OWW SMS**<br><br>**ORDER GRANTING DEFENDANTS'**<br>**MOTION TO DISMISS (DOC. 64)**<br>**AND DENYING PLAINTIFFS' MOTION**<br>**FOR PRELIMINARY INJUNCTION**<br>**(DOC. 70).** |

**I.   INTRODUCTION**

This case concerns water entitlements appurtenant to lands located in the Belridge Water Storage District ("Belridge") in Kern County, California.  Plaintiffs L.H. Meeker, Debra Wood Brants, James M. Shaffer, and Robert E. Sweeney, all residents of Texas, own lands within Belridge along with appurtenant water rights.  Some of Plaintiffs' lands are serviced by Belridges' water supply system ("Service Area" or "SA" lands) while some are not ("Non-Service Area" or "NSA" lands).  Plaintiffs assert, generally, that Belridge and certain members of Belridge's Board of Directors, namely William D. Phillimore, Robert E. Baker, and Larry Starrh ("Defendants"), violated various provisions of California law and effected takings of their property (water) without just compensation by passing a resolution that prohibited the transfer of water entitlements from NSA lands to SA lands.

Plaintiffs initial complaint, filed May 3, 2005, alleged

**1**

that the passage of the resolution by the Belridge Board should
be declared void because it violated (1) the Political Reform
Act, Cal. Gov. Code § 87100, which prohibits any public official
from making decisions in which he or she knows or has reason to
know that he or she has a financial interest; (2) California
Government Code § 1090, which prohibits public officials from
being financially interested in any contract made by them in
their official capacity; and (3) the Ralph M. Brown Act, Cal.
Gov. Code §§ 54950-54963, which requires that local legislative
bodies hold open meetings and public agendas of topics to be
discussed at those meetings in accordance with the requirements
of the Act.  (Doc. 1.)  In addition, the initial complaint
alleged that the Board's actions constituted (4) a taking of
property without just compensation in violation of the Fifth
Amendment to the United States Constitution and subjects Belridge
to inverse condemnation exposure under state law; and (5) unfair
competition based on an unlawful business practice, entitling
Plaintiffs to injunctive relief.  (See *id*.)

Defendants moved to dismiss the initial complaint.  (Doc.
16, filed May 31, 2005.)  A memorandum decision issued January
17, 2006, dismissed with leave to amend the federal takings and
state-law inverse condemnation claims, along with the California
Government Code § 1090 and Brown Act claims.  The Political
Reform Act and Unfair Competition claims survived.  (Doc. 48.)

Plaintiffs then filed a second amended complaint on April 4,
2006, re-alleging all of the claims contained within the initial
complaint along with a host of new sate-law causes of action:

**2**

1.    Violation of Political Reform Act of 1974;

2.    Violation of Gov't Code § 1090;

3.    Violation of Common Law Conflict of Interest;

4.    Inverse Condemnation;

5.    Conversion;

6.    Breach of Written Contract;

7.    Breach of Implied in Fact Contract;

8.    Breach of the Implied Covenant of Good Faith and Fair Dealing;

9.    Intentional Interference with Prospective Economic Advantage;

10.   Negligent Interference with Prospective Economic Advantage;

11.   Unfair Competition;

12.   Violation of Ralph M. Brown Act;

13.   Violation of Water Code § 43003;

14.   Failure to Complete District Project;

15.   Violation of Rights of Association et al.

(Doc. 62.)

Defendants move to dismiss all but two of the claims in the SAC for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. 65)  (Defendants do not challenge the Political Reform Act and Unfair Competition claims, the only two claims to survive the previous motion to dismiss.) Plaintiffs oppose dismissal (Doc. 85) and move separately for a Preliminary Injunction (Doc. 70).

//

//

3

1

## II.  **BACKGROUND**

2      Plaintiffs own land within the jurisdiction of the Belridge

3  Water Storage District ("Belridge").  Belridge contracts with the

4  Kern County Water Authority ("KCWA") to receive water.  KCWA in

5  turn contracts with the State Department of Water Resources

6  ("DWR") to receive a supply of water from the State Water Project

7  ("SWP").  Jurisdiction is invoked under 28 U.S.C. § 1332, because

8  there is complete diversity and the amount in controversy is more

9  than $75,000.00 exclusive of costs.

10      KCWA entered into a contract with DWR in the early 1960s,

11  pursuant to which KCWA was granted a maximum entitlement of

12  1.1534 million acre feet per year.  Belridge's contract with KCWA

13  grants Belridge an allocation of 163 thousand acre feet per year

14  from KCWA's maximum annual entitlement.

15      Belridge's distribution of its 163 thousand acre feet per

16  year annual entitlement to users is subject to, among other

17  things, the California Water Storage District Law, which requires

18  equitable allocation to the lands within Belridge, subject to

19  other existing priorities of use.  There are no "priority" zones

20  within Belridge that might entitle certain lands to higher

21  priority than other lands.

22      Belridge is a landowner voting Water Storage District

23  governed by a five-member Board of Directors ("Board").  *See*

24  Water Code § 41000.  The members of the Board are "public

25  officials" for the purposes of the Political Reform Act.  *See*

26  Gov. Code § 87100.

27  //

28  //

**4**

1        **A.   The Landowner Contracts.**

2        Belridge encompasses lands that are currently served by the

3  Belridge water distribution system ("Service Area" or "SA" lands)

4  and land that is entitled to receive water but is not currently

5  served by the distribution system ("Non-Service Area" or "NSA"

6  lands).  Plaintiffs own both SA and NSA land in Belridge.  All SA

7  and NSA lands are entitled to receive water pursuant to recorded

8  contracts ("Landowner Contracts") with Belridge.

9        The Landowner Contracts ("LCs") were first entered into in

10  1966, but have been amended several times, most recently in 2004.

11  The initial LC was between the Belridge Water Storage District

12  and the Occidental Land & Development Co., Ltd.  (*See* Doc. 39,

13  Carlson Suppl. Decl., Ex. 1 at 1.[1])  Article 5(b) of the LC sets

14  forth the method for calculating the <u>volume</u> of a Buyer's

15  entitlement to water under the contract:

16                  Commencing with the year of initial delivery,
                    [Belridge], each year, shall make available for
17                  delivery to Buyer in each Zone of Benefit, as such
                    zones are shown on the plan attached hereto as Exhibit
18                  "A", the amount of Project Water expressed in acre feet
                    which is the product of Buyer's acre foot per acre
19                  antitlement in such Zone of Benefit for such year as
                    set forth in Exhibit "C" hereto attached multiplied by
20                  the number of "owner acres" included within the portion
                    of Said Land in said Zone of benefit.  The total of all
21                  such amounts, for any year is referred to in this
                    Contract as Buyer's annual entitlement for such year.
22
23  Article 6 explains that Belridge's delivery obligation is limited

24  to the delivery of Project Water to specified locations (set

25  forth in Exhibit D to the LC):

26  ─────────────
        [1]    The obligations contained within the LC were made
27  subject to the obligations and limitations imposed upon the
    District by the contract between the State of California
28  Department of Water Resources and the Kern County Water Agency.

> Project Water made available to Buyer pursuant to this Contract shall be delivered to and accepted by Buyer **only at the locations specified on Exhibit "D"** hereto attached at which District has installed delivery structures in accordance with Article 7 hereof

(LC Art. 6 (emphasis added).)   Article 7 sets forth additional rights and obligations regarding the delivery of water to the locations specified in Exhibit D:

> District shall, on six (6) months written request from Buyer and upon payment by Buyer to District of the connection service charge of District then in effect, install and thereafter maintain during the term of this Contract delivery structures **at such of the locations designated on Exhibit "D"**, as Buyer shall direct.  Said delivery structures shall be and remain the property of District.  The cost of repairing any such structure damages by cause other than normal wear or negligence of District shall be paid by Buyer to District promptly upon written demand.

(LC Art. 7 (emphasis added).)   Nothing in the record clearly explains the relationship between the locations designated on "Exhibit D" and the locations of Plaintiffs' lands.  However, Plaintiffs do not allege that their NSA lands are serviceable by delivery structures at any of the locations designated in Exhibit D as points of delivery.

The right to receive water under the LC is "appurtenant to [the] land," (LC Art. 21), but a Buyer's ability to transfer the appurtenant water entitlement to other lands is limited:

> Project water delivered to Buyer pursuant to this Contract shall not be sold or otherwise disposed of by Buyer for use other than on Said Land without the prior written consent of District.

(LC Art. 20.)

//

//

//

**6**

1        **B.    <u>Plaintiffs' Lands and Water Entitlements</u>.**

2        The parcels in question in this suit passed from Occidental

3   to a series of subsequent landowners, each of whom specifically

4   assumed the duties and rights under the LC by signing an

5   "Agreement Amending the Landowner Contract with Belridge Water

6   Storage District for a Water Supply." (Doc. 39, Exs. 3, 4, 5 &

7   7.)  On February 1, 2000, Plaintiffs assumed the terms of the LC

8   for six parcels of land totaling 1599.16 acres, with associated

9   water entitlements of slightly more than 27,000 acre feet. (*See*

10  *id*. Ex. 7.)

11       Also on February 1, 2000, Plaintiffs entered into an

12  additional agreement amending their water supply contract.  This

13  amendment permits the permanent transfer of an unspecified volume

14  of Plaintiffs' water entitlement so that Belridge could

15  permanently transfer such water entitlement (along with other

16  water entitlements secured from other landowners) to urban users

17  pursuant to a separate agreement. (*See id*. Ex. 6.)  This was a

18  one-time transfer for which Plaintiffs were compensated.

19       Finally, at some point in early 2004, Plaintiffs appear to

20  have purchased an additional 471.27 acres within Belridge.  On

21  February 3, 2004, Plaintiffs entered into an agreement with

22  Belridge assuming the rights and duties under the LC for those

23  parcels. (*See id.* at Ex. 7.)  The record reflects no additional

24  agreement transferring any portion of the water entitlement

25  appurtenant to these 471.27 acres to other lands.

26  //

27  //

28  //

**7**

**C.    The Agricultural Interests of the Defendant Directors**.

Belridge Directors William Phillimore, Robert Baker, and Larry Starrh are connected with various agricultural enterprises operating within Belridge.

Mr. Phillimore is the President of the Belridge Board.  He is also affiliated in one way or another with the following agricultural enterprises:

- Paramount Farming Enterprises, Inc. ("PFE"), Executive Vice President and Chief Financial Officer.
- Paramount Land Company, L.P. ("PLC"), Executive Vice President and Chief Financial Officer.
- Belridge New Farming, LLC ("BNF"), Executive Vice President and Chief Financial Officer.
- Paramount Orchards Partners VI, LLC ("POP"), Executive Vice President and Chief Financial Officer.
- Paramount Farming Company, LLC ("PFC"), Executive Vice President and Chief Financial Officer.[2]

These entities, collectively referred to as the "Paramount Business Entities" are connected to one another in a variety of ways.  For example, PFE is the managing partner of PLF, while PFC manages PLC and POP pursuant to a farm management agreement.  PLC and POP own land in Belridge.

Mr. Phillimore is also the Executive Vice President and Chief Financial Officer of West Valley Acquisition Corporation and Westside Mutual Water Company, LLC, from each of which Mr. Phillimore receives a salary in excess of $100,000 per year.  Plaintiffs assert that these two additional entities may be related to the Paramount Business Entities.

Robert E. Baker is the Secretary of Belridge's Board.  He is also employed by PFC as "Ranch Manager" for which employment he

---

[2]    According to the complaint, Mr. Phillimore receives a salary in excess of $100,000 from PFE, BNF, POP and PFC.

**8**

receives a salary of $100,000 per year along with an annual bonus based on the overall profitability of the Paramount Business Entities.

Larry Starrh is the Belridge Board's Treasurer.  Mr. Starrh is also a partner in Starrh & Starrh Cotton Growers, which pays Mr. Starrh a salary in excess of $100,000 per year.

### D.   **The Top Contract**.

The District's water entitlement from KCWA is sufficient to provide an annual entitlement to lands in both the SA and the NSA.  However, because no structures exist to permit delivery to NSA lands, Belridge cannot charge NSA landowners for water. Nevertheless, the District's contract with KWCA still requires that the District pay KWCA for the entire entitlement (i.e., both SA and NSA water).  This creates a shortfall in revenue for the District.  In response, in 1999 the District entered into a contract (the "Top Contract") with certain entities in Belridge, including entities connected to the three individual Defendants in this case, which allows contracting parties to purchase water that is allocable (but undeliverable) to the NSA lands.  The water available for purchase under the Top Contract is known as "Top Water."  The parties to the Top Contract purchase Top Water from Belridge and use it on their SA lands.

Specifically, parties to the Top Contract purchase from Belridge portions of the annual entitlement associated with NSA lands as of January 1, 1999, less any portion transferred outside the NSA after January 1, 1999.  Each party to the Top Contract is entitled to purchase a certain percentage of the NSA entitlement. The parties to the Top Contract are not required to pay any

transfer charges to change the place of use of Top Water from NSA to SA lands.

In exchange, the parties to the Top Contract agreed to make annual payments to Belridge (the "Buyer's Agency Charge," the "Buyer's District Capital Charge," "The Buyer's Delivery Charge," and the "Buyer's Overhead Charge").  These fees help to cover Belridge's costs (under Belridge's KCWA contract) and the costs of delivering water to the SA lands.

The Top Contract gives each Buyer a right of termination under certain circumstances by specified dates.  These dates have expired and no Buyers exercised their right of termination.

Belridge New Farming LLC (62.84%), Starrh & Starrh Cotton Growers (16.61%), and Paramount Land company (14.46%) held the three largest phases of the Top Contract.  The remainder is held by others.

The operative effect of Plaintiffs' proposed transfer from NSA to SA lands would be to decrease the volume of water available for distribution under the Top Contract.

**E.   Pre-Existing NSA Water Transfer Policy.**

On May 3, 1999, Belridge adopted a policy regarding the permanent transfer of water from the NSA to the SA.  The policy provides "that no transfer fee should be charged for transfers from the NSA to the SA unless the transfer is a stepped transaction, i.e., where entitlement is transferred from the NSA to the SA and then the SA land owner permanently transfers entitlement outside the District within a five year period from the transfer from the NSA to the SA."  (SAC at ¶91.)

**F.   <u>Plaintiffs' request to use NSA water on SA lands</u>.**

Plaintiffs requested permission to use the water entitlements associated with their NSA lands on SA lands.   In order to obtain permission to use NSA-attributable water on SA land, Plaintiffs' Landowner Contracts must be amended.   If such amendment is not permitted, Plaintiffs cannot use their water entitlements.

On January 10, 2005, Plaintiffs sent a letter to the Board, notifying the Board that they intended to "request to have [their] non service area water activated into the service area. More specifically, [they] plan on farming with this water with Sandridge Farms and or other existing land owners and we depend on this water for the economic use of our lands in the district." (Doc. 18, Hughes Decl., Ex. D.)   The letter went on to state:

> We have been informed of a series of meetings the
> district has had regarding two requests that land
> owners have made in early 2004.   The two land owners
> are Sandridge and Chevron.   We have been made aware of
> an identical request from a land owner, Stiefvater,
> which was approved under the same Board Policies that
> are currently in place.   I have been informed that
> several of the current Board Members have been
> participating in discussions, talked to the manager and
> have voted to delay the transfer of this water.   It
> appears these Board members currently may have free use
> of about 10,000 acre feet of water of this character
> through a unique arrangement set up by the Board and
> called top contracts.   If the foregoing is true, the
> value of the top contracts of these Board Members is in
> excess of 10 million dollars assuming a value of $1,000
> per acre foot.

*(Id.)*

**G.   The Allegedly Improper/Unlawful Vote.**

On January 11, 2005, the Board held a regularly scheduled board meeting.   The agenda for that meeting referenced the following item:

Legal Counsel:

> (a) Report re: Charge for Permanent Transfers from Non-service Area to Service Area.

(Doc. 25, Carlson Decl., Ex. 7).  No vote on this issue was taken during the January 11, 2005 meeting.  Instead, the meeting was adjourned until February 16, 2005 to allow time for public comment and for the board to consider the matter.

The agenda for the February 16, 2005 meeting includes the following modified agenda item:

Other Business:

> a. Policy re: Permanent Transfer of Annual Entitlement from Non-Service Area to Service area.

(Doc. 19, Req. for Judicial Notice, Ex. C.)

On February 16, 2005, the Board voted 3-2 to <u>prohibit</u> amendments to Landowner Contracts that would transfer water from NSA land to SA land.  The three votes in favor of the prohibition were Defendant Directors William Phillimore, Robert Baker and Larry Starrh.

On March 18, 2005, in accordance with the exhaustion requirements of the Brown Act, Cal. Gov. Code § 54960.1, Plaintiffs sent a letter to the Board demanding that the action be nullified because the vote violated the terms of the Brown Act.  On April 18, 2005, the Board refused to nullify the vote.

**H.  <u>Past & Pending Transfers and Sales of Water Entitlements From the NSA.</u>**

The complaint alleges that several permanent transfers of water entitlements from the NSA have been permitted in the past. For example, the Monterey Agreement "provided for the permanent transfer of 130,000 Acre feet of SWP water entitlement from

**12**

agricultural water users to Urban Users...." (SAC ¶82.) The
entire Board voted to amend the landowner contracts to permit
these transfers. As part of the implementation of the Monterey
Agreement, Belridge and Plaintiffs "executed an amendment to
their landowner contract which authorized the permanent transfer
of a portion of the Plaintiffs' annual entitlement for transfer
outside of the District...." (*Id.* at ¶83.) Plaintiffs were
compensated in the amount of $500,001.00 for 710.5 acre feet.
(*Id.* at ¶¶83-85.)

In addition, "[s]ince 1986, 38,916 Acre feet of water
entitlement has been transferred from the NSA to the SA. These
transfers have included members of the Top Contract. Over 6000
acre feet of annual entitlement has been transferred outside of
the NSA to the SA since the Top Contract became effective." (*Id.*
at ¶88.) The SAC further specifics:

> 89. Starting as early as March 6, 1990, Paramount
> Farming Company requested from the Board the right to
> transfer water entitlement outside the District. Again
> on December 4, 1990, Paramount Farming Company asked
> the Board to develop programs to allow for water
> transfer outside of the District. Legal Counsel advised
> at the time that uses of water outside the District
> would require a finding that there was no need for the
> water within the District.

> 90. On February 14, 1999 Mr. Scott Hamilton of
> Paramount Farming Company notified the then District
> Manager Paul Hendrix by fax that Paramount had added
> 219.88 acre feet of NSA water entitlement and further
> notified the District that Paramount Farming Company
> would like to participate to the maximum extent
> possible in entitlement sales. In other words,
> Paramount Farming Company was interested in selling as
> much of its water entitlement as it could, and using
> Plaintiffs' and other NSA landowners' water entitlement
> and water on its (Paramount's) lands in the SA.
> Paramount's interested Board members frustrated the
> transfer by NSA landowners of entitlement from the NSA
> to the SA land to preserve water entitlement available
> to Paramount through a water transfer process known as

13

the Top Contract. The parties to the Top Contract are an exclusive club that the Board has allowed to transfer water entitlement from the NSA to the SA to the exclusion of the owners of that entitlement.
***

92. Currently pending is a transfer of 16,000 AF of entitlement from Berrenda Mesa Water District to Coachella Valley Water District and Desert Water Agency who are SWP contractors. Berrenda Mesa Water District is located to the north of Belridge. Plaintiffs are informed and believe that one or more of the Paramount Business Entities own land in Berrenda Mesa and have entitlement allocated to those lands, and that 3,000 AF of the 16,000 AF of entitlement being transferred from Berrenda Mesa is entitlement allocated and appurtenant to lands in Berrenda Mesa owned or farmed by one or more of the Paramount Business Entities. Coachella Valley Water District and Desert Water Agency are paying $3,000.00 [per] AF for entitlement being transferred from Berrenda Mesa. The very parties who are preventing the permanent transfer of NSA entitlement to the SA are transferring water outside the District to replace water entitlement that they have sold from another District.

93. At the November 1, 2005 Board Meeting, the General Manager reported that Paramount Farming Company had requested and was granted authorization to transfer 3,000 AF of State Water Project entitlement from the District to Berrenda Mesa Water District. Paramount is receiving $3,000 per acre foot of water entitlement sold while holding on to the Plaintiffs' water entitlement through transfer policy manipulation....

**I.  Belridge's Previous Attempts to Purchase and Retire NSA Water Entitlements.**

The SAC also alleges that Belridge has purchased and retired NSA Water Entitlements in the past.  For example, in 1986 Belridge acquired 9,600 AF of NSA water entitlement "due to Land Owner Contract Terminations."  This entitlement was redistributed to the SA.  (SAC at ¶100.)  In addition, in April 1994 Belridge sent questionnaires to all owners in the NSA inquiring whether the landowners wished to terminate their water service contracts with the District.  (*Id.* at ¶101.)  Alternatively, Belridge inquired whether the landowners "wished to transfer some or all

**14**

their entitlement to parcels they may own within the current SA, or if they desired a landowner meeting to obtain more information regarding their water service contract(s)."  (*Id.*)

On May 26, 1994, Mr. Meeker on behalf of Plaintiffs responded to the inquiry stating that "Our present opinion is not to terminate our contract; however, we need further information before we can make a firm commitment."  (*Id.* at 102.)

Plaintiffs also allege that in "August and September of 1995 at least 6 property owners terminated their water supply contract rights with the District" and that the "District has foreclosed on property in the NSA for failure to pay assessments and transferred the entitlement from the NSA to the SA."  (*Id.* at 105.)

**J.    Plaintiffs' Relationship with Sandridge Partners**.

On March 12, 2005, approximately one month after Plainitffs filed the initial complaint in this case, Plaintiffs and Sandridge Partners ("Sandridge") executed a contract for the sale of Plaintiffs' NSA land and water entitlement to Sandridge. (Meeker Decl. ¶5, Ex. A; Vidovich Decl. ¶9.)  "The Contract allocated over 96% of the purchase price to the water rights and less than 4% to the land itself."  (Doc. 70 at 6; Meeker Dec;. ¶12.)  On September 6, 2005, Sandridge sent a letter to the Belridge District manager, Greg Hammett, inquiring about building out water transportation facilities to Sandridge/Plaintiffs' NSA land.  (Vidovich Decl. ¶¶3 & 14, Ex. A.)  Sandridge requested confirmation that "Plaintiffs' and Sandridge's lands would be treated the same as all other SA lands."  (*Id.* at ¶14.)

**15**

1    On September 13, 2005, Hammett responded in writing stating

2  that Sandridge's request did not make it onto the September 7,

3  2005 Board Meeting Agenda, but that the topic was discussed

4  during his "manager report." (Vidovich Decl at ¶15, Ex. B.)

5  Hammett explained that the Board would require detailed plans and

6  specifications (prepared at Sandridge's expense) before the

7  request could be considered. (*Id*. at ¶15, Ex. B.)  Hammett's

8  letter did not respond to Sandridge's request for "assurance"

9  that Plaintiff and Sandridge would be treated the same as all

10 other landowners.  (*Id*.)

11   On October 25, 2005, Sandridge sent another letter to

12 Hammet, explaining that Sandridge sought assurances that, if it

13 invested in the construction of water transportation facilities,

14 Sandridge's SA lands would be treated the same as all other SA

15 lands.  In other words, Sandridge wanted assurances that it would

16 be able to use its water anywhere it wanted.  *(See id.* at ¶17,

17 Ex. D.)

18   On November 22, 2005, Sandridge received a letter from two

19 board members, Defendants Starrh and Baker, which requested

20 specific information about the planned construction project,

21 including a map; right of ways; crops to be grown; demand in

22 gallons; the irrigation system to be used; and the desired

23 construction schedule.  The letter contained no response to the

24 request for written assurance that Sandridge's NSA lands would be

25 treated the same as the other NSA lands in Belridge. (*Id.* at

26 ¶18, Ex. E.)

27   A Belridge board meeting agenda for February 7, 2006,

28 dedicated time to Sandridge's request to build out water

**16**

1  transportation facilities.  (Richie Decl., Ex. 1.)  The Board

2  tabled the issue and went into a closed session.  *(Id.; see also*,

3  Vidovich Decl. ¶21, Ex. F.)  After the closed session, Defendant

4  Phillimore announced in open session that the issue would not be

5  taken up by the board because Plaintiffs' first amended

6  complaint, filed February 6, 2006, raised the issue in this

7  litigation.  (Ritchie Decl., Ex. 2.)  Soon thereafter, Mr.

8  Hughes, counsel for Belridge, sent a letter to Plaintiffs'

9  counsel stating that "[t]he request of Sandridge Partners is now

10  apparently the subject of litigation and the District will

11  respond in the appropriate fashion."  (Carlson Decl. Ex. 29.)

12

13            **III.   STANDARD OF REVIEW - MOTION TO DISMISS**

14        Fed. R. Civ. P. 12(b)(6) provides that a motion to dismiss

15  may be made if the plaintiff fails "to state a claim upon which

16  relief can be granted."  However, motions to dismiss under Fed.

17  R. Civ. P. 12(b)(6) are disfavored and rarely granted.  The

18  question before the court is not whether the plaintiff will

19  ultimately prevail; rather, it is whether the plaintiff could

20  prove any set of facts in support of his claim that would entitle

21  him to relief.  *See Hishon v. King & Spalding*, 467 U.S. 69, 73

22  (1984).  "A complaint should not be dismissed unless it appears

23  beyond doubt that plaintiff can prove no set of facts in support

24  of his claim which would entitle him to relief."  *Van Buskirk v.*

25  *CNN, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) (citations omitted).

26        In deciding whether to grant a motion to dismiss, the court

27  "accept[s] all factual allegations of the complaint as true and

28  draw[s] all reasonable inferences" in the light most favorable to

**17**

1  the nonmoving party.  *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th

2  Cir. 1999); *see also Rodriguez v. Panayiotou*, 314 F.3d 979, 983

3  (9th Cir. 2002).  A court is not "required to accept as true

4  allegations that are merely conclusory, unwarranted deductions of

5  fact, or unreasonable inferences."  *Sprewell v. Golden State*

6  *Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

7

8                        **IV.  DISCUSSION**

9  **A.   Requests for Judicial Notice**.

10          **1.   Defendants' Requests.**

11       Defendants request that the court take judicial notice of

12  the following documents: The "Top Contract"; Board of Directors'

13  Minutes and Agenda of February 16, 2005; A portion of the Board

14  of Directors' Packet for Board Meeting of February 16, containing

15  a letter dated January 10, 2005; Board of Directors' Minutes of

16  November 1, 2005; Board of Directors' Minutes of February 1,

17  2005; Board of Directors' Minutes of January 11, 2005; a Letter

18  from Raymond Carlson, dated February 15, 2006; Plaintiffs'

19  Landowner Contracts as submitted by Plaintiffs, attached to the

20  August 26, 2005 Declaration of Raymond L. Carlson.  (*See* Doc. 66,

21  filed May 9, 2006.)

22       A court may take judicial notice of facts "not subject to

23  reasonable dispute in that it is either (1) generally known

24  within the territorial jurisdiction of the trial court or (2)

25  capable of accurate and ready determination by resort to sources

26  whose accuracy cannot be reasonably questioned."  Fed. R. Evid.

27  201(b).  Under certain circumstances, a court may take judicial

28  notice of a document relied upon in the complaint and/or matters

**18**

of public record outside the pleadings, without converting a
motion to dismiss into a motion for summary judgment. *See In re
Silicon Graphics Inc. Secs. Litig.*, 183 F.3d 970, 986 (9th Cir.
1999); *MGIC Indem. Corp v. Weisman*, 803 F.2d 500, 503 (9th Cir.
1986).

Under these rules, the Top Contract is judicially noticeable
because it is referenced in Plaintiffs' complaint and its
authenticity is not challenged.[3]

Minutes from an irrigation district's board meeting are
public records subject to judicial notice in a motion to dismiss,
*see Sumner Peck Ranch, Inc. v. Bureau of Reclamation*, 823 F.
Supp. 715, 724-25 (E.D. Cal. 1993), but only if "the accuracy of
the minutes cannot be reasonably questioned," Fed. R. Evid.
201(b)(2).  Plaintiffs do not object to the court taking judicial
notice of the Board minutes.

Defendants also submit for judicial notice a letter from
Plaintiffs to Defendant dated January 10, 2005.  This letter was
contained within an agenda packet distributed to Belridge's
Board.  As such, it is part of the public record of the Board's
proceedings and is subject to judicial notice.

Defendants also request judicial notice of a letter from
Raymond Carlson to Belridge, dated February 15, 2006, which
constitutes Plaintiffs' request for approval to transfer NSA
water to SA lands, along with various landowner contracts
submitted by Plaintiffs.  Although these documents are not

---

[3]      Plaintiffs note that the copy attached to Defendants'
motion to dismiss is not certified, but do not object to the
court taking judicial notice of this document.

technically public records and are therefore not judicially noticeable, they are admissible on a motion to dismiss under the "incorporation by reference doctrine," whereby a district court may consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).  The Ninth Circuit has also extended the application of this doctrine "to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint." *Id*.

Defendants request for judicial notice is **GRANTED** as to all documents for which such notice was requested.

### 2.  Plaintiffs' Requests.

Plaintiffs request that the court take judicial notice of more than forty documents filed throughout the course of this litigation.  Plaintiffs first request that the court take judicial notice of  Exhibits 1 through 8 of the Declaration of Raymond L. Carlson, filed July 22, 2005 in connection with the first motion to dismiss.  (Doc. 25).

> Exhibit 1:  "Minutes of An Adjourned Regular Meeting of the Board of Directors of Belridge Water Storage Held: January 11, 2005" received from Defendant, Belridge Water Storage District ("District") on February 16, 2005.

| | | |
|---|---|---|
| Exhibit 2: | Letter dated February 22, 2005 sent by Raymond L. Carlson to to Joseph Hughes, Assistant Secretary and attorney for the District -- a "request made to the District under the California Public Records Act for the listed records." |
| Exhibit 3: | "Belridge Water Storage District Board of Directors Meeting Roll Call (2-16-05)" with handwritten notes, received by Carlson in response to a request for records. |
| Exhibit 4: | "Belridge Water Storage District Adjourned Regular Meeting of the Board of Directors Wednesday February 16,2005 1:30 P.M. Agenda", with handwritten notes, received by Carlson in response to a request for records. |
| Exhibit 5: | A letter dated March 7, 2005, received from Mr. Hughes. |
| Exhibit 6: | "Belridge Water Storage District Minutes of a Regular Meeting of the Board of Directors of Belridge Water Storage District Held: January 4, 2005", received from the District on January 11, 2005. |
| Exhibit 7: | "Belridge Water Storage District Adjourned Regular Meeting of the Board of Directors Tuesday January 11, 2005 1:30 P.M. Agenda." |
| Exhibit 8: | An e-mail dated March 15, 2005, received by Raymond Carlson from Joseph Hughes. |

Exhibts 1, 3, 5, 6, and 7 are public records that are judicially noticeable.  However, Plaintiffs have provided absolutely no justification for taking judicial notice of Exhibits 2, 4, and 8, which are correspondence between counsel and appear not to be part of the public record in any way. The request is **GRANTED** as to Exhibits 1, 3, 5, 6, and 7, but **DENIED** as to 2, 4, and 8.

21

Plaintiffs also request judicial notice of Exhibits 1 through 38 attached to the Declaration of Raymond L. Carlson filed March 26, 2006.  (Doc. 57)[4]  Exhibits 1 through 8 are various landowner agreements and amendments thereto entered into by Plaintiffs and Belridge.  These are judicially noticeable public records.  Exhibit 9 is a copy of the "Standard Provisions for Water Supply Contracts for Supply of State Project Water," an official Kern County record that is judicially noticeable. Exhibit 10 is a copy of Belridge Resolution 749 a public record that is also judicially noticeable.  Exhibits 11, and 11A are communications from Belridge to various landowners in Belridge, including a memorandum and two questionnaires.  These documents are also arguably public records and are therefore judicially noticeable.  Similarly, the following Exhibits are judicially noticeable Belridge public records:

Exhibit 16:   The minutes of the February 16, 2005 Belridge Board meeting.

Exhibit 17:   A spreadsheet handed out at the February 16, 2005 Board meeting entitled "Acre-Feet transferred from Non-Service Area."

Exhibit 20:   A memorandum dated April 21, 1995 from the Belridge Board president to NSA land owners.

Exhibit 26:   The minutes of the October 4, 2005 Belridge Board meeting.

Exhibit 30:   A memorandum dated January 11, 2005 from Greg Hammett and Joseph D. Hughes to the Belridge Board.

_____

[4]   There are actually 39 exhibits attached to Carlson's March 26, 2006 declaration, but Plaintiffs here only request that the court take judicial notice of the first 38.  (*See* Doc. 77.)

22

| | | |
|---|---|---|
| Exhibit 31: | Minutes of the November 1, 2005 Belridge Board meeting. |
| Exhibit 32: | Minutes of the January 4, 2005 Belridge Board meeting. |
| Exhibit 33: | Minutes of the January 11, 2005 Belridge Board meeting. |
| Exhibit 34: | The agenda for the February 16, 2005 Belridge Board meeting. |
| Exhibit 35: | The minutes of the January 11, 2005 Belridge Board meeting. |
| Exhibit 36: | The agenda for the February 1, 2005 Belridge Board meeting. |

However, the remainder of the exhibits attached to the March 26, 2006 Declaration are not judicially noticeable.  Exhibit 12 is California Land Trust check #008 dated May 11, 1987 for $10,683.56 and a TSD, Inc. check 284 dated July 17, 1987 for $2,435.15.  Plaintiffs do not indicate how these checks are judicially noticeable (e.g., there is no indication that they are public records).  The same holds for Exhibit 13, a memorandum from Clayton Brants to TSD Land/California Land Trust.  Exhibits 14 and 15 are communications between Belridge and Plaintiffs. Again, Plaintiffs do not articulate a basis for taking judicial notice of these documents.  The same applies to Exhibit 18 (a memorandum from the manger of Berrenda Mesa Water District to land owners in Berrenda Mesa) and Exhibit 19 (a Sale Agreement between Berrenda Mesa Water District, Coachella Valley Water District and Desert Water Agency), and to Exhibits 21, 22, 23, 24, 25, 27, 28 and 29, all communications between Belridge, Plaintiffs, and representatives of Sandridge.  Judicial notice is not a mechanism by which a party can offer into evidence documents that do not fall into one of the specific categories

1   articulated in Federal Rule of Evidence 201.

2      Plaintiffs next request judicial notice of Exhibit 37, a

3   list of electronic files comprising the agendas for the 2005

4   Belridge Board meetings, obtained in electronic form from

5   Belridge on March 17, 2006.  Plaintiffs do not indicate why this

6   document should qualify as a "public record" or otherwise

7   satisfies Rule 201.

8      Finally, Plaintiffs request judicial notice of Exhibit 38,

9   the contemporaneous hand written notes taken by Assistant

10  Secretary LaDonna Hickernell at the Belridge Board meeting held

11  on February 16, 2005, obtained in response to a California Public

12  Records Act request propounded on Belridge by letter dated

13  February 22, 2005.  This document is arguably a public record,

14  but is judicially noticeable only for its existence, not for the

15  truth of the matters asserted within the handwritten notes.

16     The motion regarding Exhibits 1-39 of the Carlson is **GRANTED**

17  as to Exhibits 1-10, 11, 11A, 16-17, 20, 26, 30-36, and 38, but

18  **DENIED** as to all other exhibits.

19     Next, Plaintiffs request that the district court take

20  judicial notice of Exhibits 1 and 2 of the Declaration of Leslie

21  Richie, filed March 26, 2006.  (Doc. 58.)  Leslie Richie is a

22  representative of Sandridge. Exhibit 1 is a copy of the agenda

23  for the February 7, 2006 regular meeting of the District Board.

24  This is a public record and is therefore judicially noticeable.

25  Exhibit 2 is a transcript of that portion of the meeting during

26  which the Board addressed Sandridge's request to build out water

27  delivery facilities.  Members of the public are permitted to tape

28  record public meetings under California Government Code

**24**

§ 54953.5.   Defendants do not dispute the accuracy of the transcript, but they assert that it is an incomplete excerpt. With that understanding, the excerpt is judicially noticeable as evidence of what was said during the excerpted portion of the hearing.

Plaintiffs then request that the district court take judicial notice of Exhibits A and B to the Declaration of Raymond L. Carlson, filed June 12, 2006.  (Doc. 71)  Exhibit A is a contract between Sandridge and Plaintiffs pursuant to which Sandridge agreed to purchase Plaintiffs' land.  This is judicially noticeable under "incorporation by reference doctrine." *Knievel*, 393 F.3d at 1076.  Exhibit B is a letter sent by Plaintiffs to the Belridge District Manager.  There is no indication that this document was made a part of the public record and therefore the motion is **DENIED** as to Exhibit B.

Finally, Plaintiffs separately request that the court take judicial notice of the "Agenda of Special Meeting of Belridge Board held on May 23, 2005" (Ex. 40), and the "Minutes of Special Meeting of Belridge Board held on May 23, 2005 (Ex. 41)."  As these documents are public records, they are judicially noticeable.  The request is **GRANTED** as to these two documents.

### B.   Motion to Dismiss.

Defendants move again to dismiss all but two of the claims in this case.  (Defendants do not challenge the Political Reform Act (First Claim) or Unfair Competition (Eleventh Claim) causes of action, the only two claims to survive the prior motion to dismiss.)

**25**

1        **1.   California Government Code § 1090 (Second Claim).**

2        Section 1090 of the California Government Code prohibits

3   Directors of a water district from being "financially interested

4   in any <u>contract made by them</u> in their official capacity, or by

5   any body or Board of which they are a member."  Cal. Gov. Code

6   § 1090 (emphasis added).  Section 1090 "encompass such

7   embodiments in the making of a contract as preliminary

8   discussions, negotiations, compromises, reasoning, planning,

9   drawing of plans and specifications and solicitations for bids."

10  *Millbrae Assoc. for Residential Survival v. Millbrae*, 262 Cal.

11  App. 2d 222, 237 (1968).

12       Plaintiffs claim based upon California Government Code

13  § 1090 was previously dismissed on the ground that the February

14  15, 2005 vote did not "make" a contract.  The January 17, 2006

15  memorandum decision held:

16           Plaintiffs appear to concede that the Defendant
             directors did not actually cause the Top Contract to be
17           created.  The Top Contract was drafted and signed prior
             to any of the Defendant Directors becoming members of
18           the Board.

19           Plaintiffs also appear to concede that the February 16,
             2005 vote did not expressly "make" a contract.  Rather,
20           Plaintiffs assert that:

21
             The Board's action at the February 16, 2005
22           special Board meeting amended the Top Contract
             into a permanent contract whereby all of the NSA
23           entitlement is permanently made available to the
             Buyers under the Top Contract, effectively
24           transforming the Top Contract from an interim or
             temporary measure into a permanent arrangement.
25
             (Doc. 1, Compl., at ¶77.)  Essentially, Plaintiffs
26           argue that the adoption of the policy was a de facto
             contract amendment, "insuring a supply of seized NSA
27           water to Top Contract buyers."  (Doc. 25 at 12.)
             Plaintiffs offer no legal support for the proposition
28           that liability under § 1090 may be triggered by such an

                                    26

implied amendment. (The appropriate legal remedy appears to be under the PRA.)

Plaintiffs also suggest that *Milbrae* and its progeny call upon courts to read [] the statutory language liberally. For example, in *Thomson v. Call*, 38 Cal. 3d 633 (1985), a complex, multi-party contract transaction was found to be "part of a single multiparty agreement." It was therefore improper for a city councilman, whose own property was acquired in one of the more tangential transactions, to have participated in the making of any of the interrelated contracts:

> [T]he prospect that performance of the contract would involve acquisition of the [councilman's land and conveyance of that land to the city was contemplated by all parties....[T]he policy goals of section 1090 support the rule that public officers "are denied the right to make contracts in their official capacity with themselves or to become interested in contracts thus made."

*Id*. at 645. A similarly broad view of the meaning of the term "contract" was taken in *People v. Honig*, 48 Cal. App. 4th 289 (1996). In that case, a state educational official was married to the founder and director of a nonprofit corporation involved in education. At this official's direction, grants were made by the state to certain school districts. But, these funds were actually used to pay the salaries of employees who worked for his wife's nonprofit organization. The official was found to have violated § 1090 because he had indirectly caused the improper contracts to be made. The *Honig* court reasoned:

> In considering conflicts of interest we cannot focus upon an isolated 'contract' and ignore the transaction as a whole. It appears clear that the payment of DOE funds to the school districts, the districts' payment of those funds to QEP employees in the form of continued salaries and benefits, and the employees' work for QEP, were in performance of single multiparty agreements. In short, defendant simply used the school district contractors as conduits to funnel DOE funds to individuals as compensation for working for his wife's corporate employer. The use of a third party as a contractual conduit does not avoid the inherent conflict of interest in such a transaction.

*Id*. at 320. *See also People v. Gnass*, 101 Cal. App. 4th 1271, 1293 (2002) ("[T]he test is whether the officer or employee participated in the making of the contract in his official capacity.").

27

> Although these cases take a broad view of the term contract, Plaintiffs suggest an even broader interpretation of § 1090.  Under Plaintiffs' interpretation, any vote of a government official that advances an independent existing contractual interest held by that government official would be prohibited by § 1090.  Plaintiffs essentially argue that § 1090 should be read to subsume any action that advances a contractual interest.  This in effect rewrites § 1090.  (Noticeably, § 1090 lacks the "public generally" exception which threatens Plaintiffs' PRA claim.)  The Belridge Board's vote on the transfer of NSA water is not a "contract made" by the Board, unless an agreement between the district and the Top Contractors results from the vote.  Defendants' motion to dismiss the § 1090 claim is **GRANTED WITH LEAVE TO AMEND.**

(Doc. 48 at 38-41.)

In the SAC, Plaintiffs advance four separate theories to support a renewed section 1090 claim, arguing that:

(a)  "The February 16, 2005 Board Meeting was the 'making' of a contract under the guise of being a policy change.  The law does not reward form over substance."  (SAC at ¶28.)

(b)  "The Top Contract is void under § 1090 because it requires the making of a contract each year."  (SAC at ¶31.)

(c)  "The Joint Defense Agreement is a void contract under § 1090 because it is the making of a contract."  (SAC at ¶32.)

(d)  "The November 1, 2005 Board Decision is the making of a contract and void under § 1090."  (*Id.*)

//

//

//

//

### a.   February 16, 2005 board meeting as the "making" of a contract.

Alleging that the February 16, 2005 Board Meeting was "a de facto amendment to the Top Contract" (SAC at ¶29), Plaintiffs essentially advance the same argument that was rejected in the January 17, 2006 memorandum decision.  Plaintiffs offer no new legal authority or argument that would warrant departure from the previous ruling.  No remedy is available under § 1090 with regard to the resolution passed at the February 16, 2005 board meeting.

### b.   Does the Top Contract require the making of a contract each year?

Plaintiffs next argue that the "Top Contract is void under § 1090 because it requires the making of a contract each year." (SAC at ¶31.)  Specifically, the standard provisions set forth in the Top Contract require the Board to determine charges for water distribution each year.  Plaintiffs maintain that this procedure requires the board to "re-make" the top contract each year.

Plaintiffs cite *City of Imperial Beach v. Bailey*, 103 Cal. App. 3d 191 (1980) in support of their position.[5]  In that case, the operator of a concession stand under contract with the city was later elected to become a member of the city council.  *Id*. at 194.  A provision of the concession contract provided that on the fifteenth anniversary of the agreement, ownership of the building in which the concession was housed would pass to the city and

---

[5]     Plaintiffs also cite Volume 84, page 34 of the Opinions of the California Attorney General as additional support.  The California Attorney General's opinions are an advocate's summary of California law and are not binding authority.

that "[a]t the end of said fifteen year period City may reasonably adjust the rate of payment to be paid by Operator to City to reflect the fact that City owns the building." *Id.* When the concession contract came up for renewal, the operator was still a member of the city council. The city refused to renew the contract, citing § 1090, and sought a declaration as to the legality of its refusal. *Imperial Beach* first held that the renewal would constitute the making of a contract which would violate § 1090. The court reasoned that adjustment of the rate on the fifteen year anniversary would require a "negotiation" prohibited by § 1090, even if the city set the rate unilaterally (i.e., without negotiating with the concession) and <u>even if the conflicted council member abstained from voting</u>. *Id*. at 195. The critical inquiry was whether the council was required to approve the rate: "It is not her participation in the voting which constitutes the conflict of interest, but her potential to do so." *Id.*

Plaintiffs allege that the Top Contract must be voided under § 1090 because it "require[s] the Board to determine charges for water distribution in the October Board Meeting each year," just like the *Imperial Beach* contract required "a concession price be inserted for each year the contract was in force." (SAC at ¶¶ 161-62.) First, Plaintiffs misrepresent the nature of the contract in *Imperial Beach*. As discussed, that contract permitted a rate adjustment on the fifteen year renewal date. Nothing in *Imperial Beach* suggests that a "concession price [must] be inserted for each year the contract was in force." Moreover, while the contract in *Imperial Beach* was explicitly

1   subject to renewal on the fifteen year anniversary, the Top

2   Contract contains no annual renewal provision.  Plaintiffs

3   correctly point out that charges for water distribution must be

4   calculated each year, and appear to suggest that this annual

5   calculation constitutes the type of "negotiation" prohibited in

6   *Imperial Beach*.  However, the charges for water distribution are

7   calculated according to a pre-determined mathematical formula and

8   are part of the inherent functions of a water district in

9   providing water services to its members.  Moreover, nothing in

10  the Top Contract speaks of annual <u>renewal</u> of the contract at the

11  time of the rate-setting, nor is it alleged that the Top Contract

12  requires Board approval of the new rate.

13

14              **c.    The Joint Defense Agreement.**

15       Plaintiffs further argue that the "Joint Defense Agreement

16  is a void contract under § 1090 because it is the making of a

17  contract."  (SAC at ¶32.)  Defendants respond that the making of

18  this contract is not barred by § 1090 because of "the rule of

19  necessity," a common law defense that provides "where an

20  administrative body has a duty to act upon a matter which is

21  before it and is the only entity capable to act in the matter,

22  the fact that members may have a personal interest in the result

23  of the action does not disqualify them in performing their duty."

24  *Gonsalves v. City of Dairy Valley*, 265 Cal. App. 2d 400, 404

25  (1968).  California courts have applied this rule to § 1090

26  claims.  *See, e.g., Eldridge v. Sierra View Local Hospital Dist.,*

27  224 Cal. App. 3d 311, 319-23 (1990).

28       Defendants argue that a government entity must defend itself

                                 **31**

1    and indemnify its directors against lawsuits.  *See* Cal. Gov. Code

2    §§ 825, 995.  Defendants are correct that Plaintiffs' view of the

3    law "would lead to the absurdity of a plaintiff being able to

4    stop any government entity from defending itself merely by also

5    suing the directors who need to deal with the defense" thereby

6    rendering any joint defense agreement between the entity and the

7    Directors void under § 1090.  (Doc. 65 at 7.)  Plaintiffs'

8    reading of § 1090 cannot be countenanced.

9

10             **d.   November 1, 2005 Board Decision.**

11        Finally, Plaintiffs maintain that "The November 1, 2005

12   Board Decision is the making of a contract and void under

13   § 1090."  On that date, the SAC alleges that an amendment to a

14   water supply contract for Paramount Farming Company was

15   "suggested" to the Board.  Defendants respond by pointing to the

16   minutes from that meeting which indicate that Paramount did not

17   suggest an amendment to its water supply contract.  Rather,

18   Paramount requested that the Board approve a landowner transfer

19   pursuant to standard District policy.  (*See* Nov. 1, 2005 Board

20   Minutes.)  Plaintiffs cite no authority to support the

21   proposition that such an approval constitutes the making of a

22   contract.[6]

23   _____

24        [6]   Assuming that the judicially noticeable minutes
     accurately reflect what transpired at the meeting, the Board did
25   not make a contract on November 1, 2005.  Rather, the Board
     exercised its duty to approve landowner contracts, an event that
26   is more appropriately challenged under the Political Reform Act.
     Plaintiffs themselves concede that the two interested Defendant
27   Directors recused themselves from this vote, so no PRA violation
     occurred.
28

1    None of the theories advanced by Plaintiffs support a cause

2    of action under California Government Code § 1090.  Defendants'

3    motion to dismiss this claim is **GRANTED WITHOUT LEAVE TO AMEND.**

4

5              **2.   Common Law Conflict of Interest (Third Claim).**

6    Plaintiffs' second claim is that the conduct of the

7    interested directors constitutes a violation of the common law

8    prohibition against conflicts of interest.  "The common law

9    doctrine against conflicts of interest prohibited public

10   officials from placing themselves in a position where their

11   private, personal interests may conflict with their official

12   duties."  *Clark v. City of Hermosa Beach*, 48 Cal. App. 4th 1152,

13   1171 (1996).  But, the common law doctrine has been superceded by

14   the Political Reform Act (PRA), and survives only to the extent

15   that violations are not specifically governed by an applicable

16   PRA provision or regulation.  1 Witkin, Summary of California Law

17   (10th ed. 2005) Contracts §§ 650, 652 ("state statutes, generally

18   declaratory of the common law, cover the field"); *see also*

19   *Victory Oil Co. v. Hancock Oil Co.*, 125 Cal. App. 2d 222, 229

20   (1954)(discussing California's Code of Civil Procedure and

21   holding that the common law remains in force "except so far as

22   it... has been modified by statute....").  In *Clark*, the common

23   law governed in part because PRA was found inapplicable, as the

24   alleged conflict did not involve a financial interest.  48 Cal.

25   App. 4th at 1173.  Here, however, the alleged conflict is

26   financial and the PRA "covers the field."

27   Plaintiffs assert generally that "[t]he great number of

28   conflicts in this case, the length of time over which they

**33**

1   occurred, and the great variety of contexts in which they arose,

2   are not all envisioned by or contemplated by the [PRA]." (Doc.

3   85 at 12.)   But, Plaintiffs point to no examples of conflicts

4   that do not involve financial interests and none could be

5   discovered in the record.[7]

6       During oral argument, Plaintiffs relied upon the recent

7   decision in *Pajaro Valley Water Management Agency v. Amrhen*  46

8   Cal. Rptr. 3d 476 (Cal. App. 6 Dist. 2006).   In that case, a

9   water management agency sought a judicial determination that its

10  ordinance increasing a groundwater augmentation fee charged to

11  operators of wells within its jurisdiction was valid.   Objectors

12  challenged the ordinance on many grounds, including the PRA and

13  common law conflict of interest.   Plaintiffs assert that *Pajaro*

14  supports their claim for common law conflict of interest because

15  the *Pajaro* court treated the common law claim as a substantive

16  issue and did not discuss whether it had been superceded by the

17  PRA.   Plaintiffs' reliance is misplaced for several reasons.

18  First, *Pajaro* did indirectly address the issue of PRA

19  supercession in its discussion of *Clark*, 49 Cal. App. 4th at

20  1172-73:

21          Objectors assert in passing that Directors Capurro and
            Gallino were disqualified by a common law conflict of
22          interest as discussed in *Clark v. City of Hermosa Beach*
            (1996) 48 Cal.App.4th 1152, 1170-1172, 56 Cal.Rptr.2d
23          223 ( Clark ). Objectors merely quote a passage from
            that case, cite an opinion by the Attorney General on
24

25          [7]   Again, Plaintiffs cite summaries of California law
26  authored by the California Attorney General's Office.   These
    summaries are not binding on California law, nor are they
27  particularly persuasive, as they do not apply the general
    principles of law to cases with factual circumstances even
28  remotely parallel to those presented here.

**34**

the same general subject, and assert that the ordinance is void "since a common law conflict of interest existed at the time Ordinance 2003-01 was adopted." Assuming this is a sufficient presentation to tender an issue for our consideration, it falls far short of persuading us that the ordinance is void. In Clark a city council member was held to have acted under a common law conflict of interest by voting against a development that would interfere with ocean views from his rented home, and against the proponents of which he harbored personal animosity. (*Clark, supra,* 48 Cal.App.4th at pp. 1172-1173, 56 Cal.Rptr.2d 223.) <u>The [Clark] court fell back on common law principles because the facts did not establish a financial interest in violation of the PRA</u>. (*Id*. at p. 1173, fn. 19, 56 Cal.Rptr.2d 223.) The case bears no material similarity to this one.

46 Cal. Rptr. 3d at 494 (emphasis aded).  Moreover, *Pajaro* is no longer good law, as rehearing has been granted and the opinion has been deemed not citeable.

Defendants' motion to dismiss the common law conflict of interest claim is **GRANTED WITHOUT LEAVE TO AMEND.**

### 3.   Inverse Condemnation (Fourth Claim).

Plaintiffs included a claim for inverse condemnation in their initial complaint.  That claim was dismissed with leave to amend on the grounds that Plaintiffs could not establish that they possess a vested property right.  The January 17, 2006 memorandum decision held:

Before any of [the Lucas, Penn Central, etc.] standards come into play...the court must as a threshold matter, determine whether Plaintiffs possess a vested property right:

The first step in [a] taking analyses is to determine whether there is a property right that is protected by the Constitution. *See, e.g., Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 54-55 [additional citations]. In *Public Agencies*, a taking case, the Court held that the contractual right at issue "did not rise to the level of

35

'property'" and "[could] not be viewed as
conferring any sort of 'vested right.'" 477 U.S.
at 55.  Without a property right, there could be
no "taking within the meaning of the Fifth
Amendment." *Id*. at 55-56.

*Peterson v. United States Dept. of Interior*, 899 F.2d
799, 807 (9th Cir. 1990).

The parties expend a great deal of energy discussing
whether Belridge's conduct in this case constitutes a
per se taking or satisfies the requirements of the *Penn
Central* test.  The parties <u>totally neglect</u>, however, to
address the threshold question of whether the right
Plaintiffs claim was condemned by Belridge is of a type
that is protected by the California or United States
constitutions.

Unless Plaintiffs possess water rights separate and
distinct from those granted to them under their
landowner contracts, Plaintiffs' entitlement (or
"right") to SWP water is defined exclusively by that
contract.  Here, Plaintiffs do not claim to possess any
vested water rights other than their entitlement as a
District landowner to contract for water service under
the landowner contracts, nor do they claim that any
provision of state law conveys upon them or creates any
other form of water right.  The terms of the contracts
solely determine the nature of any water rights
Plaintiffs hold.

Here, Plaintiffs claim that they have been injured by
Defendants' decision to prohibit transfers from the
parcels of land designated in the landowner contracts
to other parcels of land within Belridge.  Yet, the
Landowner Contracts specifically prohibit the transfer
of water entitlements without express written
permission from Belridge.

> Project water delivered to Buyer pursuant to this
> Contract ***shall not be sold or otherwise disposed
> of by Buyer for use other than on Said Land
> without the prior written consent of District.***

(LC Art. 20.)  The contract does not contain a
provision that the District's consent to a requested
transfer shall not be unreasonably withheld

Plaintiffs purchased 1599.16 acres of NSA land in early
2000 and an additional 471.27 acres of NSA land in
2004.  At the time Plaintiffs executed the LC for the
lands purchased in 2000, Plaintiffs entered into an
agreement with Belridge that permitted Plaintiffs to
transfer some of their NSA water to urban uses.  This,
however, was a limited, one-time transfer as part of a

36

larger negotiated transfer of agricultural water
entitlements to urban water users.

Plaintiffs assert that Defendants have "seized" their
NSA water and suggest that this amounts to a "per se"
physical taking of their property.  But, again,
Plaintiff's right to water is defined by the LC and any
applicable amendments.  According to these documents,
Plaintiffs' only right to water is for their lands in
Zones of Benefits (Art. 5(b)), which may be qualified
to receive water by following the service connection
procedure of Article 7 for locations specified on
Exhibit D.  Plaintiffs' right to receive and use water
under the LC is subject to the further condition that
if any water to be delivered is not for use on the
lands specified in Plaintiffs' LC, the District's
consent must be obtained under Article 20.  Plaintiffs
have no absolute vested right to transfer their water
away from their NSA lands.  (Plaintiffs do not allege
that they were wronged by Belridge's failure to <u>deliver</u>
water to their NSA land.)

Plaintiffs argue in the alternative that they have
alleged a regulatory taking because the Board's vote
has deprived them of "all economically beneficial use
of their property."  Plaintiffs suggest that the
district court should follow the holding in, *Tulare
Lake Basin Water Storage Dist. v. United States*, 49
Fed. Cl. 313, 318 (2001), where Judge Wiese held that
"the federal government, by preventing plaintiffs from
using the water to which they would otherwise have been
entitled, [has] rendered the usufructuary right to that
water valueless, [and has] thus effected a physical
taking."  The Court of Claims decision has no binding
effect in the Eastern District of California.
Moreover, the conclusory reasoning in the *Tulare Lake
Basin* case is without analytical foundation and is
suspect, as it has been criticized in the Court of
Claims.  *See Klamath Irrigation Dist. v. United States,*
67 Fed. Cl. 504, 513 (2005) (criticizing *Tulare Lake
Basin* for its failure to engage in any analysis of the
contracts which establish the rights in question).  In
the Ninth Circuit and California, it is the contract
that defines the nature and terms of the water right
possessed by users of water from the CVP or SWP.
*Peterson*, 899 F.2d at 807 ("The first step in both due
process and taking analyses is to determine whether
there is a property right that is protected by the
Constitution."); *Planning and Conservation League v.
DWR*, 83 Cal. App. 4th 892, 899 (2000) (SWP contractors
are obligated to pay for their contractual entitlements
to water "whether the water is delivered or not").

Here, Plaintiffs' contract specifically withholds the
right to transfer water without written permission from

37

1   Belridge.  In essence, Belridge's vote amounts to an
    announcement that no such written permission will be
2   granted until further notice.  Plaintiffs were offered
    an opportunity at oral argument to point to any
3   alternative source of a vested property right in this
    case and were unable to do so.  Plaintiffs do not state
4   a claim for inverse condemnation under California law.
    Accordingly, Defendants' motion to dismiss the state
5   law inverse condemnation claim is **GRANTED WITH LEAVE TO
    AMEND, subject to Rule 11's requirement that a good
6   faith investigation and analysis provide a basis for
    the claim of a vested property right in District water.**
7
8   (Doc. 48 at 22-26 (emphasis in original).)

9        Plaintiffs again attempt to plead that they posses vested

10  water rights, this time pointing not only to the Landowner

11  Contracts but to various items of extrinsic evidence.

12       Plaintiffs' argument is convoluted.  They first argue that

13  the District's right to approve transfers of NSA water does

14  preclude "the vesting of Plaintiffs' Right to Water."  Plaintiffs

15  maintain that, although "the right to delivery of water is

16  subject to some limitations," such as approval by the Board,

17  these limitations must be "reasonable" and cannot be "arbitrary

18  and capricious."  More specifically, Plaintiffs assert that the

19  District's right to approve is subject to the legislative mandate

20  "to equitably distribute water" set forth in California Water

21  Code § 43003, which is the subject of a separate claim in this

22  case.  (*See* Doc. 85, Opp'n, at 14-15.)

23       In support of this argument, Plaintiffs acknowledge the

24  general rule that an individual has no vested property right in a

25  particular benefit where a governmental agency retains discretion

26  to grant or deny the benefit.  *See Bernizer v. Ray,* 915 F. Supp.

27  176, 181 (C.D. Cal 1995) and cases cited therein.  However,

28  Plaintiffs assert that an alternative line of authority, *e.g.,*

*Kerley Indus., Inc. v. Pima County*, 785 F.2d 1444, 1446 (9th Cir. 1986), should apply here.  In that case, Kerley, the owner of a chemical plant in Pima County, Arizona applied for an operating permit from the Pima County Air Quality Control District. Initially, a conditional permit was granted, providing Kerley an opportunity to demonstrate that it could comply with air quality requirements.  Later, however, the permit was revoked on the ground that the plant violated a Pima County zoning ordinance and the Air Quality District was precluded by law from issuing any permit that violated a zoning ordinance.  Kirley filed suit in federal court against the Air Quality Control Board and others, alleging that Pima County deprived it of property without due process by denying its permit without prior notice and hearing. The Ninth Circuit held that Kirley "had sufficient property interest to invoke procedural due process protections," reasoning that:

> Property rights do not arise from simple wants and desires; they must be based on legitimate claims of entitlement. *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). Property rights are created "and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Id.

> Arizona law provides for the issuance of conditional permits, such as the one Kerley received, Ariz.Rev.Stat.Ann. § 36-784 (1974); it contains detailed provisions for their suspension and revocation. Ariz.Rev.Stat.Ann. § 36-784.04 (1974). This body of law endowed appellant with a sufficient claim of entitlement to its conditional use permit and the operation of its plant to establish a property right and to trigger the constitutional requirement of due process.  Having granted appellant a permit to operate its plant, the county could not take it away arbitrarily, for improper reasons, or without appropriate procedural safeguards. The fact that

1
2
3
4

> plaintiff's operation might have violated the county's
> zoning ordinance does not render its interest in the
> permit any less deserving of constitutional protection.
> The violation was not conclusively established by the
> Chief Zoning Inspector's determination. The permit
> could not be revoked without giving Kerley an
> opportunity to prove the Zoning Inspector wrong.

5 *Id.* at 1445-46 (internal citations omitted).

6 Plaintiffs assert that the circumstances here are similar to

7 those in *Kerley* because Belridge's right to approve any water

8 transfer is "subject to the legislative mandate to equitably

9 distribute water." (Doc. 85 at 15.) Plaintiffs are comparing

10 apples to oranges. In *Kirley*, the Arizona legislature provided

11 for specific procedures that must be followed prior to the

12 issuance or revocation of a use permit. Accordingly, the Ninth

13 Circuit found that Kerley held a permit and "had sufficient

14 property interest to invoke procedural due process protections."

15 This is very different from concluding that the existence of a

16 substantive, external requirement for equitable distribution of

17 water transforms the Landowner Contract into a vested property

18 right for purposes of inverse condemnation. *Kerley* does not

19 support the proposition Plaintiffs advance.

20 Plaintiffs also cite *Peterson v. United States*, 899 F.2d

21 799, 809 (9th Cir. 1990). In that case, a number of water

22 districts challenged the constitutionality of section 203(b) of

23 the Reclamation Act, 43 U.S.C. § 390cc(b), the so-called "hammer

24 clause," which gave water districts holding contracts for

25 Reclamation water the option of either (1) amending their

26 existing contracts to conform with new provisions of the

27 Reclamation Act that closed various loopholes in the Act, or

28 (2) paying "full cost" for any water delivered to leased or owned

**40**

landholdings that exceeded the new acreage limitations contained in the revised Act.  The water districts maintained that their pre-existing contracts conferred upon them a constitutionally protected property interest in the delivery of subsidized water to leased tracts of any size.  *Id*. at 807.  Specifically, the water districts claimed, among other things, that their contracts must be interpreted "as giving them an implied right to deliver subsidized water to leased tracts of any size...."  *Id*. at 807-08.  In support of this argument the water districts pointed to a particular provision of their contracts, which explicitly precluded delivery to land in excess of 160 acres held "in common ownership."  The presence of this language, they argued, gave them an implied right to deliver water to farms of any size, as long as the farms are leased instead of owned.

The Ninth Circuit <u>did not agree</u>:

> As the Supreme Court has stated when reviewing a similar claim to a vested right based on an implied contractual provision, the Water Districts' claim "lies in the periphery where vested rights do not attach." *Darlington*, 358 U.S. at 90.

> The Supreme Court considered and rejected a similar due process claim to an implied contractual right against the government in Darlington, and its analysis controls. Darlington involved another federal subsidy, a mortgage insurance program embodied in the 1942 National Housing Act, 56 Stat. 303, 12 U.S.C. § 1743, as amended by § 10 of the Veterans' Emergency Housing Act of 1946, 60 Stat. 207, 214, and the regulations issued thereunder. Congress enacted the program with the aim of making housing more accessible to veterans and their families. A corporation, which had entered into a federal contract to obtain mortgage insurance, rented apartments to transients, a use not expressly prohibited by the contract, controlling statute, or regulations promulgated thereunder. In fact, the only relevant requirement in force at the time the mortgage insurance contract was entered into was that the property be "designed principally for residential use." 358 U.S. at 85 (quotation omitted). Five years later,

41

Congress enacted legislation expressly barring the rental of such housing units to transients. The corporation sued, asserting that the amendment amounted to an unconstitutional infringement of its contractual rights.

To determine whether a right to rent to transients could fairly be implied in the contracts, the Court turned to the legislation that had authorized the contracts. Review of the controlling statute, the National Housing Act, convinced the Court that the "legislation [was] passed to aid veterans and their families, not...to promote the hotel or motel business." *Id.* at 87 (footnote omitted). Congress's intention that the mortgaged properties be rented only as permanent dwellings pervaded the Committee reports and other legislative history, although the requirement was never made expressly. Because the legislative purpose of the Act was to provide permanent homes for families, and in particular, for veterans and their families, the Court declined to hold that the plaintiff had an implicit right to engage in conduct that did not serve that purpose. The Court rejected the argument advanced by the dissent that Darlington's contract gave it a vested right to make rentals to any persons and in any manner that was not expressly prohibited by the statute or contract. *Id.* at 95 (Harlan, J., dissenting). Instead, the Court concluded that "[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Id.* at 91, . By passing legislation barring rentals to transients, Congress was simply making explicit the policy underlying the legislation, thus "doing no more than protecting the regulatory system which it had designed." *Id.*

The similarities between the Water Districts' claim in this case and the claim rejected in Darlington are striking. The Water Districts contend that because they were not expressly prohibited by the Department in their contracts from providing water to leased land, they have a contractual right to do so which must be considered "vested" or immune from later regulations or statutory amendments. This argument was squarely rejected in Darlington as insufficient ground on which to base a claim to a vested right.

As in *Darlington*, the implied right asserted here clearly violates the spirit, if not the letter, of the reclamation laws which authorized such contracts. The reclamation projects were funded by the federal government with the express intent that the subsidized water be used to promote the development of family-owned farms. See discussion, supra, at pp.

**42**

802-803. Prior to the RRA, Congress had always required that land receiving reclamation water be owned in no larger than 160-acre parcels and that the owners of the land occupy it or reside in the neighborhood. The fact that the Department of the Interior ignored the residency requirement and turned a blind eye to the practice of large-scale leasing does not lessen the importance of these restrictions in the congressional scheme. Nor did the Department's lax enforcement policy over the years remove the ever-present possibility that Congress would buttress the reclamation laws "by subsequent amendments to achieve [its original] legislative end." *Darlington*, 358 U.S. at 91.

In sum, the fact that the reclamation laws had as their end the dismantling of large landholdings in the West and the redistribution of that land to families, effectively undercuts the Water Districts' argument that they were given an implied right to deliver the water to farms regardless of size, as long as the land was not actually owned by the operator of the farm. To find a vested contract right with these facts, we believe, would seriously impair Congress's sovereign power to pass laws for the public welfare. Were we to accept the Water Districts' argument, parties that enter into contracts with the government pursuant to such legislation could claim vested rights to engage in all conduct not expressly forbidden in the contracts. We do not believe that Congress must exhaustively proscribe conduct in a regulated field to prevent parties from claiming an "implied vested right" to engage in conduct found by later Congresses to be harmful to the public welfare.

*Peterson*, 899 F.2d at 809-11 (parallel citations omitted).

Plaintiffs latch onto this reasoning, arguing that unlike in *Peterson* where the legislative interest in the "promot[ion] of family farming by providing water subsidies to family farms" was in <u>conflict</u> with the asserted implied contractual right, here the legislative interest in the equitable distribution of water is <u>not in conflict</u> with the implied right asserted by Plaintiffs here – the right to not be unreasonably refused permission to transfer water. (*See* Doc. 85 at 15.) But, Plaintiffs ignore a fundamental distinction between *Peterson* and this case, the key language in the *Peterson* contracts which precluded delivery of

**43**

1   water to particular sized farms held "in common ownership."  That

2   language at least arguably implies that delivery to leased farms

3   above the size limit <u>would be permissible</u>.  The Ninth Circuit

4   found this alleged implied right to be incompatible with the

5   statutory scheme and its legislative purposes.  Here, <u>there is no</u>

6   <u>language in the Landowner contracts that can fairly be read as</u>

7   <u>impliedly creating a right to be permitted to transfer water to</u>

8   <u>the SA</u>.  Article 20 expressly prohibits such transfers without

9   the written permission of the Board.

10      Finally, Plaintiffs point to parol evidence in an attempt to

11  establish that existence of a vested right.  For example,

12  Plaintiffs refer to Belridge's transfer policy, in operation

13  prior to the February 16, 2005 vote, specifying a procedure for

14  effecting transfers.  Plaintiffs insist that "there must be a

15  right or there would be no need for a transfer policy."

16  Plaintiffs describe a series of additional factors that they

17  believe are "evidence" of a vested right, including: (1) that NSA

18  landowners have transferred water from the NSA to the SA in prior

19  years; (2) NSA landowners have sold water entitlements;

20  (3) language in the Top Contract defines NSA entitlement as "that

21  portion of the District Contract Entitlement appurtenant to lands

22  in the non-service area on January 1, 1999, less the amount of

23  such portion, if any, that is transferred outside of the

24  Non-Service Area after January 1, 1999;" (4) the April 3, 1967

25  amendment to the Landowner Contract increased that amount of

26  annual entitlement of Occidental Land and Development Company,

27  Ltd., a predecessor-in-interest to Plaintiffs, for an

28  uncontracted portion of Belridge's maximum contract entitlement;

**44**

(5) Belridge asked NSA Landowners to choose between keeping, terminating or transferring water entitlement in 1994; and (6) Plaintiffs' property is subject to foreclosure for non-payment of assessments that Plaintiffs have paid in the past. (*See* Doc. 85 at 6.)

But, all of this "evidence" boils down to an expectation on the part of NSA landowners that they would be permitted to transfer their water rights. No constitutionally protected right can be "spun out of the yarn of investment backed expectations." *Peterson*, 899 F.2d 813. Peterson expressly rejected similar arguments:

> The Water Districts urge yet another line of reasoning in their effort to establish a vested property right in the contracts. They argue that they have a "reasonable investment-backed expectation" to receive water at subsidized rates and that this expectation amounts to a property interest that is protected by the fifth amendment. They claim that their expectation of subsidized water was reasonable based upon the statutes then in effect and upon the representations "made by the United States during the negotiation, drafting, and execution of the water service contracts." *813 Appellants' Opening Brief at 36. They also point to the investments that the Water Districts and property owners made, in reliance upon these representations, statutes, and contracts, and claim that section 203(b) destroys their reasonable expectation that they would continue to receive subsidized water for lands leased in excess of 160 acres.
>
> The Water Districts offer no authority for the proposition that a constitutionally protected property interest can be spun out of the yarn of investment-backed expectations. Their reliance upon Ruckelshaus v. Monsanto Co., 467 U.S. 986 (1984) for this argument is misplaced. Ruckelshaus is authority for the proposition that once a constitutionally protected property interest is established, then a reasonable investment-backed expectation is one of several factors to be taken into account "when determining whether a governmental action has gone beyond 'regulation' and effects a 'taking.' " 467 U.S. at 1005 Whether a "taking" has occurred is the second step of the inquiry. Here, we do not reach that step

45

1    because the Water Districts have failed to survive the
     first step, which is establishing that a property right
2    exists. Thus, the Water Districts' reliance on
     Ruckelshaus is misplaced, leaving them with no support
3    for the curious proposition that investment-backed
     expectations can give rise to a constitutionally
4    protected property interest.

5    *Peterson*, 899 F.2d 812-13 (parallel citations omitted).

6         Plaintiffs also refer to a line of authority that stands

7    generally for the proposition that water rights are a form of

8    real property.  Specifically, Plaintiffs argue:

9         The right to receive water is a form of real property.

10             The right in water which has been diverted into
               ditches or other artificial conduits, for the
11             purpose of conducting it to land for irrigation,
               has been uniformly classed as real property in
12             this state. *Stanislaus Water Company v. Bachman*
               152 Cal. 716, 726-727 (1908) (citations omitted).
13
               The principles stated in Stanislaus have not changed.
14             <u>The right to use water for irrigation is not personal
               property but is real property.</u> *Fawkes v. Reynolds* 190
15             Cal. 204, 211 (1922); *Schimmel v. Martin* 190 Cal. 429,
               432 (1923). "Water rights are a species of real
16             property capable of acquisition by adverse user." Locke
               v. Yorba Irrigation Company 35 Cal.2d 205, 211 (1950).
17             The right to the use of water is classified as real
               property and "The concept of an appropriative water
18             right is a real property interest incidental and
               appurtenant to land." *Fullerton v. State Water
19             Resources Control Board* 90 Cal.App.3d 590, 598 (1979).

20             The SWP water rights are post-1914 appropriative water
               rights held by the State. The State contracts with the
21             Kern County Water Agency (KCWA) who in turn then
               contracts with its members Landowner Contract defines
22             the term in Article 1(b) as:

23             the total amount of water to be made available by
               District to Buyer during the particular year under
24             the terms of the Landowner Contract. Said amount
               is the product, expressed in acre feet, of Buyer's
25             total acre foot per acre entitlement for such year
               as set forth in Exhibit "C" hereto attached and
26             multiplied by the number of "owner acres" included
               within the land described in Exhibit "E" hereto
27             attached for which water is available hereunder
               for such year.

28

**46**

1          <u>The term acre foot per acre "entitlement" seems to
           define the annual entitlement for each acre of land
2          owned by Plaintiffs.</u>

3          Section 11.00 of the Top Contract defines the "annual
           entitlement" as each Buyer's portion of the NSA
4          entitlement, expressed as a percentage of the NSA
           entitlement.
5
           Entitlement is used in at least two senses: (i) as a
6          share of the water supply available in a given year; or
           (ii) a share of the overall maximum water supply
7          available to the District. When the District sent
           Plaintiffs $500,001 in checks the District stated that
8          Plaintiffs sold "annual entitlement" and received
           compensation therefor. See Exs. 14, 15. <u>Therefore the
9          term "annual entitlement" has to be susceptible of a
           meaning that includes giving a vested right to the
10         entitlement to the land owner.</u>

11   (Doc. 85 at 4-5(emphasis added).)   In so arguing, Plaintiffs

12   suggest that <u>their</u> water entitlement is a "real property right,"

13   deriving its character from the "SWP water rights [that] are

14   post-1914 appropriative water rights held by the State."   But, to

15   the contrary, Plaintiffs hold a contract right to water

16   entitlement.   True, the entitlement runs with any transfer of

17   their land and is measured by the acreage of their landholdings,

18   however this does not transform their contract water right into

19   an appropriative right classed as real property in California

20   under. *Stanislaus*, 152 Cal. 716.

21         Finally, Plaintiffs appear to confuse their inverse

22   condemnation claim with one based on contract, arguing that the

23   term "annual entitlement" in the landowner contract is

24   "reasonably susceptible of a meaning that includes giving a

25   vested right to the entitlement to the land owner."   (Doc. 85 at

26   4.)   Plaintiffs offer absolutely no legal authority to support

27   the proposition that a vested property right worthy of protection

28   under the Fifth Amendment can arise simply by virtue of ambiguous

**47**

contractual language.

Defendants' motion to dismiss the Inverse Condemnation claim is **GRANTED WITH PREJUDICE.**  Plaintiffs were previously given leave to amend on the condition that they re-allege their inverse condemnation claim in good faith.

Plaintiffs also discuss in great detail the other elements of an inverse condemnation claim, including a detailed analysis of the *Lucas and Penn Central* tests.  Plaintiffs' discussion of these authorities adds nothing to the threshold inquiry – whether they possess a vested property right.

> **4.   Contract-Based Claims (Sixth, Seventh & Eighth Claims).**

Plaintiffs' sixth, seventh, and eighth claims are for "Breach of Written Contract," "Breach of Implied in Fact Contract," and "Breach of the Implied Covenant of Good Faith and Fair Dealing," respectively.  (SAC at ¶¶ 39-42.)  Defendants move to dismiss all three of these claims.

> ***a.   Breach of Express Contract (Sixth Claim).***

Plaintiffs allege that Defendants breached the terms of the Plaintiffs' Landowner Contract by "refusing to allow Plaintiffs to amend their Land Owner Contract[s] to allow transfer of entitlement and water from Plaintiffs' NSA lands to SA lands, in common with prior practice in administering other landowner contracts."  (SAC at ¶222.)  Plaintiffs contend that this "failure and refusal to perform" directly damaged Plaintiffs through the loss of 2,726.64 acre feet of annual water entitlement valued at least at $3000.00/AF, are $8,179,920, if

**48**

Plaintiffs are permanently deprived of such entitlement...."
(*Id.* at ¶223.)

Article 5(b) of the LC sets forth the method for calculating the <u>volume</u> of a Buyer's entitlement to water under the contract:

> Commencing with the year of initial delivery, [Belridge], each year, shall make available for delivery to Buyer in each Zone of Benefit, as such zones are shown on the plan attached hereto as Exhibit "A", the amount of Project Water expressed in acre feet which is the product of Buyer's acre foot per acre entitlement in such Zone of Benefit for such year as set forth in Exhibit "C" hereto attached multiplied by the number of "owner acres" included within the portion of Said Land in said Zone of benefit.  The total of all such amounts, for any year is referred to in this Contract as Buyer's annual entitlement for such year.

Article 6 of the Landowner Contract explains that Belridge's delivery obligation is limited to the delivery of Project Water to specified locations (set forth in Exhibit D to the LC):

> Project Water made available to Buyer pursuant to this Contract shall be delivered to and accepted by Buyer **only at the locations specified on Exhibit "D"** hereto attached at which District has installed delivery structures in accordance with Article 7 hereof

(LC Art. 6 (emphasis added).)  Article 7 sets forth additional rights and obligations regarding the delivery of water to the locations specified in Exhibit D:

> District shall, on six (6) months written request from Buyer and upon payment by Buyer to District of the connection service charge of District then in effect, install and thereafter maintain during the term of this Contract delivery structures **at such of the locations designated on Exhibit "D"**, as Buyer shall direct.  Said delivery structures shall be and remain the property of District.  The cost of repairing any such structure damages by cause other than normal wear or negligence of District shall be paid by Buyer to District promptly upon written demand.

(LC Art. 7 (emphasis added).)  Plaintiffs do not allege that their NSA lands are currently serviceable by delivery structures

49

at any of the locations designated in Exhibit D as points of delivery.

The right to receive water under the LC is "appurtenant to [the] land," (LC Art. 21), but a Buyer's ability to transfer the appurtenant water entitlement to other lands is limited:

> Project water <u>delivered</u> to Buyer pursuant to this Contract shall not be sold or otherwise disposed of by Buyer for use other than on Said Land without the prior written consent of District.

(LC Art. 20)(emphasis added).

Plaintiffs maintain that this language obligates Plaintiffs to allow transfers from NSA to SA lands in accordance with the prior practice of the district.  Defendants respond that Plaintiffs fundamentally misunderstand the Landowner Contract:

> Article 5(b) of the Landowner Contract provides that the District shall make water available to Plaintiffs beginning with the year of initial delivery. Accordingly, Plaintiffs have no obligation under the Landowners Contract, including the obligation to pay for water, until there are facilities to begin delivery of water to Plaintiffs.  Landowner Contract, p. 27. Thus, the District has no present obligation to make water available and deliver water to Plaintiffs. Article 20 is not pertinent to that issue.

(Doc. 86, Deft's Reply, at 6.)

To be liable for breach of a written contract, Defendants must have unjustifiably failed to perform a promise contained within that contract.  *See* 1 Witkin, Summary of California Law (10th ed. 2005), Contracts § 847.

Nothing in the contract obligates the District to approve the transfer requested by Plaintiffs, nor does anything in the contract preclude the district from "unreasonably withhold[ing] such approval" or denying such approval "in an arbitrary and capricious manner."  (Doc. 18.)  Such obligations may derive from

50

other bodies of law, but not from the four corners of the

Landowner Contract itself unless Plaintiffs can allege they have

satisfied conditions precedent set forth in the contract.

Plaintiffs have not alleged such compliance nor pointed to any

term in the Landowner Contract that is reasonably susceptible to

the reading they suggest.

### b. Breach of Implied Contract (Seventh Claim).

Plaintiffs next claim is that Defendants breached an implied

agreement to approve the transfer request:

> [T]he District had an established practice allowing the transfer of NSA entitlement and amendment of NSA Land Owner Contracts to conform to such transfers....[I]n addition[,] the District's policy since May 1999 was to allow transfer of entitlement from the NSA into the SA portion of the District, and the Top Contract which was made effective January 1, 1999 acknowledged that the amount of NSA entitlement appurtenant to NSA lands was subject to diminishment as NSA entitlement was transferred outside the NSA after January 1, 1999.
>
> Based on the foregoing, Plaintiffs had an implied in fact agreement and/or an agreement implied by conduct that Plaintiffs would be allowed to transfer the entitlement appurtenant to their NSA land to the land in the SA portion of the District and to that end made request therefor by letter dated January 10, 2005.

(SAC at ¶225.)

Defendants rejoin by citing, *Lance Camper Manufacturing*

*Corp. v. Republic Indemnity Co.*, 44 Cal. App. 4th 194, 203

(1996), which discusses the "well settled" principle "that an

action based on an implied-in-fact or quasi-contract cannot lie

where there exists between the parties a valid express contract

covering the same subject matter."  Defendants argue that the

implied promise suggested by Plaintiffs conflicts with the

express terms of the Landowner Contract, so they cannot be read

into the contract:

The express terms of the Landowners Contract provide, however, that (1) the Landowners Contract and Plaintiffs' right to receive water thereunder are appurtenant to their Non-Service Area land (Landowners Contract, p.24), (2) the District shall make water available to Plaintiffs' when water service to their Non-Service Area lands begins (Landowners Contract, p. 5), and (3) water delivered pursuant to the Landowners Contract shall not be sold or otherwise disposed of for use other than on Plaintiffs' land without the prior written consent of the District (Landowners Contract, p. 24). Thus, the Landowners Contract precludes the very transfer of entitlement and water to which Plaintiffs' claim that Defendants have impliedly agreed.

(Doc. 65 at 16.)

Plaintiffs respond by arguing that it is "unreasonable for the District not to approve an NSA landowner's request to transfer NSA entitlement to the SA, while simultaneous[ly] allowing a party with inferior rights (Top Contract parties) the right to use that same water in the SA."  (Doc. 85 at 18.) Although this may be hypothetically unfair, the contract has not been previously modified as to Plaintiffs.  Whether the Board's (or the District's) conduct in the past violated the contract or was ultra vires, is addressed under other legal remedies.

### c. Breach of the Implied Covenant of Good Faith and Fair Dealing (Eighth Claim).

Finally, Plaintiffs' eighth claim alleges that Defendants breached the covenant of good faith and fair dealing by refusing to amend their Landowner Contract:

231.  Implied in each [contract], including the Landowner Contract, is an implied covenant of good faith and fair dealing which imposes on each party to the contract the duty to refrain from doing any act which would deny to the other party the benefits of the contract or which would make performance of the contract impossible, and to do every act each party is bound to do to accomplish the purpose of the contract, including the Land Owner Contract between Plaintiffs

**52**

1    and the District.

2        232.  As a consequence of the act of Defendants on
     February 16, 2005, and acts thereafter....Plaintiffs
3    have been denied all benefits under the Land Owner
     Contract appurtenant to their lands at the same time
4    that the Land Owner Contract remains a lien on
     Plaintiffs' land and Plaintiffs' lands remain subject
5    to assessments and liens imposed by the District under
     the Land Owner Contracts.

6
(SAC at ¶42.)

7
     Defendants respond that the covenant of good faith and fair

8
dealing is limited to assuring compliance with the express terms

9
of a contract, and cannot be used to create obligations not

10
contemplated in the contract.  This rule was summarized in *Racine*

11
*& Laramie, Ltd. v. Department of Parks & Recreation*, 11 Cal. App.

12
4th 1026, 1031-32 (1992):

13
          The implied covenant of good faith and fair dealing
14        rests upon the existence of some specific contractual
          obligation. (*Foley v. Interactive Data Corp.* (1988) 47
15        Cal.3d 654, 683-684, 689-690.) "The covenant of good
          faith is read into contracts in order to protect the
16        express covenants or promises of the contract, not to
          protect some general public policy interest not
17        directly tied to the contract's purpose." (*Id.* at p.
          690.) As we stated in *Love v. Fire Ins. Exchange* (1990)
18        221 Cal.App.3d 1136 at page 1153: "In essence, the
          covenant is implied as a supplement to the express
19        contractual covenants, to prevent a contracting party
          from engaging in conduct which (while not technically
20        transgressing the express covenants) frustrates the
          other party's rights to the benefits of the contract."

21
                              ***
22
          If there exists a contractual relationship between the
23        parties, as was the case here, the implied covenant is
          limited to assuring compliance with the express terms
24        of the contract, and cannot be extended to create
          obligations not contemplated in the contract. (*Gibson
25        v. Government Employees Ins. Co.* (1984) 162 Cal.App.3d
          441, 448 [208 Cal.Rptr. 511].)

26
The plaintiff in *Racine* argued that the implied covenant of good

27
faith and fair dealing required the defendant to negotiate a

28

**53**

1  modification of plaintiff's concession contract.  The *Racine*

2  court reasoned that the "provision closest to a possible

3  obligation is that contained in paragraph 25 of the contract,"

4  which provided:

5           Notwithstanding any of the provisions of this contract,
          the parties may hereafter, by mutual consent, agree to
6         modifications thereof or additions thereto in writing
          which are not forbidden by law. The State shall have
7         the right to grant reasonable extensions of time to
          Concessionaire for any purpose or for the performance
8         of any obligation of Concessionaire hereunder.

9  *Id*. at 1030-31.  This language was found to "fall[] far short of

10 the imposition of any [enforceable] obligation on either party to

11 even participate in activity leading to a modification of the

12 concession."  *Id*. at 1032.  Absent a contractual agreement to

13 negotiate, the *Racine* court found there was no obligation to

14 negotiate in good faith.  *Id*.

15     Here, the language in the Landowner Contract that comes

16 closest to imposing a duty to consider Plaintiffs' transfer

17 request in good faith is contained within Article 20, which

18 provides:

19           Project water delivered to Buyer pursuant to this
          Contract shall not be sold or otherwise disposed of by
20        Buyer for use other than on Said Land without the prior
          written consent of District.
21
22 This language is non horatory and is even less favorable to

23 Plaintiffs than was the *Racine* contract language.  Article 20

24 affirmatively forbids transfers without the express written

25 consent of the District and contains no language obligating the

26 district to negotiate NSA water transfers in good faith.

27     Defendants insist that the Landowner Contract does establish

28 a right to water delivery, arguing

**54**

> The water is delivered to the land each year after the
> initial delivery.  The initial delivery takes place
> after the District builds out the transportation
> facilities.  This effects the right to delivery, not
> the right to the water or the entitlement.  The
> contract gives the right to deliver the water to other
> locations provided that the District agrees.  The
> District may not unreasonably withhold approval or not
> allow the request for an arbitrary or capricious
> reason.  The implied covenant of good faith and fair
> dealing is supported by this term and acts to prevent
> the District from continuing to sell water to Top
> Contract buyers that provide financial benefits to
> individual Board members when there is a request by the
> entitlement holder to make the same use of that
> entitlement and water.

(Doc. 85 at 18 (emphasis added).)  But, the Landowner Contract
only establishes the right to delivery of water to the NSA lands
if and when delivery structures are constructed to reach those
lands.  The contract specifically prohibits the transfer of water
entitlement from one place or another without prior permission of
the District.  Whether the District approves of such a transfer
is a matter of policy and politics, not a matter of contractual
obligation, express or implied.

Moreover, no tortious breach of contract for violation of
the implied covenant of good faith and fair dealing can be
advanced in this case, because such a claim is only recognized in
special relationship (insurance contract) and employment contract
(public policy) cases.  *See e.g., Bionghi v. Metropolitan Water
Dist. of So. California*, 70 Cal. App. 4th 1358, 1370 (1999)
("[T]ort recovery for breach of the covenant is available only in
limited circumstances, generally involving a special relationship
between the contracting parties, such as the relationship between
an insured and its insurer.").

Defendants' motion to dismiss the eighth claim (implied

**55**

covenant of good faith and fair dealing) is **GRANTED without leave to amend.**

## 5.   Tort-Based Claims (Fifth, Ninth & Tenth Claims).

Plaintiffs also set forth three tort claims: Conversion (Fifth Claim); Intentional Interference with Prospective Economic Advantage (Ninth Claim); and Negligent Interference with Prospective Economic Advantage (Tenth Claim).  Defendants attack these claims on numerous grounds, arguing that all three claims are barred because (1) public entities and directors may not be sued in tort for their discretionary actions; and (2) Defendants failed to comply with the California Tort Claims Act.  In the alternative, Defendants argue that all three allegations should be dismissed for failure to state a claim.

### a.   Discretionary Act Immunity.

California Government Code section 820.2 provides that public officials are immune from tort liability for discretionary acts:

> Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the <u>exercise of the discretion vested in him, whether or not such discretion be abused</u>.

Section 815.2(b) provides similar immunity for public entities:

> Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability.

A California Supreme Court case, *Caldwell v. Montoya*, 10 Cal.4th 972 (1995), provides additional guidance:

> [A] "workable definition" of immune discretionary acts draws the line between "planning" and "operational"

functions of government.  Immunity is reserved for those basic policy decisions which have been expressly committed to coordinate branches of government, and as to which judicial interference would thus be "unseemly."  Such areas of quasi-legislative policy-making are sufficiently sensitive" to call for judicial abstention from interference that "might even in the first instance affect the coordinate body's decision-making process."

On the other hand...there is no basis for immunizing lower-level, or "ministerial," decisions that merely implement a basic policy already formulated. Moreover...immunity applies only to deliberate and considered policy decisions, in which a conscious balancing of risks and advantages took place. The fact that an employee normally engages in discretionary activity is irrelevant if, in a given case, the employee did not render a <u>considered decision.</u>

Recognizing that "it is not a tort for government to govern" our subsequent cases have carefully preserved the distinction between policy and operational judgments. Thus, we have rejected claims of immunity for a bus driver's decision not to intervene in one passenger's violent assault against another, a college district's failure to warn of known crime dangers in a student parking lot, a county clerk's libelous statements during a newspaper interview about official matters, university therapists' failure to warn a patient's homicide victim of the patient's prior threats to kill her, and a police officer's negligent conduct of a traffic investigation once undertaken.

On the other hand, we have concluded that the discretionary act statute does immunize officials and agencies against claims that they unreasonably delayed regulations under which a murdered security guard might have qualified himself to carry a defensive firearm, or negligently released a violent juvenile offender into his mother's custody.

*Id.* at 981-82 (internal citations and quotations omitted) (emphasis added).

Both parties also cite to the discussion of these principles contained in *Sumner Peck Ranch, Inc. v. Bureau of Reclamation,* 823 F. Supp. 715, 722 (E.D. Cal. 1993).  In determining whether the discretionary duty exception applied, *Sumner Peck* inquired

whether the defendant officials "render[ed] a considered decision." *Id*. at 723.  In *Sumner Peck*, the plaintiffs' allegations focused on two events:

> 1) The water district's decision to enter into the April 3, 1985 Agreement, which resulted in the closure of the San Luis Drain and blockage of the collector system while delivery of irrigation water was continued; and 2) The water district's decision to fund projects which failed to provide drainage but instead promoted the increased delivery of irrigation water.

These alleged acts were found to "fall squarely within the immunity provided under section 820.2, as interpreted by California courts." *Id*.

> Westlands is vested by state law with the authority to enter agreements and make funding decisions. *See, e.g.,* Cal. Water Code § 35851 (authorizing the district to enter into contracts with the United States, "as the Board deems proper, advisable or in the interests of the district"); §§ 36455, 36455.2 (authorizing the district "in the discretion of the board of directors" to acquire and construct various works, and provide funding by levying assessments and issuing bonds). The alleged decisions made by the Board, the district's legislative body, were purely discretionary. The Board's determination that it was better to agree to block existing drainage facilities than to risk losing both drainage and irrigation water delivery service in a legal battle with the State and the federal government was a "basic policy decision" which it was authorized to make. The decision to fund one project instead of another is similarly a purely legislative concern. Section 820.2 makes these policy decisions unreviewable by the judicial branch. Allegations that these decisions were unwise, or even an abuse of the Board's discretion, do not diminish Westlands' entitlement to discretionary act immunity.

*Id*.

The plaintiffs in *Sumner Peck* cited *Sandrini Brothers, Inc. v. Voss*, 7 Cal. App. 4th 1398, a case in which the Director of California's Department of Food and Agriculture was <u>not</u> immune under § 820.2 for damages suffered by a property owner resulting

from a wrongful seizure of crops.  The Director in *Sandrini* acted pursuant to a state statute which provided that he may order contaminated crops seized.  The *Sandrini* court held that "[a] broad policy or planning decision is not involved" in the Director's choice as how to handle the crops.  *Id*. at 1408. *Sumner Peck* distinguished Sandrini, reasoning:

> Whether to seize the crops or choose an alternate course of action was merely a ministerial decision. *Id*. Here, the difficult and well-debated decisions to settle ongoing litigation by choosing to block drainage in exchange for continued water delivery and to fund delivery programs while allegedly abandoning the drainage program implicate broad policy choices rather than merely ministerial functions.

*Id*. at 724.  In so holding, the *Sumner Peck* court examined the minutes of the Westlands' Board meetings against the standard for the application of discretionary act immunity: "[T]o be entitled to immunity the state must make a showing that such a policy decision, consciously balancing risks and advantages, took place."  *Id*. at 724 (citing *Johnson v. California*, 69 Cal. 2d 782, 795 (1968)).  *Sumner Peck* held that the minutes satisfied this standard.  For example, the minutes indicated that the Westlands' Board "was aware prior to the April 3, 1985 Agreement that its access to irrigation water was threatened;" it was "apprised of the risks and advantages involved in its later decision to plug the drainage collector system;" and "funding decisions were discussed by the Board."  *Id*. at 725-26.

Here, Defendants argue that the February 16, 2005 decision was not a considered decision:

> Defendants merely rationalized <u>post hoc</u> that the Board determined that the District's long-term economic health would benefit by not permitting permanent transfers of entitlement (even though the Top Contract

does just that).  According to Sumner Peck the Board should have stated the factors that were balanced to reach the conclusion that it was, and is, in the District's best interest to deny permanent transfers fo entitlement to NSA land owners.  In *Sumner Peck* the board made a "basic policy decision" that it was better to agree to block existing drainage facilities than to risk losing both drainage and irrigation water delivery service.  In the case at bench, the Board clearly made a decision without weighing the benefits against the district's perceived risks, all of which they have utterly failed to disclose or consider.

(Doc. 85 at 19.)

Defendants assert that the decision was a considered one, pointing to the minutes of the February 16, 2005 Board meeting (Doc. 68, Hughes Decl. Ex. C), the minutes from a previous Board meeting on January 11, 2006 (*id.* at Ex. K), an ad hoc committee report regarding the establishment of a charge to permanently transfer NSA entitlement to SA lands (Carlson Decl., Doc. 57, at Ex. 30), along with landowner responses to that ad hoc committee report (*Id.*).  (All of these documents are judicially noticeable public records.)

A close examination of these documents reveals that the board closely considered the question of whether to impose a transfer charge on the permanent transfer of NSA entitlement to SA lands.  This is the subject of the ad hoc committee report, and the subject of some discussion at the January 11, 2005 and February 16, 2006 Board meetings.  What is not so clear from the current record is the extent to which the Board considered the actual decision made – to permanently ban permanent transfers. The idea was suggested by one of the comment letters received by the Board in response to the circulation of the ad hoc committee report.  That letter, from Starrh & Starrh Cotton Growers to Mr

60

1  Hammet, General Manager of the District, appended to the ad hoc

2  committee report states:

3           We received your memo dated September 9, 2004
            requesting comments on the proposed transfer policy of
4           entitlement from the NSA.

5           It is my understanding that the [NSA] contracts are
            appertinent [sic] to the land, that is, the [NSA]
6           landowners have the right to activate their contracts
            and use water on the land specified in the contract,
7           but they have no right to permanently transfer the
            entitlement anywhere else.

8
            Recently we have seen increased requests to transfer
9           entitlement from the [NSA] area into the [SA].  There
            seems to be an equity issue that should be addressed
10          and has to do more with continued use of water use than
            monetary compensation.

11
            Historically, the [NSA] area entitlement was a burden
12          to the district that often resulted in increased
            expense to landowners in the [SA].  With the
13          implementation of the top contracts, the [NSA]
            landowners have been spared the expense of holding the
14          water while maintaining their contract rights.  Some of
            these landowners [who are parties to the top contracts]
15          have planted permanent crops in order to help cover the
            expense of the water.  Now that the entitlement costs
16          have been carried for several years and the
            agricultural economy has improved, some of the [NSA]
17          landowners are asking the Board to add value to their
            contractual rights by allowing the entitlement to be
18          transferred.  There seems to [be] a question as to
            whether the Board should permit any activity beyond
19          that specified in the contract if there are adverse
            impacts on other landowners in the District.

20
            The entitlement to the NSA only gains value through the
21          Board's action to permit that entitlement to be moved.
            There is no right to move the entitlement.  If [] there
22          is no right to move entitlement, I would question why
            the Board would implement a policy that benefits some
23          landowners while making other landowners worse off.  It
            seems especially ironic that the landowners who are
24          being hurt are the same ones who have supported and
            preserved the NSA entitlement in the first place.

25                              ***

26  (Doc. 57, Carlson Decl., Ex. 30)

27       The Minutes of the February 16, 2005 Board Meeting (*see*

28

**61**

Hughes Decl., Ex. C) reveal considerable discussion of whether the "imposition of a fee as a condition to the amendment of a contract to allow the permanent transfer of Annual Entitlement creates a disqualifying conflict of interest for any Director." (*Id.* at C-4.)   The meeting then turned to the topic of "the Board's policy regarding permanent transfers of Annual entitlement from the Non-Service Area to the Service Area." (*Id.*)

> The President began by noting his recollection that when the permanent transfers of Annual Entitlement outside of the District were approved some years ago the Board's position was that there would be no further permanent transfers of Annual Entitlement outside of the District.   The Directors concurred with the President's recollection.   The President then asked those in attendance for their comments.   Larry Ritchie, Larry Johns, Fred Starrh, Scott Hamilton, Raymond L Carlson and Leon Etwell provided their comments regarding the permanent transfer of Annual Entitlement from the [NSA] to the [SA].

> The President acknowledged that transfers of Annual Entitlement between Zones of Benefit and from the [NSA] to the [SA] have historically been made.   The General Manager then presented a spreadsheet explaining the reduction in [NSA] Annual Entitlement over the years and identifying permanent transfers from the [NSA] both outside of the District and to the [SA].

> Larry Starrh asked Legal Counsel to further explain how amendment of Landowner Contracts relates to the permanent transfer of Annual Entitlement from the [NSA] to the [SA].   Legal Counsel advised that a permanent transfer of Annual Entitlement requires amendment to a Landowners Contract or Water Supply Contract, as the case may be.   Each Landowners Contract and Water Supply Contract is appurtenant to a particular parcel of land. The parcel of land described in the contract would need to be amended to a parcel within the Service Area thereby allowing the delivery of water to begin with respect to that Annual Entitlement under the contract.

> David L. Barger then questioned whether Annual Entitlement under a Landowners Contract or Water Supply Contract could be transferred on a year-to-year basis. Legal Counsel responded that a permanent transfer of Annual Entitlement requires an amendment to the

1    underlying contract, which the District would not wish
     to perform on a year-to-year basis.
2    Following further discussion, Robert E. Baker moved to
     adopt a policy whereby Landowner Contracts and Water
3    Supply Contracts shall not be amended for the purpose
     of permanently transferring Annual Entitlement from the
4    [NSA] to the [SA] Larry Starrh seconded the motion.
     The President asked the Directors for any additional
5    discussion.  David K. Banker questioned whether
     implementation of the proposed policy could take effect
6    after the current requests for permanent transfers are
     approved.  The President noted that the implication of
7    Director Baker's motion was that the policy would take
     effect immediately and apply to all pending requests.
8    Director Baker advised that he did not wish to amend
     his motion to delay implementation of the proposed
9    policy.  The motion then carried on the following vote.

10                   AYES:     Robert E. Baker
                               Larry Starrh
11                             William D. Phillimore.

12
13   (*Id.* at C-4 - C-5.)  The extent to which the Board "considered"

14   Director Baker's motion is not sufficiently clear from the

15   current record to apply discretionary immunity as a matter of

16   law.  Further discovery might reveal that a truly considered

17   decision was made.  For the purposes of the pending motion,

18   however, the tort claims cannot be eliminated on this ground at

19   this time.  **Nevertheless, all of the tort claims fail on other**

20   **grounds, as discussed below.**

21              ***b.    California Tort Claims Act.***

22        Even if the acts challenged by Plaintiffs' tort claims were

23   not discretionary, they are barred because Plaintiffs failed to

24   comply with the exhaustion requirements set forth in the

25   California's Tort Claims Act, Cal. Gov. Code 911.2(a).  A

26   plaintiff seeking to bring tort claims against a government

27   entity to presented those claims to the government entity within

28   a limitations period, either six months or one year, depending on

                                    63

the nature of the tort alleged:

> A claim relating to a cause of action for death or for injury to person or to personal property or growing crops shall be presented as provided in Article 2 (commencing with Section 915) not later than six months after the accrual of the cause of action. A claim relating to any other cause of action shall be presented as provided in Article 2 (commencing with Section 915) not later than one year after the accrual of the cause of action.

Cal. Gov. Code § 911.2(a).  Here, Plaintiffs' tort claims arise out of the vote taken by the Belridge board on February 16, 2005. Plaintiffs did not present their claim to Belridge until February 15, <u>2006</u>.  Defendants assert that all of the tort claims are barred because the six month limitations period, applicable to claims concerning personal property, controls here.  Plaintiffs, however, maintain that the one year window, applicable to "any other cause of action" applies.

It is clear from the face of the complaint that Plaintiffs' conversion claim for deprivation of water rights is a claim concerning personal property, as the very definition of the tort of conversion is the wrongful exercise of dominion over the personal property of another.  *In re Pekler*, 260 F.3d 1035, 1037 (9th Cir. 2001)(applying California law).  There is no question that the six month limitations period applies to this claim.

Determining what limitations period to apply to the remaining two tort claims, for intentional and negligent interference with prospective economic advantage, is not as clear.  Plaintiffs assert that they actually suffered injury to their "contracts and business relationships," specifically those contract and business relationships between Sandridge and

**64**

1   Plaintiffs.  Defendants cite *Storeck & Storeck, Inc. v. Port of*

2   *Oakland*, 869 F.2d 1322, 1325 (9th Cir. 1989), for the proposition

3   that Plaintiffs cannot escape the operation of the six month

4   limitations period by simply labeling their claims as being

5   "contractual" in nature.  In *Storeck* the Ninth Circuit considered

6   claims brought by real estate developers who sought to develop a

7   portion of downtown Oakland.  The Oakland authorities gave

8   preliminary to approval to the Storecks' plans for the

9   development, but placed a number of conditions on approval of the

10  project.  After preparing various aspects of the project over a

11  ten month period, the Storecks were unable to satisfy all of the

12  conditions and asked for additional time.  Oakland, however,

13  terminated the approval and began negotiations with other

14  developers.  The Storecks filed suit, alleging, among other

15  things that Oakland City employees had conspired to interfere

16  with the Storecks' prospective economic advantage.

17      The Ninth Circuit held that the conspiracy to interfere with

18  prospective economic advantage claim was barred because plaintiff

19  failed to comply with the then 100 day limitations period

20  applicable to claims for "injury to personal property."[8]  The

21  Ninth Circuit reasoned:

22          The Storeks presented their conspiracy claims in their
            third and fifth causes of action nearly one year after
23          the court had terminated the approval in principle. The
            California Government Code § 911.2, governing tort
24          claims against public entities, provides that a claim
            for injury to personal property shall be presented no
25          later than the 100th day after the accrual of the cause
            of action. The Storeks attempt to avoid the application

26

27

28      [8]     The statute has since been modified to replace the 100
        day period with a six month deadline.

**65**

> of the tort statute of limitations by contending that
> their conspiracy claims are actually contract claims.
> They point to no law supporting the contention. They
> argue that the conspiracy claim "is premised on duty
> which does not exist but for the contractual
> promissory-based relationship between the Port and the
> Storeks." That the conspiracy claim is based on an
> allegation of extant contractual duty does not convert
> it into a contractual claim.
>
> Just as conspiracy to injure property is not an
> assertion of a property claim, so assertion of injury
> to a contract does not itself sound in contract.
> Doleman v. Mieji Mutual Life Insurance Co., 727 F.2d
> 1480 at 1482 n. 3 (9th Cir.1984); Prosser & Keaton on
> Torts § 129 (5th ed. 1984). These causes of action are
> unmistakably tort claims. See American Law Institute,
> Restatement (Second) of Torts, § 766B. These causes of
> action are barred by their 1326 untimeliness under
> California Government Code § 911.2.

*Id.* at 1325-26.  Plaintiffs offer no contrary authority.

Plaintiffs' claims of intentional and negligent interference with

prospective advantage are undeniably tort claims and cannot be

re-packaged as contract claims to escape the six month

limitations period.

    All of three of Plaintiffs' tort claims are barred by their

failure to timely present their claims within the six month

period under the California Tort Claims Act.

### c.    *Conversion (Fifth Claim).*

    Even if the conversion claim was not barred by the

California Tort claims act, it must be dismissed for failure to

state a claim.  As discussed, conversion is the wrongful exercise

of dominion over personal property of another.  *In re Pecklar*,

260 F.3d at 1037.  Plaintiffs attempt to rely again on their

assertion that the landowner contract bestows upon them a vested

property right.  First, as discussed, Plaintiffs have not pled

possession of a vested property right.  More importantly, only

"specific," "identifiable" personal property may be the subject of a conversion action." *Olschewski v. Hudson*, 87 Cal. App. 282, (1927) (Conversion "lies only for the wrongful appropriation of goods, chattels or personal property which is specific enough to be identified, and not to such indefinite, intangible and uncertain property rights as the mere goodwill of a business, or trade secrets, or a newspaper route, or a licensed market stall for transacting trade."). Defendants correctly point out that if one possesses a property right to water, that right is usually identified as <u>real</u> property, not personal property. *Santa Clarita Water Co. v. Lyons*, 161 Cal. App. 3d 450, 461 (1984)("Water in its natural state is a part of the land, and therefore real property. When severed from the realty, reduced to possession and placed in containers, it becomes personal property.").

> ### d. Intentional (or Negligent) Interference with Economic Advantage (Ninth and Tenth Claims).

The elements of an intentional (or negligent) interference with economic advantage claim are:

> (1)  an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff;
>
> (2)  the defendant's knowledge of the relationship;
>
> (3)  intentional or negligent acts on the part of the defendant designed to disrupt the relationship;
>
> (4)  actual disruption of the relationship; and
>
> (5)  economic harm to the plaintiff proximately caused by the acts of the defendant.

67

1   *See Youst v. Longo*, 43 Cal. 3d 64, 71 (1987); *Santa Clarita Water*
2   *Co.*, 20 Cal. App. 4th at 1750.

3        The complaint arguably alleges that the intentional or
4   negligent interference stems from two separate courses of
5   conduct.  First, Plaintiffs appear to allege that the February
6   15, 2005 Board vote constituted actionable interference with
7   Plaintiffs contractual relationship with Sandridge.  But,
8   Defendants correctly point out that Plaintiff's contract with
9   Sandridge was not signed until March 2005.  Accordingly, absent
10  an allegation that the economic relationship began earlier than
11  March 2005 and was known to the board at the time of the February
12  16, 2005 vote, this conduct cannot form the basis of an
13  intentional (or negligent) interference with economic advantage
14  claim.

15       Second, Plaintiffs allege that the Board has failed to act
16  quickly enough to address Sandridge's concerns about building out
17  delivery structures to Plaintiffs' NSA lands.  Defendant argues
18  that there are no facts to support this allegation, but Federal
19  Rule of Civil Procedure 8 requires only a "a short and plain
20  statement of the claim showing that the pleader is entitled to
21  relief."  This aspect of the intentional/negligent interference
22  claims cannot be dismissed for failure to state a claim.

23       Nevertheless, these claims must be dismissed on other
24  grounds.

25  //
26  //
27  //
28  //

**68**

### *6.   Ralph M. Brown Act Claim (Twelfth Claim).*

Plaintiffs' previous attempt to state a claim under the Ralph M. Brown Act was unsuccessful.  The January 17, 2006 order dismissed the claim from the initial complaint, reasoning:

> The Brown Act is California's local government open meeting law.  Belridge is a "local agency" covered by the Brown Act.  Cal. Gov. Code §§ 54950.5, 54951.  Among other things, the Brown Act sets forth various procedural requirements for local government meetings, including requirements for the posting of agendas prior to such meetings.  For example, at least 72 hours before a "regular meeting," a local legislative body must post an agenda containing a "brief general description of each item of business to be transacted or discussed at the meeting...."  § 54954.2.  Other types of meetings are subject to different notice requirements.  For example, "special meetings" must be "posted at least 24 hours prior to the special meeting in a location that is freely accessible to members of the public."  § 54956.
>
> The parties dispute whether the February 16, 2005 meeting was an "adjourned regular meeting" or a "special meeting."  Defendants contend that it was an "adjourned regular meeting," pointing to the minutes from the February 16th meeting.  As such, Defendants submit the meeting was subject to the regular notification procedures under the Brown Act.
>
> Plaintiffs insist that the meeting was actually a "special meeting" pointing to passages from the appointment calendar of Belridge's manager, Greg Hammett, which indicates that a "Special Board Meeting" was held on February 16, 2005 at 1:30 pm.  Plaintiffs also submit that the February 16th meeting must be considered a special meeting because Defendants altered the agenda item from that which was posted for the January 11, 2005 meeting.  Plaintiffs argue that "such an impermissible change in the agenda without following the procedures for a Special Meeting appears to be a clear violation of the Brown Act...."  (Doc. 25 at 14.)  However, Plaintiffs cite no authority for this proposition.  Nothing in the Brown Act explicitly prohibits alteration of an agenda prior to holding re-adjourned regular board meeting.  What seems to be required prior to the re-adjourned regular meeting is the re-posting of <u>some</u> agenda that complies with the Brown Act's provisions.  Here, such an agenda was posted.  The agenda announced that the following topic would be considered "Policy re: Permanent Transfer of Annual Entitlement from Non-Service Area to Service

> Area."  This is a "brief general description of each
> item of business to be transacted or discussed at the
> meeting...."  § 54954.2.  Absent any other procedural
> objection, Plaintiffs have failed to state a claim
> under the Brown Act.
>
> Defendants motion to dismiss the Brown Act Claim is
> **GRANTED WITH LEAVE TO AMEND.**

(Doc. 48 at 41 (emphasis added).)

Plaintiffs now assert essentially two distinct claims.
First, Plaintiffs again insist that the item on the agenda for
the February 16, 2005 meeting did not appropriately describe the
action that was taken by the board.  (SAC at ¶¶ 255-60.)  Just
such an assertion was previously rejected by the district court:

> The agenda announced that the following topic would be
> considered "Policy re: Permanent Transfer of Annual
> Entitlement from Non-Service Area to Service Area."
> This is a "brief general description of each item of
> business to be transacted or discussed at the
> meeting...."  § 54954.2.  Absent any other procedural
> objection, Plaintiffs have failed to state a claim
> under the Brown Act.

(Doc. 48.)  Plaintiffs offer no reason to depart from this
previous ruling.

Plaintiffs also now allege that the February 16, 2005
meeting was a "special meeting" of the Board, rather than an
"adjourned regular meeting" as Belridge contends.  The Minutes
from the January 11, 2005 Board meeting do indeed indicate that
the topic of charging a transfer fee for permanent transfers of
entitlement from the NSA to the SA would be discussed at a
"special meeting" of the Board to be held on February 16, 2005.
Defendants point to some contrary evidence in judicially
noticeable documents.  However, for the purposes of a motion to
dismiss, the facts as pled must be viewed in a light most
favorable to Plaintiffs.  Therefore, the court must assume that

70

1 the February 16, 2006 meeting was a "special" meeting.

2     However, the legal significance of this conclusion is not

3 obvious on the face of an otherwise detailed complaint.

4 Plaintiffs suggested at oral argument that, assuming the February

5 16, 2006 meeting was a "special" meeting, it was improper for the

6 Board to discuss a topic that was not specifically indicated on

7 the notice for the special meeting.  In support of this argument,

8 Plaintiffs cite California Government Code § 54956, which

9 provides:

10

11          A special meeting may be called at any time by the
            presiding officer of the legislative body of a local
12          agency, or by a majority of the members of the
            legislative body, by delivering written notice to each
13          member of the legislative body and to each local
            newspaper of general circulation and radio or
14          television station requesting notice in writing. The
            notice shall be delivered personally or by any other
15          means and shall be received at least 24 hours before
            the time of the meeting as specified in the notice. The
16          call and notice shall specify the time and place of the
            special meeting and the business to be transacted or
17          discussed. No other business shall be considered at
            these meetings by the legislative body. The written
18          notice may be dispensed with as to any member who at or
            prior to the time the meeting convenes files with the
19          clerk or secretary of the legislative body a written
            waiver of notice. The waiver may be given by telegram.
20          The written notice may also be dispensed with as to any
            member who is actually present at the meeting at the
            time it convenes.
21
            The call and notice shall be posted at least 24 hours
22          prior to the special meeting in a location that is
            freely accessible to members of the public.
23

24     But, again, the posted agenda announced that the following

25 topic would be considered "Policy re: Permanent Transfer of

26 Annual Entitlement from Non-Service Area to Service Area."  This

27 "brief general description," § 54954.2, encompasses the topics

28 that were actually discussed -- the proposed transfer fee, and

71

1  the proposed ban on transfers.  Plaintiff has pointed to no

2  authority that would suggest a different result.[9]

3      In addition, in their opposition, Plaintiffs allege <u>for the</u>

4  <u>first</u> time that the Board failed to post the agenda for the

5  meeting within 72 hours of the February 16, 2006 meeting, as

6  would be required for any "special meeting."  In support of this

7  contention, Plaintiffs cite a computer-generated list of word

8  processing files obtained from Belridge on March 17, 2006.  That

9  list indicates that the agenda was "last modified" after the

10 expiration of the 72 hour deadline.[10]

11     Defendants first protest that this untimeliness allegation

12 was not set forth in the complaint.[11]  As the untimeliness

13 allegation is not in the SAC, it cannot be considered here.

14 Plaintiffs are, however, **granted leave to amend as to this claim,**

15 **subject to Rule 11's requirement that a good faith investigation**

16 **and analysis provide a basis for the untimeliness allegation.**

17 //

18 //

19 //

20

21     [9]    Notably, Plaintiffs' counsel was present at the

22 February 16, 2006 meeting, so Plaintiffs cannot argue that they

23 failed to attend the meeting because the agenda item was drawn
   too narrowly.

24     [10]    Plaintiffs have requested that the district court take

25 judicial notice of this document.  Absent a dispute as to the
   authenticity and reliability of its text, the document will be

26 considered.

27     [11]    Defendants also protest that the allegation is simply

28 untrue.  However, there appears to be no judicially noticeable
   evidence to support Defendants' contention.

**72**

### 7.   Water Code § 43003 (Thirteenth Claim).

Plaintiffs' thirteenth claim is for a "violation of water code § 43003." (SAC at ¶¶ 265-269.) Plaintiffs allege that the District is "subject to an affirmative statutory obligation at all times to establish equitable rules and regulations for the distribution and use of water within the District." Plaintiffs allege that the District has violated this obligation by creating an "inequitable system of water allocation all in violation of and in flagrant disregard of Water Code § 43003 and under which, among other things, all of the water entitlement appurtenant to the NSA land in the District, and the water attributable to such entitlement, has been converted to Top Water which is then sold to the Buyers under the Top Contract... At the same time the owners of NSA land and entitlement are prohibited from transferring entitlement and water for use on lands in the service area portion of the District." (*Id*. at ¶268.)

Water Code § 43003 states in its entirety:

> The board shall establish equitable rules and regulations for the most economical and efficient distribution and use of water within the district, and pursuant thereto may enter into long-term water service contracts with landowners in the district which contracts may, in the discretion of the board, provide, among other things, that the obligations are a lien on the land with the same force, effect, and priority as an assessment lien if such contract is recorded in the office of the county recorder in the county in which such land is situated. The rules, regulations, and contracts shall recognize and shall be subject to such priorities in the right to water between the different consumers of the water as may legally exist. Among other things the rules and regulations may establish a procedure for fixing tolls and charges authorized by Sections 43006 and 47180 and may provide equitable rules for reapportionment of assessments supplementary to the provisions of Article 8 (commencing with Section 46325) of Chapter 2 of Part 9 of this division

73

1    Defendant argues, again, that the Board cannot be liable

2    under Water Code § 43003 for adoption of the no-transfer policy

3    on February 16, 2005, because that vote was a discretionary act.

4    As discussed above, *supra* Part IV.B.5.a., this cannot be

5    determined at this stage in the litigation.

6    However, Plaintiffs cite no authority that Water Code §

7    43003 establishes a private right of action.  No cases suggest

8    that the provision can be enforced by a member of the public.

9    The statute is not cited in any published cases.  Whether a

10   district member or the State Attorney General has standing to

11   enforce this statutory duty is not discussed by the parties.

12   Defendants' motion to dismiss the claim brought under Water

13   Code § 43003 is **GRANTED.**

14

15           **8.   Failure to Complete District Project in Violation
                    of Water Code § 42200 (Fourteenth Claim).**

16

17   Plaintiffs next allege that Belridge has violated Water Code
     § 42200, which provides:

18

19          Upon the organization of a district, the board shall
            make or cause to be made all examinations, surveys,
20          plans and specifications, and estimates of costs for
            the acquisition, appropriation, diversion, storage,
            conservation, and distribution of water, any drainage
21          or reclamation works connected therewith, and the
            generation of hydroelectric energy incident thereto,
22          and the sale and distribution thereof, as may be
            necessary or requisite to enable the board to ascertain
23          and estimate the requirements and works necessary for
            the purpose of the district, and the probable cost and
24          to make a report.

25   The same defects -- the absence of a private right of action --

26   that applied to the section 43003 claim are present here.

27   Moreover, Plaintiffs concede that a project report was prepared

28   and that construction of the facilities proceeded in stages.

**74**

(SAC at ¶¶ 273-275).  The duties prescribed by § 42220 are too
general to apply in this case.  Section 42225 authorizes the
Board to divide the construction projects into units of
construction that may be taken in the order and at the time of
the Board's choosing.  Those decisions are made at the Board's
discretion.  Article 26 of the landowner contract specifically
provides that the District shall not be liable to Plaintiffs for
any damages in the event the District fails to complete, for any
reason, any portion of the water transportation facilities
necessary to deliver water to the Plaintiffs.  Section 42225
implicates only discretionary functions.  No private claim for
damages can be maintained under its provisions.

Defendants' motion to dismiss the claim brought under Water
Code § 42200 is **GRANTED.**

### 9.   Right to Association (Fifteenth Claim).

Finally, Plaintiffs allege that the Board violated
Plaintiffs' "right of association" when the Board refused to
respond to Sandridge's request for assurance that it would be
treated in the same manner as other parties who had earlier been
permitted to build out distribution facilities to their NSA
lands.  Specifically, the complaint alleges that Sandridge's
build out request was on the agenda for the February 7, 2006
Board meeting but that, instead of acting on the item, the Board
tabled the matter, claiming that Sandridge's request raised
matters related to the pending litigation.  (SAC at ¶284.)
Plaintiffs allege that this refusal to act further on Sandridge's
request was "retaliatory" against Plaintiffs for associating with

75

1   Sandridge and for wanting to do business with Sandridge.   (*Id*. at
2   285.)

3       Defendants move to dismiss on the ground that their decision
4   to table Sandridge's request is conduct protected by the
5   litigation privilege, Cal. Civ. Code § 47(b).   The litigation
6   privilege protects individuals from liability arising out of any
7   communication made (a) in a judicial proceeding, (b) by a
8   litigant, (c) to achieve the objects of the litigation, and (d)
9   having some connection or logical relation to the action.
10  *Silberg v. Anderson*, 50 Cal. 3d 205, 212 (1990).

11      As a threshold matter, Plaintiffs assert broadly that the
12  litigation privilege does not shield Defendants from liability
13  for a claim that alleges a violation of constitutional rights.
14  Plaintiffs note that Defendants did not cite any cases applying
15  the litigation privilege to claims based on asserted
16  constitutional rights.   But, one such case was easily located,
17  *Mansell v. Otto*, 108 Cal. App. 4th 265 (2003) (applying
18  litigation privilege to claim that constitutional right to
19  privacy was violated).

20      Here, assuming Plaintiffs association claim is grounded in
21  state, rather than federal law, the conduct that allegedly
22  violated Plaintiffs right to association is protected by the
23  litigation privilege.   California Civil Code § 47(b) provides in
24  pertinent part.

25  //
26  //
27  //
28  //

**76**

1    A privileged publication or broadcast is one made:

2    (a)   In the proper discharge of an official duty.

3    (b)   In any (1) legislative proceeding, (2) judicial
           proceeding, (3) in any other official proceeding
4          authorized by law, or (4) in the initiation or
           course of any other proceeding authorized by law
5          and reviewable pursuant to Chapter 2 (commencing
           with Section 1084) of Title 1 of Part 3 of the
6          Code of Civil Procedure, except as follows:

7               (1) An allegation or averment contained in
                any pleading or affidavit filed in an action
8               for marital dissolution or legal separation
                made of or concerning a person by or against
9               whom no affirmative relief is prayed in the
                action shall not be a privileged publication
10              or broadcast as to the person making the
                allegation or averment within the meaning of
11              this section unless the pleading is verified
                or affidavit sworn to, and is made without
12              malice, by one having reasonable and probable
                cause for believing the truth of the
13              allegation or averment and unless the
                allegation or averment is material and
14              relevant to the issues in the action.
                              ***
15   (c)   In a communication, without malice, to a person
           interested therein, (1) by one who is also
16         interested, or (2) by one who stands in such a
           relation to the person interested as to afford a
17         reasonable ground for supposing the motive for the
           communication to be innocent, or (3) who is
18         requested by the person interested to give the
           information. This subdivision applies to and
19         includes a communication concerning the job
           performance or qualifications of an applicant for
20         employment, based upon credible evidence, made
           without malice, by a current or former employer of
21         the applicant to, and upon request of, one whom
           the employer reasonably believes is a prospective
22         employer of the applicant. This subdivision
           authorizes a current or former employer, or the
23         employer's agent, to answer whether or not the
           employer would rehire a current or former
24         employee. This subdivision shall not apply to a
           communication concerning the speech or activities
25         of an applicant for employment if the speech or
           activities are constitutionally protected, or
26         otherwise protected by Section 527.3 of the Code
           of Civil Procedure or any other provision of law.

27
     The most relevant portion of section 47 is subsection b, which
28

**77**

provides absolute privilege for any "publication or broadcast"
made in any judicial proceeding.  California courts have given
this privilege an "expansive reach."  *Rubin v. Green*, 4 Cal. 4th
1187, 1193-94 (1993).  It extends to any communication that bears
"some relation to any ongoing or anticipated lawsuit."  *Id*. at
1194.  The privilege also applies to a wide range of causes of
action.  The California Supreme Court noted "the only exception
to [the application of [section 47(b) to tort suits has been for
malicious prosecution."  *Id*.  The California courts have applied
the privilege to claims of abuse of process, *Pollock v. Univ. of
So. Cal.*, 112 Cal. App. 4th 1416 (2003), fraud, *Carden v.
Getzoff*, 190 Cal App. 3d 907 (1987), invasion of privacy, *Ribas
v. Clark*, 38 Cal. 3d 355, 364 (1985), *and interference with
contract*, *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.
3d 1118 (1990).

Critically, the privilege only applies to communicative
acts, not noncommunicative conduct.  *Rubin v. Green*, 4 Cal. 4th
1187, 1195-96 (1993).  For example, an attorney's act of
counseling his or her client is covered, even if it is alleged
that the attorney made misrepresentations during the course of
such communications.  *Id*.  However, pure conduct, such as
eavesdropping, is not covered.  *Id*.

Here, Plaintiffs allege that the Board violated Plaintiffs'
"right of association" when the Board refused to respond to
Sandridge's request for assurance that it would be treated in the
same manner as other parties who had earlier been permitted to
build out distribution facilities to their NSA lands.  The
Complaint alleges that Sandridge's build out request was on the

**78**

1    agenda for the February 7, 2006 Board meeting but that, instead

2    of acting on the item, the Board tabled the matter, claiming that

3    Sandridge's request raised matters related to the pending

4    litigation.  (SAC at ¶284.)  An examination of Plaintiffs First

5    Amended Complaint (not the currently operative complaint), filed

6    February 6, 2006, one day before the February 7, 2006 meeting,

7    reveals that the Board was completely justified in concluding

8    that Sandridge's build out request was related to the current

9    litigation.  The build out request is, in fact, <u>specifically</u>

10   <u>mentioned in the First Amended Complaint</u>.  (Doc. 49 at ¶¶ 73-78.)

11        Plaintiffs' "Right of Association" claim must be dismissed

12   because the Board's allegedly unlawful actions in not responding

13   based on the advice of counsel are shielded by California's

14   litigation privilege.

15        Accordingly, Defendants' motion to dismiss is **GRANTED IN ITS**

16   **ENTIRETY WITHOUT LEAVE TO AMEND, EXCEPT THAT LEAVE TO AMEND IS**

17   **GRANTED AS TO THE BROWN ACT CLAIM.**   The only claims remaining

18   under the currently operative complaint are those that were not

19   challenged by Defendants in this motion - the Political Reform

20   Act Claim and the Unfair Competition claim.

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

1

**C.** __Request for Preliminary Injunction__.

Plaintiffs' succinctly summarize their request as follows:

> Plaintiffs entered into a contract ("Contract") with
> Sandridge Partners ("Sandridge") for Sandridge to
> purchase real property from Plaintiffs ("Plaintiffs'
> Land") in order to make beneficial use of water rights
> appurtenant to such property which is located in the
> Non-Service Area ("NSA") portion of Belridge Water
> Storage District ("Belridge" or "District"). The
> Belridge Board retaliated against Plaintiffs by
> refusing to deal with Sandridge in connection with
> efforts to investigate building out water
> transportation facilities to Plaintiffs' and
> Sandridge's lands.

> After the District denied Plaintiffs' (and others')
> requests to transfer NSA water for use on Service Area
> (SA) land, Plaintiffs and Sandridge agreed to delay
> closing of the land sale for up to five years. As an
> alternate means of obtaining the water attributable to
> the water entitlement for Plaintiff's Land, Sandridge
> contacted District staff to discuss design and
> construction of water transportation facilities to
> Sandridge's and Plaintiffs' lands to make beneficial
> use of the water entitlement of those lands.

> The defendant Board members William Phillimore
> (Phillimore), Robert E. Baker (Baker), and Larry Starrh
> (Starrh) interfered with the Contract by preventing
> Sandridge from pursuing building out facilities to
> provide water delivery service to the Plaintiffs' land,
> causing Plaintiffs and Sandridge to delay the close of
> the land sale and delaying Plaintiffs' receipt of the
> sale proceeds.

> While the decisions of a public entity may deserve
> deference, here blatant protectionism and self-dealing
> by those in control of the public entity cannot be
> allowed. The three directors are all employed by
> entities that take 93.3% of the water attributable to
> the Plaintiffs' and other landowners' NSA land pursuant
> to a contract that they wrongfully entered into in
> light of their obvious conflicts of interest. These
> same directors had previously denied any change in
> place of use of water under Plaintiffs' and others'
> land owner contracts, to protect their and their
> employers' interest in the water off those lands,
> effectively amending the Top Contract by making it
> permanent. Now these conflicted Board members have
> resorted to thwarting contractual rights to continue to
> protect the water flow to their employers.

**80**

1
2
3
4
5
6

The purpose of Belridge is to equitably distribute
water to its members. Here, Belridge's actions are
decreasing the Plaintiffs property value by over 96%.
The problem would be solved by Belridge equitably
distributing the water as is Belridge's public purpose.
But as a landowner voting district, the biggest
landowners control the District. Plaintiffs have no
chance for electoral relief because the conflicted
directors represent entities that own the majority of
land value in the District.

7
8
9
10
11

The activities of a water storage district like
Belridge take place outside public view, without
oversight by any other branch of state government.
There is no oversight mechanism by which a water
storage district like Belridge, or the record of its
acts is made disclosable or accountable to the public,
despite the fact that all water in the State of
California is owned by the people of the State as a
whole. California Water Code §§ 102, 1201.

12
13
14
15
16

Plaintiffs request that the defendant Board members be
enjoined from delaying the discussions regarding
costing out, quoting, and possible eventual build-out
of water distribution facilities between District staff
and Sandridge or Plaintiffs will be irreparably harmed
by being prevented from mitigating damages through the
alternative of having facilities built to make water
delivery to Plaintiffs' lands possible and by the
commensurately longer delay in being able to close
their land sale with Sandridge.

17  (Doc. 70 at 1-3.)

18      Plaintiffs' request for an injunction fails at the outset

19  because the allegedly unlawful conduct against which Plaintiffs

20  request an injunction is the operation of the district itself,

21  the effect of the litigation privilege, and the highly

22  contentious dispute over the District's operations.  Therefore,

23  Plaintiffs have not established the requisite likelihood of

24  success on the merits of the particular claim that relates to

25  their request for an injunction.[12]

26

27      [12]   The parties debate whether the state or federal

28  standard for injunctive relief applies here, but, without
engaging in this dispute, it is enough to note that both the

**81**

Plaintiffs' attempt to use their surviving political reform
act claim to support a finding of likelihood of success, based on
the conduct alleged in that claim -- that the Board's February
16, 2005 vote is void because several voting Board members
operated under a conflict of interest – is only tangentially
related to what is in effect a request for the court to take over
management of the District.

Plaintiffs' motion for entry of a preliminary injunction is
**DENIED.**


**V.   CONCLUSION**

For the reasons set forth above:

(1)  Defendants' motion to dismiss is **GRANTED IN ITS ENTIRETY,**
     **WITHOUT LEAVE TO AMEND, EXCEPT THAT LEAVE TO AMEND IS**
     **GRANTED AS TO THE BROWN ACT CLAIM.**  The only claims
     remaining are those that were not challenged by Defendants
     in this motion - the Political Reform Act Claim and the
     Unfair Competition claim.

(2)  Plaintiffs' motion for a preliminary injunction is **DENIED.**

IT IS SO ORDERED.

**Dated:   October 18, 2006**        _____ **/s/ Oliver W. Wanger** _____
b2e55c                               UNITED STATES DISTRICT JUDGE

_____

state and federal standards require a showing of likelihood of
success. *See E&J Gallo Winery v. Andina Licores, S.A.*, 446 F.3d
984, 990 (9th Cir. 2006); *White v. Davis*, 30 Cal. 4th 528, 554
(2003).