1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **L.H. MEEKER, et al.,** | **1:05-CV-00603 OWW SMS** |
| **Plaintiffs,** | **ORDER RE PLAINTIFFS' MOTION FOR A CERTIFICATE OF APPEALABILITY** |
| **v.** | |
| **BELRIDGE WATER STORAGE DISTRICT, et al.,** | |
| **Defendants.** | |

## I.   INTRODUCTION

This case concerns water entitlements appurtenant to lands located in the Belridge Water Storage District ("Belridge") in Kern County, California.  Some of Plaintiffs' lands are serviced by Belridges' water supply system ("Service Area" or "SA" lands) while some are not ("Non-Service Area" or "NSA" lands). Plaintiffs assert, generally, that Belridge and certain members of Belridge's Board of Directors, namely William D. Phillimore, Robert E. Baker, and Larry Starrh ("Defendants"), violated various provisions of California law by passing a resolution that prohibited the transfer of water entitlements from NSA lands to SA lands.  After two rounds of motions to dismiss, all but two of Plaintiffs' claims have been eliminated from the case.

One of the twice-dismissed claims alleged that Belridge's Board violated California Government Code § 1090, which prohibits public officials from being financially interested in any

**1**

contract made by them in their official capacity.  Plaintiffs now move for a certificate of appealability so that they can seek review of the district court's dismissal of that claim.  (Doc. 94.)  Defendants oppose.  (Doc. 103.)

## II.   STANDARD OF REVIEW

The certification of interlocutory appeals is governed by 28 U.S.C. § 1292(b), which provides, in pertinent part:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves [1] a controlling question of law [2] as to which there is substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order...

Whether to permit an interlocutory appeal is vested, in the first instance, within the discretion of the district court.  *Conners B. Lybrand v. Livesay*, 437 U.S. 463, 474 (1978).  The party seeking review bears the burden of showing that "exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of final judgment."  *Id.* at 475; *United States Rubber Co. v. Wright*, 359 F.2d 784, 785 (9th Cir. 1966)(1292(b) is "to be used only in extraordinary cases where decisions might avoid protracted and expensive litigation.").

## III.   ANALYSIS

### A.   Asserted Factual Errors.

Plaintiffs argue that the district court made certain erroneous factual assumptions, impliedly asserting that the

2

district court relied upon these assumptions to reach an
erroneous legal conclusion.  However, rather than moving for
reconsideration or otherwise bringing these potential errors to
the attention of the court, Plaintiffs assert that these errors
justify interlocutory appeal.  To fully understand the alleged
factual errors, it is helpful to explain them in the context of
the procedural history of this case.

Plaintiffs' original complaint was nineteen pages long,
alleging five causes of action, including a version of the § 1090
claim.  Section 1090 prohibits Directors of a water district from
being "financially interested in any contract made by them in
their official capacity, or by any body or Board of which they
are a member."  Cal. Gov. Code § 1090 (emphasis added).  The
initial complaint alleged (a) that Defendants Phillimore, Baker,
and Starr, each work for and receive income and benefits from
entities that are parties to the Top Contract, an agreement
between the District and those entities and others for purchase
and use of District water, and (b) that the Top Contract was
entered into in 1999.  (Doc. 1 at ¶19.)  The initial complaint
did not allege that either Defendant Phillimore, Baker, or Starr
were members of the Belridge Board at the time the Top Contract
was entered into, nor did Plaintiffs explain when Phillimore,
Baker, or Starr became members of the board.  Moreover,
Plaintiffs did not allege that the Top Contract itself should be
voided under § 1090 because it had been entered into by an
interested board.  Rather, Plaintiffs focused on a subsequent
Board action taken on February 16, 2005, whereby Belridge
prohibited the permanent transfer of water entitlement from NSA

**3**

to SA lands, which prevented Plaintiffs from using NSA water

entitlements on SA lands.  The initial complaint did allege that

Phillimore, Baker, and Starr were members of the Board as of

February 16, 2005.  Plaintiffs maintained that the February 16,

2005 action constituted a "de facto" amendment to the Top

Contract, because the transfer ban ensured that water would be

available for purchase by the Top Contract parties and not

Plaintiffs, who are thereby prevented from making agricultural

use of their NSA lands in the District.  Plaintiffs further

alleged that this February 16, 2005 "de facto" amendment

constituted a violation of § 1090 because it was approved by

directors who held interests in the Top Contract.  (*See* Doc. 1 at

¶78.)

Defendants moved to dismiss this claim, arguing that the

February 16, 2005 Board action did not constitute the making of a

contract.  The district court agreed, reasoning:

> Plaintiffs appear to concede that the Defendant
> directors did not actually cause the Top Contract to be
> created.  The Top Contract was drafted and signed prior
> to any of the Defendant Directors becoming members of
> the Board.
>
> Plaintiffs also appear to concede that the February 16,
> 2005 vote did not expressly "make" a contract.  Rather,
> Plaintiffs assert that:
>
>> The Board's action at the February 16, 2005
>> special Board meeting amended the Top Contract
>> into a permanent contract whereby all of the NSA
>> entitlement is permanently made available to the
>> Buyers under the Top Contract, effectively
>> transforming the Top Contract from an interim or
>> temporary measure into a permanent arrangement.
>
> (Doc. 1, Compl., at ¶77.)  Essentially, Plaintiffs
> argue that the adoption of the policy was a de facto
> contract amendment, "insuring a supply of seized NSA
> water to Top Contract buyers."  (Doc. 25 at 12.)
> Plaintiffs offer no legal support for the proposition

**4**

that liability under § 1090 may be triggered by such an implied amendment. (The appropriate legal remedy appears to be under the PRA.)

Plaintiffs also suggest that *Milbrae* and its progeny call upon courts to read [] the statutory language liberally. For example, in *Thomson v. Call*, 38 Cal. 3d 633 (1985), a complex, multi-party contract transaction was found to be "part of a single multiparty agreement." It was therefore improper for a city councilman, whose own property was acquired in one of the more tangential transactions, to have participated in the making of any of the interrelated contracts:

> [T]he prospect that performance of the contract would involve acquisition of the [councilman's land and conveyance of that land to the city was contemplated by all parties....[T]he policy goals of section 1090 support the rule that public officers "are denied the right to make contracts in their official capacity with themselves or to become interested in contracts thus made."

*Id.* at 645. A similarly broad view of the meaning of the term "contract" was taken in *People v. Honig*, 48 Cal. App. 4th 289 (1996). In that case, a state educational official was married to the founder and director of a nonprofit corporation involved in education. At this official's direction, grants were made by the state to certain school districts. But, these funds were actually used to pay the salaries of employees who worked for his wife's nonprofit organization. The official was found to have violated § 1090 because he had indirectly caused the improper contracts to be made. The *Honig* court reasoned:

> In considering conflicts of interest we cannot focus upon an isolated 'contract' and ignore the transaction as a whole. It appears clear that the payment of DOE funds to the school districts, the districts' payment of those funds to QEP employees in the form of continued salaries and benefits, and the employees' work for QEP, were in performance of single multiparty agreements. In short, defendant simply used the school district contractors as conduits to funnel DOE funds to individuals as compensation for working for his wife's corporate employer. The use of a third party as a contractual conduit does not avoid the inherent conflict of interest in such a transaction.

*Id.* at 320. *See also People v. Gnass*, 101 Cal. App. 4th 1271, 1293 (2002)("[T]he test is whether the officer or employee participated in the making of the

**5**

1    contract in his official capacity.").

2        Although these cases take a broad view of the term
         contract, Plaintiffs suggest an even broader
3        interpretation of § 1090.  Under Plaintiffs'
         interpretation, any vote of a government official that
4        advances an independent existing contractual interest
         held by that government official would be prohibited by
5        § 1090.  Plaintiffs essentially argue that § 1090
         should be read to subsume any action that advances a
6        contractual interest.  This in effect rewrites § 1090.
         (Noticeably, § 1090 lacks the "public generally"
7        exception which threatens Plaintiffs' PRA claim.)  The
         Belridge Board's vote on the transfer of NSA water is
8        not a "contract made" by the Board, unless an agreement
         between the district and the Top Contractors results
9        from the vote.  Defendants' motion to dismiss the §
         1090 claim is **GRANTED WITH LEAVE TO AMEND.**
10
(Doc. 48 at 38-41 (emphasis added).)
11
         Plaintiffs now argue that the court erred in assuming that
12
Plaintiffs "concede[ed] that the Defendant directors did not
13
actually cause the Top Contract to be created."  However, at no
14
time after the issuance of the the January 17, 2006 order, until
15
the filing of their motion for a certificate of appealability,
16
almost one year later, did Plaintiffs ever move for
17
reconsideration or to otherwise correct the court's "error."[1]
18
         Plaintiffs then filed a thirty eight page first amended
19
complaint (Doc. 49), and then, by stipulation, a second amended
20
complaint (Docs. 62 & 63).  The second amended complaint, which
21
was fifty eight pages long, advanced fifteen separate claims,
22

23
         [1]    Based on the allegations contained in the initial
24   complaint, the district court had no notice that Plaintiffs
     disputed this assumption.  Moreover, the absence of any
25   allegation that the Top Contract should be voided under § 1090
     because it was **originally** entered into by interested directors
26   necessarily suggested that the Defendant Directors were not on
     the Board at the time the Top Contract was signed.  The absence
27   of any such allegation is also explained by the fact that such a
     claim might be barred by the statute of limitations.
28

**6**

1   most of them entirely new.  (Doc. 62.)

2       Among the many new claims, Plaintiffs again included a

3   § 1090 claim, advancing four separate theories:

4       (a)  That "[t]he February 16, 2005 Board Meeting was the

5            'making' of a contract under the guise of being a

6            policy change. The law does not reward form over

7            substance."  (SAC at ¶28.)

8       (b)  That "[t]he Top Contract is void under § 1090 because

9            it requires the making of a contract each year."  (SAC

10           at ¶31.)

11      (c)  That "[t]he Joint Defense Agreement is a void contract

12           under § 1090 because it is the making of a contract."

13           (SAC at ¶32.)

14      (d)  That "[t]he November 1, 2005 Board Decision is the

15           making of a contract and void under § 1090."  (*Id.*)

16  In the General Background section of the SAC, Plaintiffs

17  specifically allege that Defendants Starr, Phillimore, and Baker

18  became members of the Board in 1998; and that all of them signed

19  the Top Contract, on behalf of the District and/or various

20  entities that were parties to the Top Contract.  However, nowhere

21  did Plaintiffs clearly point out to the court that this fact

22  contradicted the court's prior assumption that Plaintiffs had

23  "concede[ed] that the Defendant directors did not actually cause

24  the Top Contract to be created."  Moreover, nowhere did

25  Plaintiffs allege in the SAC that the Top Contract was void when

26  it was entered into in 1999 because interested directors sat on

27  the Board at that time.

28      Defendants again moved to dismiss all but two of the claims

**7**

1   in the SAC, including the § 1090 claim.  In an October 23, 2006
2   memorandum decision, the district court dismissed the renewed
3   § 1090 claim.  The district court first quoted its reasoning from
4   the January 17, 2006 order, including the language which
5   expressed the assumption that Plaintiffs had conceded the
6   defendant Directors did not cause the Top Contract to be formed.
7   Plaintiffs now suggest that the reiteration of this language
8   somehow tainted the district court's dismissal of the renewed
9   § 1090 claim.  However, the district court did not materially
10  rely upon this language, as the SAC asserts no claim regarding
11  the initial formation of the Top Contract.

12       The district court rejected each of the four theories
13  advanced by Plaintiffs in support of their renewed § 1090 claim.
14  Of particular concern to Plaintiffs is one other part of the
15  district court's October 23, 2006 order.  In addressing
16  Plaintiffs' argument that the Top Contract required the making of
17  a contract each year, the district court reasoned:

18          ...Specifically, the standard provisions set forth in
            the Top Contract require the Board to determine charges
19          for water distribution each year.  Plaintiffs maintain
            that this procedure requires the board to "re-make" the
20          top contract each year.

21              Plaintiffs cite *City of Imperial Beach v. Bailey*,
            103 Cal. App. 3d 191 (1980) in support of their
22          position.  In that case, the operator of a concession
            stand under contract with the city was later elected to
23          become a member of the city council.  *Id.* at 194.  A
            provision of the concession contract provided that on
24          the fifteenth anniversary of the agreement, ownership
            of the building in which the concession was housed
25          would pass to the city and that "[a]t the end of said
            fifteen year period City may reasonably adjust the rate
26          of payment to be paid by Operator to City to reflect
            the fact that City owns the building."  *Id.*  When the
27          concession contract came up for renewal, the operator
            was still a member of the city council.  The city
28          refused to renew the contract, citing § 1090, and

**8**

sought a declaration as to the legality of its refusal. *Imperial Beach* first held that the renewal would constitute the making of a contract which would violate § 1090. The court reasoned that adjustment of the rate on the fifteen year anniversary would require a "negotiation" prohibited by § 1090, even if the city set the rate unilaterally (i.e., without negotiating with the concession) and even if the conflicted council member abstained from voting. *Id.* at 195. The critical inquiry was whether the council was required to approve the rate: "It is not her participation in the voting which constitutes the conflict of interest, but her potential to do so." *Id.*

Plaintiffs allege that the Top Contract must be voided under § 1090 because it "require[s] the Board to determine charges for water distribution in the October Board Meeting each year," just like the *Imperial Beach* contract required "a concession price be inserted for each year the contract was in force." (SAC at ¶¶ 161-62.) First, Plaintiffs misrepresent the nature of the contract in *Imperial Beach*. As discussed, that contract permitted a rate adjustment on the fifteen year renewal date. Nothing in *Imperial Beach* suggests that a "concession price [must] be inserted for each year the contract was in force." Moreover, while the contract in *Imperial Beach* was explicitly subject to renewal on the fifteen year anniversary, the Top Contract contains no annual renewal provision. Plaintiffs correctly point out that charges for water distribution must be calculated each year, and appear to suggest that this annual calculation constitutes the type of "negotiation" prohibited in *Imperial Beach*. However, the charges for water distribution are calculated according to a **pre-determined mathematical formula** and are part of the inherent functions of a water district in providing water services to its members. Moreover, nothing in the Top Contract speaks of annual <u>renewal</u> of the contract at the time of the rate-setting, nor is it alleged that the Top Contract requires Board approval of the new rate.

(Doc. 91 at 29-31.) For the first time in their reply brief, Plaintiffs assert that the district court made an additional factual error by assuming that the Top Contract calculated charges for water distribution according to a "pre-determined mathematical formula." But, again, Plaintiffs never brought this asserted factual "error" to the court's attention after the issuance of the October 23, 2006 order. Plaintiffs assert that

1  this assumption is "important because it [was] used to
2  distinguish *City of Imperial Beach*."

3       Critically, Plaintiffs here seek permission to file an
4  interlocutory appeal.  Yet, they entirely fail to explain how
5  these alleged errors of <u>fact</u> fit within the 1292(b) framework,
6  which permits interlocutory appeals to be taken only on
7  "controlling questions of <u>law</u>."  Although the Ninth Circuit has
8  not directly spoken on the issue, it is generally accepted that
9  "[q]uestions of fact, questions as to how agreed-upon law should
10 be applied to particular facts, or questions regarding the manner
11 in which the trial judge exercised his or her discretion may not
12 be properly certified for interlocutory review."  2. Fed. Proc.,
13 L. Ed., § 3:210 (citing cases from within the Second, Third and
14 Fifth circuits).[2]  The appropriate mechanism for redress of
15 factual errors is a motion for reconsideration, not an
16 interlocutory appeal.  Such a motion permits the district court
17 to consider whether its decision should have been modified in
18 light of different facts that were not specifically alleged in
19 the amended complaint.  During oral argument, the parties agreed
20 to stipulate to the facts that needed correction.  Their
21 stipulation was entered on February 5, 2007.  (Doc. 111.)

22
23
24

25      [2]    The only remotely responsive citation provided by
26 Plaintiffs is *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227,
   240-241 (1937), which holds that courts do not have the power to
27 render advisory opinions based on hypothetical facts.  *Aetna* says
   nothing, however, about whether issues of fact or mixed questions
28 of fact and law may be certified for interlocutory review.

1    **B.    Does Plaintiffs' Request Otherwise Satisfy § 1292(b)**.

2    Plaintiffs generally argue that the district court's

3    rejection of their § 1090 claim presents "[1] a controlling

4    question of law [2] as to which there is substantial ground for

5    difference of opinion and [3] that an immediate appeal from the

6    order may materially advance the ultimate termination of the

7    litigation."  28 U.S.C. § 1292(b).

8    Plaintiffs suggest that the controlling question of law here

9    is "whether an action taken by the Board of a public entity,

10   which necessarily results in the amendment of a contract,

11   violates [] § 1090."  (Doc. 95 at 8.)  An issue is controlling if

12   it would "materially affect the outcome of litigation in the

13   district court."  *In re Cement Antitrust Litig.*, 673 F.2d 1020,

14   1026 (9th Cir. 1982).  Here, Plaintiffs' success on appeal would

15   materially affect the outcome of the litigation in the district

16   court.  Although Plaintiffs' related Political Reform Act ("PRA")

17   claim, Cal. Gov. Code § 87100, remains in the case, the PRA claim

18   is not identical to the dismissed § 1090 claim.  For instance,

19   while success under either the PRA and § 1090 claims would result

20   in nullification of the challenged Board action, it appears that

21   § 1090 claim requires a more straightforward evidentiary showing.

22   Specifically, to obtain nullification, § 1090 requires only that

23   the Board member <u>vote</u> on the challenged action in which they

24   alleged to have an interest, facts which are not disputed in this

25   case.  The PRA contains several exceptions, the application of

26   which may require evidence regarding the interested Board

27   members' land and water holdings.  (*See* Doc. 48 at 29-38.)

28   The third requirement for an interlocutory appeal –- that

**11**

the appeal must be likely to materially speed the termination of the litigation -- is closely linked to the question of whether an issue of law is "controlling," because the district court should consider the effect of a reversal on the management of the case. *In Re Cement Antitrust Litig.*, 673 F.2d at 1026.  Here, if Plaintiffs are successful on interlocutory appeal, the strength of their overall case would be greatly enhanced.

Finally, Plaintiffs argue that there is substantial ground for a difference of opinion on the controlling issue, because California courts have generally adopted a broad interpretation of § 1090.  Specifically, Plaintiffs argue:

> The court in *Millbrae Assn for Residential Survival v. City of Millbrae*, 262 Cal.App.2d (1968), 237 [sic] provides that the concept "making of a contract" should be used in a wide sense.
>
> Although section 1090 refers to a contract "made" by the officer or employee, the word "made" is not used in the statute in its narrower and technical contract sense but is used in the broad sense to encompass such embodiments in the making of a contract as preliminary discussions, negotiations, compromises, reasoning, planning, drawing of plans and specifications and solicitation for bids. (citation omitted). Such construction is predicated upon the rationale that government officers and employees are expected to exercise absolute loyalty and undivided allegiance to the best interests of the governmental body or agency of which they are officers or employees, and upon the basis that the object of such a statute is to remove or limit the possibility of any personal influence, either directly or indirectly which may bear on an officer's or employee's decision. (Citation omitted).
>
> If the "making of a contract" encompasses such activities as preliminary discussions, negotiations, and reasoning, it should include direct action which effects a contact to which the  government officer's employer is a beneficiary and party, where the action enhances the benefits accruing to the official's employer from the contract.

(Doc. 95 at 8-9.)

But, Defendants correctly point out that a plaintiff's disagreement with the district court's ruling is not sufficient to establish that a substantial ground for difference of opinion exists. *See Hansen v. Schubert*, 459 F. Supp. 2d 973 (E.D. Cal. 2006)("A party's strong disagreement with the court's ruling is not sufficient for there to be a 'substantial ground for difference'; the proponent of an appeal must make some greater showing.").  In support of their assertion that there are substantial grounds for a difference of opinion about the scope of § 1090, Plaintiffs cite *Thompson v. Call*, 38 Cal. 3d 633, 645 (1985), for the proposition that California courts have voided contracts under § 1090 where the public officer was found to have an indirect interest in the contract. *Thompson* was cited in support of the first motion to dismiss along with several related cases.  The district court discussed those cases in the January 17, 2006 order:

> Plaintiffs also suggest that *Milbrae* and its progeny call upon courts to read [] the statutory language liberally.  For example, in *Thomson v. Call*, 38 Cal. 3d 633 (1985), a complex, multi-party contract transaction was found to be "part of a single multiparty agreement."  It was therefore improper for a city councilman, whose own property was acquired in one of the more tangential transactions, to have participated in the making of any of the interrelated contracts:
>
> > [T]he prospect that performance of the contract would involve acquisition of the [councilman's land and conveyance of that land to the city was contemplated by all parties....[T]he policy goals of section 1090 support the rule that public officers "are denied the right to make contracts in their official capacity with themselves or to become interested in contracts thus made."
>
> *Id*. at 645.  A similarly broad view of the meaning of the term "contract" was taken in *People v. Honig*, 48 Cal. App. 4th 289 (1996).  In that case, a state educational official was married to the founder and

**13**

director of a nonprofit corporation involved in
education. At this official's direction, grants were
made by the state to certain school districts. But,
these funds were actually used to pay the salaries of
employees who worked for his wife's nonprofit
organization. The official was found to have violated
§ 1090 because he had indirectly caused the improper
contracts to be made. The *Honig* court reasoned:

> In considering conflicts of interest we cannot
> focus upon an isolated 'contract' and ignore the
> transaction as a whole. It appears clear that the
> payment of DOE funds to the school districts, the
> districts' payment of those funds to QEP employees
> in the form of continued salaries and benefits,
> and the employees' work for QEP, were in
> performance of single multiparty agreements. In
> short, defendant simply used the school district
> contractors as conduits to funnel DOE funds to
> individuals as compensation for working for his
> wife's corporate employer. The use of a third
> party as a contractual conduit does not avoid the
> inherent conflict of interest in such a
> transaction.

*Id.* at 320. *See also People v. Gnass*, 101 Cal. App.
4th 1271, 1293 (2002)("[T]he test is whether the
officer or employee participated in the making of the
contract in his official capacity.").

Although these cases take a broad view of the term
contract, Plaintiffs suggest an even broader
interpretation of § 1090. Under Plaintiffs'
interpretation, any vote of a government official that
advances an independent existing contractual interest
held by that government official would be prohibited by
§ 1090. Plaintiffs essentially argue that § 1090
should be read to subsume any action that advances a
contractual interest. This in effect rewrites § 1090.
(Noticeably, § 1090 lacks the "public generally"
exception which threatens Plaintiffs' PRA claim.) The
Belridge Board's vote on the transfer of NSA water is
not a "contract made" by the Board, unless an agreement
between the district and the Top Contractors results
from the vote. Defendants' motion to dismiss the §
1090 claim is **GRANTED WITH LEAVE TO AMEND.**

(Doc. 48 at 39-41.)

Although *Thompson* and *Honig* do support the proposition that

contracts which indirectly affect a Director's interests may be

covered by § 1090, the district court concluded that these cases

**14**

do not support Plaintiffs' broader assertion that § 1090 should be applied to non-contractual Board actions which happen to advance a Director's previously formed contract interests.  While *City of Imperial Beach v. Bailey*, 103 Cal. App. 3d 191 (1980), does expand the reach of § 1090 to certain non-contractual actions which would amount to a de facto contract renegotiation, the district court distinguished *Bailey* on a number of grounds.[3]

As a practical matter, directors of water districts are likely to have some contractual in any water allocation decisions made by the district.  Under Plaintiffs' interpretation of § 1090, no water districts could ever vote on water allocation decisions.  However, the issue is one of first impression in California and the applicability of § 1090 to the facts of this case is a close call, particularly in light of the state cases which suggest courts should construe § 1090 liberally.  There is a substantial basis for differences of opinion on the merits of Plaintiffs' § 1090 claim.

//
//
//
//
//
//

---

[3]   Plaintiffs suggest that the district court's decision to distinguish *Imperial Beach* was erroneous because the district court relied upon an improper factual assumption.  Even if the district court relied on erroneous facts, this does not justify an interlocutory appeal if the law was clear.  Plaintiffs offer no other authority which calls into question the district court's conclusion regarding the applicability of *Imperial Beach*.

1    Whether the action taken by the Belridge Board on November

2    1, 2005, prohibiting the permanent transfer of NSA water to SA

3    land, violates § 1090 because it constituted a "de facto"

4    amendment of the Top Contract is a controlling question of law as

5    to which there is substantial ground for difference of opinion.

6    An immediate appeal from the order may materially advance the

7    ultimate termination of the litigation.

8

9                    **IV.   <u>CONCLUSION</u>**

10    For the reasons set forth above, Plaintiffs' motion for a

11   certificate of appealability as to this issue is **GRANTED.**

12

13   IT IS SO ORDERED.

14   **Dated:    March 12, 2007**          /s/ Oliver W. Wanger
     b2e55c                        UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**16**