1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **L.H. MEEKER**, *et al.*,<br><br>                    **Plaintiffs,**<br><br>                    **v.**<br><br>**BELRIDGE WATER STORAGE**<br>**DISTRICT**, *et al.*,<br><br>                    **Defendants.** | **1:05-CV-00603 OWW SMS**<br><br>**ORDER DENYING PLAINTIFFS'**<br>**MOTION FOR SUMMARY JUDGMENT**<br>**(DOC. 117).** |

16
17
18

**I.   INTRODUCTION**

    This case concerns water entitlements appurtenant to lands

located in the Belridge Water Storage District ("Belridge") in

Kern County, California.  Some of Plaintiffs' lands are serviced

by Belridge's water supply system ("Service Area" or "SA" lands),

while some are not ("Non-Service Area" or "NSA" lands).

Plaintiffs assert, generally, that Belridge and certain members

of Belridge's Board of Directors, namely William D. Phillimore,

Robert E. Baker, and Larry Starrh ("Defendants"), violated

various provisions of California law by passing a resolution on

1

February 16, 2005, that prohibited the transfer of water
entitlements from NSA lands to SA lands.  On May 3, 2005,
Plaintiffs filed suit in federal court, invoking diversity
jurisdiction.  (Doc. 1.)  After two rounds of motions to dismiss,
all but two of Plaintiffs' claims under state law -- for
violations of the Political Reform Act ("PRA") and the
prohibition of unfair competition -- have been eliminated from
the case.

Plaintiffs now move for summary judgment on the PRA claim as
to Defendant Starrh.  Because there are substantial disputes as
to material facts related to one element of this claim, the
motion is DENIED.

## II.  BACKGROUND

Extensive factual background on the parties, their land
holdings, and economic interests is set forth in prior decisions.
Only the facts pertinent to this motion are presented here.

Plaintiffs own land within Belridge, which contracts with
the Kern County Water Authority ("KCWA") to receive water.  KCWA
in turn contracts with the California Department of Water
Resources ("DWR") to receive a supply of water from the State
Water Project ("SWP").

Belridge encompasses lands that are currently served by
Belridge's water distribution system ("Service Area" or "SA"
lands), as well as land that is entitled to receive water but is
not currently served by the distribution system ("Non-Service
Area" or "NSA" lands).  Plaintiffs own both SA and NSA land in
Belridge.  All SA and NSA lands are entitled to receive water

2

1  pursuant to recorded contracts ("Landowner Contracts") with
2  Belridge.

3      Belridge is a landowner voting Water Storage District
4  governed by a five-member Board of Directors ("Board").  *See* Cal.
5  Water Code § 41000.

6      A.   <u>The Defendants</u>.

7      Defendants William Phillimore, Robert Baker, and Larry
8  Starrh are members of Belridge's Board.  Larry Starrh, the
9  subject of the pending motion for summary judgment, is the
10  Belridge Board's Treasurer.  The three have been Board members
11  continuously since 1998.  (UMF 4.)

12      Mr. Starrh is also a partner in Starrh & Starrh Cotton
13  Growers, which pays him a salary in excess of $100,000 per year.

14      B.   <u>The Top Contract</u>.

15      Certain entities in Belridge, including entities with whom
16  the three individual Defendants in this case have business
17  relationships, are parties to a 1999 contract with Belridge,
18  known as the "Top Contract."  This agreement allows such
19  contracting parties to purchase water that is allocable (but
20  undeliverable) to the NSA lands.  The water available for
21  purchase under the Top Contract is known as "Top Water."  The
22  parties to the Top Contract purchase Top Water from Belridge and
23  use it on their SA lands.

24      Specifically, parties to the Top Contract purchase from
25  Belridge portions of the annual entitlement associated with NSA
26  lands as of January 1, 1999, less any portion transferred outside
27  the NSA after January 1, 1999.  Each party to the Top Contract is
28  entitled to purchase a certain percentage of the NSA entitlement.

**3**

1  The parties to the Top Contract are not required to pay any

2  transfer charges to change the place of use of Top Water from NSA

3  to SA lands.

4      In exchange, the parties to the Top Contract agreed to make

5  annual payments to Belridge. These fees help to cover Belridge's

6  costs (under Belridge's KCWA contract) and the costs of

7  delivering water to the SA lands.

8      Belridge New Farming LLC (62.84%), Starrh & Starrh Cotton

9  Growers (16.61%), and Paramount Land company (14.46%) are the

10 three largest parties to the Top Contract. The remaining 6.09%

11 is held by others.

12     C.   <u>Plaintiffs' Request to Use NSA Water on SA lands</u>.

13     Plaintiffs requested permission to use the water

14 entitlements associated with their NSA lands on SA lands. In

15 order to obtain permission to use NSA-attributable water on SA

16 land, Plaintiffs' Landowner Contracts must be amended. Without

17 amendment, Plaintiffs cannot use their NSA water entitlements.

18     On January 10, 2005, Plaintiffs sent a letter to the Board,

19 notifying the Board that they intended to "request to have

20 [their] non service area water activated into the service area.

21 More specifically, [they] plan on farming with this water with

22 Sandridge Farms and or other existing land owners and we depend

23 on this water for the economic use of our lands in the district."

24 (Doc. 18, Hughes Decl., Ex. D.) The letter also states:

25          We have been informed of a series of meetings the
           district has had regarding two requests that land
26          owners have made in early 2004. The two land owners
           are Sandridge and Chevron. We have been made aware of
27          an identical request from a land owner, Stiefvater,
           which was approved under the same Board Policies that
28          are currently in place. I have been informed that

4

several of the current Board Members have been
participating in discussions, talked to the manager and
have voted to delay the transfer of this water.  It
appears these Board members currently may have free use
of about 10,000 acre feet of water of this character
through a unique arrangement set up by the Board and
called top contracts.  If the foregoing is true, the
value of the top contracts of these Board Members is in
excess of 10 million dollars assuming a value of $1,000
per acre foot.

*(Id.)*

The operative effect of Plaintiffs' proposed transfer from
NSA to SA lands would be to decrease the volume of water
available for distribution under the Top Contract.

D.    The Allegedly Improper/Unlawful Vote.

On January 11, 2005, the Board held a regularly scheduled
board meeting.  The agenda for that meeting referenced the
following item:

Legal Counsel:

(a) Report re: Charge for Permanent Transfers from
Non-service Area to Service Area.

(Doc. 25, Carlson Decl., Ex. 7).  No vote on this issue was taken
during the January 11, 2005 meeting.  Instead, the meeting was
adjourned until February 16, 2005 to allow time for public
comment and for the board to consider the matter.

The agenda for the February 16, 2005 meeting includes the
following modified agenda item:

Other Business:

a. Policy re: Permanent Transfer of Annual
Entitlement from Non-Service Area to Service area.

(Doc. 19, Req. for Judicial Notice, Ex. C.)

On February 16, 2005, Defendant Baker moved to adopt a
policy to prohibit permanent transfers of water from NSA land to

5

1  SA land.  The Board voted 3-2 to adopt that policy.  The three

2  votes in favor of the prohibition were Defendant Directors

3  William Phillimore, Robert Baker and Larry Starrh.

4        On March 18, 2005, in accordance with the exhaustion

5  requirements of the Brown Act, Cal. Gov. Code § 54960.1,

6  Plaintiffs sent a letter to the Board demanding that the action

7  be nullified because the vote violated the terms of the Brown

8  Act.  On April 18, 2005, the Board refused to nullify the vote.

9        E.    The Sale of Plaintiffs' Property to Sandridge Partners
             And Sandridge's Parallel State Lawsuit.

10       Since the commencement of these proceedings, Plaintiffs have

11  sold their NSA lands to a third party, Sandridge Partners

12  ("Sandridge"), which owns land in both the NSA and SA.  On

13  October 19, 2006, Sandridge filed a complaint, nearly identical

14  to the Complaint in this case, against the Defendants in Kern

15  County Superior Court Case No. S-1500-CV 259407.  One of the

16  causes of action in the Kern County case is identical to the PRA

17  claim here, another is the same as the unfair competition claim

18  still pending here, and a third is based upon the Government Code

19  § 1090 claim previously dismissed by this court.

20       Defendants filed a motion for summary adjudication of the

21  PRA claim in the Kern County case, based on the special rule for

22  landowner voting districts under the public generally exception.

23  That motion was denied.

24       III.   STANDARD OF REVIEW - MOTION FOR SUMMARY JUDGMENT

25       Summary judgment is warranted only "if the pleadings,

26  depositions, answers to interrogatories, and admissions on file,

27  together with the affidavits, if any, show that there is no

28

                                  6

1  genuine issue as to any material fact." Fed. R. Civ. Pro. 56(c);
2  *California v. Campbell*, 138 F.3d 772, 780 (9th Cir.1998).
3  Therefore, to defeat a motion for summary judgment, the
4  non-moving party must show (1) that a genuine factual issue
5  exists and (2) that this factual issue is material. *Id*. A
6  genuine issue of fact exists when the non-moving party produces
7  evidence on which a reasonable trier of fact could find in its
8  favor viewing the record as a whole in light of the evidentiary
9  burden the law places on that party. *See Triton Energy Corp. v.*
10 *Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also*
11 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).
12 Facts are "material" if they "might affect the outcome of the
13 suit under the governing law." *Campbell*, 138 F.3d at 782
14 (*quoting Anderson*, 477 U.S. at 248).

15        The non-moving party cannot simply rest on its allegations
16 without any significant probative evidence tending to support the
17 complaint. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th
18 Cir.2001). The plain language of Rule 56(c) mandates the entry
19 of summary judgment, after adequate time for discovery and upon
20 motion, against a party who fails to make a showing sufficient to
21 establish the existence of an element essential to the party's
22 case, and on which that party will bear the burden of proof at
23 trial. In such a situation, there can be "no genuine issue as to
24 any material fact," since a complete failure of proof concerning
25 an essential element of the nonmoving party's case necessarily
26 renders all other facts immaterial. *Celotex Corp. v. Catrell*,
27 477 U.S. 317, 322-23 (1986). The more implausible the claim or
28 defense asserted by the non-moving party, the more persuasive its

**7**

evidence must be to avoid summary judgment. *See United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1996). Nevertheless, the evidence must be viewed in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. A court's role on summary judgment is not to weigh evidence or resolve issues; rather, it is to determine whether there is a genuine issue for trial. *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th Cir.1996).

IV.   <u>DISCUSSION</u>

    A.   <u>Standing</u>.

    Defendants assert that Plaintiffs lack standing because they sold their land to Sandridge.

    To have standing, a plaintiff must show three elements.

> First, the plaintiff must have suffered an "injury in fact"--an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of-- the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted).

    The Supreme Court has described a plaintiff's burden of proving standing at various stages of a case as follows:

> Since [the standing elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In

8

> response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Id.* at 561; *see also Churchill County v. Babbitt*, 150 F.3d 1072, 1077 (9th Cir. 1998).

Plaintiffs contract of sale with Sandridge was signed March 14, 2005. (Doc. 122, Def. Opp. Mot. Sum. J., Ex. J at 29.) The agreement was to close in 120 days. (*Id.* at § 2.2.) Defendants argue that, given that the 120 day period has passed, Plaintiffs have no further interest in the Property and therefore have no personal interest in this lawsuit and hence no standing to sue. (Doc. 122 at 6.)

Plaintiffs rejoin that the contract is still "wholly executory." (Doc. 125 at 2.) According to a declaration filed on June 12, 2006 by one of the Plaintiffs, Mr. Meeker, the purpose of the contract of sale is to allow Sandridge access to the water entitlement appurtenant to Plaintiffs' land. (Doc. 71 at ¶6.) Without access to water, Plaintiffs' land is of little value, as recognized in the contract of sale, which assigns 96% of the value of the property to the water entitlement. (Doc. 122, Ex. J at 27.) According to Meeker, after the February 16, 2005 vote, Plaintiffs and Sandridge agreed to delay the close of the property sale for up to five years. (Doc. 71 at ¶10.) Defendants do not dispute this assertion. Accordingly, Plaintiffs still hold title to the land in question and their economic interests give them standing to challenge regulations that impact the value and alienability of that property.

9

1

      **B.**   **Elements of a Prohibited Conflict of Interest under California's Political Reform Act.**

2

     The elements of a prohibited conflict of interest under the Political Reform Act of 1974 (PRA) are set out in California Government Code § 87100 and Title 2 of the California Code of Regulations §§ 18700 et seq.  Government Code § 87100 provides:

          No public official at any level of state or local government shall make, participate in making or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest.

Therefore, a prohibited conflict of interest exists where:  (1) the decision maker is a "public official" of a state or local government; and (2) the public official is making, participating in making, or influencing a government decision in which he knows or has reason to know he has a financial interest.

     Title 2 of the California Code of Regulations, section 18702, promulgated by the Fair Political Practices Commission, provides guidance to determine if a prohibited conflict of interest exists:

          (a) No public official at any level of state or local government may make, participate in making or in any way use or attempt to use his/her official position to influence a governmental decision in which he/she knows or has reason to know he/she has a disqualifying conflict of interest. A public official has a conflict of interest if the decision will have a reasonably foreseeable material financial effect on one or more of his/her economic interests, unless the public official can establish either: (1) that the effect is indistinguishable from the effect on the public generally, or (2) a public official's participation is legally required.

2 Cal. Code Regs. § 18700(a).

     Specifically, "to determine whether a given individual has a disqualifying conflict of interest under the Political Reform

10

1   Act," the following eight step analysis applies:

2           (1) Determine whether the individual is a public
        official, within the meaning of the Act. (See
3       Government Code section 82048; 2 Cal. Code Regs. §
        18701.) If the individual is not a public official, he
4       or she does not have a conflict of interest within
        the meaning of the Political Reform Act.

5

6           (2) Determine whether the public official will be
        making, participating in making, or using or attempting
7       to use his/her official position to influence a
        government decision. (See 2 Cal. Code Regs. § 18702.)
8       If the public official is not making, participating in
        making, or using or attempting to use his/her official
9       position to influence a government decision, then he or
        she does not have a conflict of interest within the
10      meaning of the Political Reform Act.

11          (3) Identify the public official's economic interests.
        (See 2 Cal. Code Regs. § 18703.)

12          (4) For each of the public official's economic
        interests, determine whether that interest is directly
13      or indirectly involved in the governmental decision
        which the public official will be making, participating
14      in making, or using or attempting to use his/her
        official position to influence. (See 2 Cal. Code Regs.
15      § 18704.)

16          (5) Determine the applicable materiality standard for
        each economic interest, based upon the degree of
17      involvement determined pursuant to California Code of
        Regulations, title 2, section 18704. (See 2 Cal. Code
18      Regs. § 18705.)

19          (6) Determine whether it is reasonably foreseeable that
        the governmental decision will have a material
20      financial effect (as defined in California Code of
        Regulations, title 2, section 18705) on each economic
21      interest identified pursuant to California Code of
        Regulations, title 2, section 18703. (See 2 Cal. Code
22      Regs. § 18706.) If it is not reasonably foreseeable
        that there will be a material financial effect on any
23      of the public official's economic interests, he or she
        does not have a conflict of interest within the meaning
24      of the Political Reform Act. If it is reasonably
        foreseeable that there will be a material financial
25      effect on any of the public official's economic
        interests, and the official does not participate in the
26      decision, determine whether the official may segment
        the decision into separate decisions to allow his or
27      her participation in subsequent decisions. (See 2 Cal.
        Code Regs. § 18709.)

28

**(7) Determine if the reasonably foreseeable financial effect is distinguishable from the effect on the public generally. If the official can establish that the reasonably foreseeable material financial effect on his or her economic interest is indistinguishable from the effect on the public generally, he or she does not have a conflict of interest within the meaning of the Political Reform Act. If the reasonably foreseeable material financial effect on the public official's economic interest is distinguishable from the effect on the public generally, he or she has a conflict of interest within the meaning of the Political Reform Act. (See 2 Cal. Code Regs. § 18707.)**

**(8) Determine if the public official's participation is legally required despite the conflict of interest. If the official can establish that his or her participation is legally required, he or she may participate in the governmental decision despite the conflict of interest. (See 2 Cal. Code Regs. § 18708.)**

2 Cal. Code Regs. § 18702(b).

The parties do not dispute that this is the appropriate procedure to follow in determining whether a violation of the PRA has occurred.

   C.   <u>Applying the Eight Step Process</u>.

      1.   <u>Is Starrh a Public Official</u>?

The first question is "whether the individual is a public official, within the meaning of the Act. If the individual is not a public official, he or she does not have a conflict of interest within the meaning of the Political Reform Act." 2 Cal. Code Regs. § 18700(b)(1)(internal citations omitted).

California Government Code section 82048 defines "public official" to mean "every member, officer, employee or consultant of a state or local government agency." Title 2, of the California Code of Regulations, section 18701 defines "member" to include "salaried or unsalaried members of committees, boards or commissions with decisionmaking authority." "A committee, board

or commission possesses decisionmaking authority whenever...[i]t may make a final governmental decision...."  *Id.*

There is no dispute that Starrh, who is the Treasurer of the Belridge Board, a public entity that possesses decisionmaking authority, is a public official under the meaning of the PRA.

### 2.   Did Starrh Participate in Making a Governmental Decision?

The second step examines whether Starrh "ma[de], participat[ed] in making, or us[ed] or attempt[ed] to use his/her official position to influence a government decision."  2 Cal. Code Regs. § 18700(b)(2)(internal citations omitted).

Title 2 of the California Code of Regulations, section 18702, refers in turn to section 18702.1(a), for the following definition:

> A public official "makes a governmental decision," except as provided in 2 Cal. Code Regs. section 18702.4, when the official, acting within the authority of his or her office or position...<u>votes on a matter</u>....

(Emphasis added.)

There is no dispute that Defendant Starrh, by voting on the February 16, 2005 motion, made a governmental decision.

### 3.   What are Starrh's Economic Interests?

The third identifies "the public official's economic interests."  2 Cal. Code Regs. § 18700(b)(3)(internal citations omitted).

A public official has an economic interest in a business entity if "[t]he public official is a director, officer, partner, trustee, employee, or holds any position of management in the business entity.". § 18703.1.

1    Here, it is not disputed that Starrh is a partner in Starrh

2  & Starrh Cotton Growers, a California general partnership.  (UMF

3  12.)  Defendant Starrh is one of four partners, whose ownership

4  interests are equal.  (UMF 16, 21.)  Starrh & Starrh Cotton

5  Growers owns 6,441.91 acres in the District, and holds a total of

6  15,478.70 acre feet (AF) district water service entitlement, of

7  which 2,180.31 AF (41%) is Top Contract entitlement.  (UMF 15)

8              **4.   Is Starrh's Economic Interest in Starrh & Starrh
                      Cotton Growers a Direct or Indirect Interest?**

9
10   The next step examines whether "each of the public

11  official's economic interests...is directly or indirectly

12  involved in the governmental decision...."  2 Cal. Code Regs. §

13  18700(b)(4)(internal citations omitted).  The Code of Regulations

14  contains numerous sets of rules to determine whether an economic

15  interest is "direct" or "indirect," depending on the type of

16  interest.

17   For the business interest at issue here, the definition of a

18  "direct" interest is provided by section 18704.1:

19           (a) A person, including business entities, sources of
             income, and sources of gifts, is directly involved in a
20           decision before an official's agency when that person,
             either directly or by an agent:

21               (1) Initiates the proceeding in which the decision
22               will be made by filing an application, claim,
                 appeal, or similar request or;

23               (2) Is a named party in, or is the subject of, the
24               proceeding concerning the decision before the
                 official or the official's agency. A person is the
25               subject of a proceeding if a decision involves the
                 issuance, renewal, approval, denial or revocation
26               of any license, permit, or other entitlement to,
                 or contract with, the subject person.

27  Here, Plaintiffs assert that Starrh "initiated" the proceeding by

28  voting to approve the motion at the February 16, 2005 meeting.

                              **14**

Voting, however, is not included in the definition of "initiates" provided in section 18704.1, which includes "filing an application, claim, appeal, or similar request...."[1]  Nor was Starrh or Starrh & Starrh Cotton Growers a named party or the subject of the decision.  Starrh's economic interest was not directly affected.  As a partner in Starrh & Starrh Cotton Growers, Starrh's economic interest was "indirectly" affected, if at all by the potential impact the February 16, 2005 vote would have on the availability of Top Contract water.

### 5.   What Materiality Standard Applies?

The fifth step requires a determination of "the applicable materiality standard for each economic interest, based upon the degree of involvement [direct or indirect]...."  2 Cal. Code Regs. § 18700(b)(5)(internal citations omitted).

Having found Starrh's economic interest is indirectly, rather than directly, involved, the regulations require application of the materiality standards of California Code of Regulations, title 2, section 18705.1(c)(applicable to economic interests in business entities).  *See* § 18704.1.

Section 18705.1(c) provides a number of different paths for determining materiality:

---

[1]      Plaintiffs also assert that Mr. Starrh's partner initiated the proceeding by requesting in a letter that the Board determine that NSA entitlement could not be moved from the NSA. Assuming, *arguendo,* the letter request to the Board to draft a non-transfer policy is "initiation," plaintiffs do not explain why or provide any legal authority suggesting that actions taken by Defendant Starrh's business partners satisfy the requirement that Mr. Starrh initiate the proceedings.

Indirectly involved business entities. The following materiality standards apply when a business entity in which a public official has an economic interest is indirectly involved in a governmental decision. If more than one of the following subdivisions is applicable to the business entity in question, apply the subdivision with the highest dollar thresholds.

(1) <u>If the business entity is listed in the Fortune 500</u>, the financial effect of a governmental decision on the business entity is material if it is reasonably foreseeable that:

(A) The governmental decision will result in an increase or decrease in the business entity's gross revenues for a fiscal year of $10,000,000 or more; or

(B) The governmental decision will result in the business entity incurring or avoiding additional expenses or reducing or eliminating existing expenses for a fiscal year in the amount of $2,500,000 or more; or

(C) The governmental decision will result in an increase or decrease in the value of the business entity's assets or liabilities of $10,000,000 or more.

(2) If the business entity is listed on the New York Stock Exchange, or if not listed on the New York Stock Exchange, for its most recent fiscal year had earnings before taxes of no less than $2.5 million, or such other amount described at Rule 102.01C of the New York Stock Exchange's Listed Company Manual (or any superseding rule of the New York Stock Exchange describing its financial standards for initial listing), the financial effect of a governmental decision on the business entity is material if it is reasonably foreseeable that:

(A) The governmental decision will result in an increase or decrease to the business entity's gross revenues for a fiscal year in the amount of $500,000 or more; or,

(B) The governmental decision will result in the business entity incurring or avoiding additional expenses or reducing or eliminating existing expenses for a fiscal year in the amount of $200,000 or more; or,

(C) The governmental decision will result in an increase or decrease in the value of

16

assets or liabilities of $500,000 or more.

(3) If the business entity is listed on either the NASDAQ or American Stock Exchange, or if not so listed, for its most recent fiscal year had: net income of no less than $500,000 (or such other amount described in the minimum financial requirements for continued listing on the NASDAQ SmallCap market), or earnings before taxes of no less than $750,000 (or such other amount of earnings before taxes described under initial listing standard 1 of Section 101(a) of the Rules of the American Stock Exchange, or any superseding Section of the Rules of that Exchange), the financial effect of a governmental decision on the business entity is material if it is reasonably foreseeable that:

(A) The governmental decision will result in an increase or decrease to the business entity's gross revenues for a fiscal year in the amount of $300,000 or more; or,

(B) The governmental decision will result in the business entity incurring or avoiding additional expenses or reducing or eliminating existing expenses for a fiscal year in the amount of $100,000 or more; or,

(C) The governmental decision will result in an increase or decrease in the value of assets or liabilities of $300,000 or more.

(4) If the business entity is not covered by subdivisions (c)(1)-(3), the financial effect of a governmental decision on the business entity is material if it is reasonably foreseeable that:

(A) The governmental decision will result in an increase or decrease in the business entity's gross revenues for a fiscal year in the amount of $20,000 or more; or,

(B) The governmental decision will result in the business entity incurring or avoiding additional expenses or reducing or eliminating existing expenses for a fiscal year in the amount of $5,000 or more; or,

(C) The governmental decision will result in an increase or decrease in the value of the business entity's assets or liabilities of $20,000 or more.

(emphasis added.)

No party presents evidence to address application of this provision.  The court can take judicial notice of the fact that Starrh & Starrh Cotton Growers is not on the Fortune 500 list nor is it listed on the NYSE, NASDAQ, or American Stock Exchange,[2] but it is not possible on this record to determine whether the alternative financial thresholds are met.  For this reason alone, it is inappropriate to grant summary judgment to Plaintiff.

> 6.    <u>Was it Reasonably Foreseeable that the Governmental Decision Would Have a Material Financial Effect on Defendant Starrh's interest in Starrh & Starrh Cotton Growers</u>.

The next step determines:  "whether it is reasonably foreseeable that the governmental decision will have a material financial effect...on each economic interest identified...."  2 Cal. Code Regs. § 18700(b)(6).  Giving the benefit of the doubt to Plaintiffs that the lowest possible financial threshold, that from section 18705.1(c)(4), applies, any financial effect of the governmental decision on Starrh & Starrh Cotton Growers is "material" if it is "reasonably foreseeable" that:

> (A) The governmental decision will result in an increase or decrease in the business entity's gross revenues for a fiscal year in the amount of $20,000 or more; or,
>
> (B) The governmental decision will result in the business entity incurring or avoiding additional expenses or reducing or eliminating existing expenses for a fiscal year in the amount of $5,000 or more; or,
>
> (C) The governmental decision will result in an increase or decrease in the value of the business entity's assets or liabilities of $20,000 or more.

§ 18705.1(c)(4).

---

[2] This information is readily available in the public record.  *See* http://money.cnn.com/magazines/fortune/fortune500/2008/full_list/; http://www.amex.com/; http://www.nasdaq.com; http://www.nyse.com/

1    First, Plaintiffs assert that Defendant Starrh has

2  stipulated to the issue of materiality, pointing to Defendant's

3  Trial Brief in the Kern County case, which states: "Mr. Starrh[]

4  has stipulated to materiality to avoid production of confidential

5  business information...."  (Doc. 126, Att. I to Pls. Repl. Br. at

6  13:21-23.)  Plaintiffs, in essence, ask that Mr. Starrh's

7  stipulation in the Kern County case be given collateral estoppel

8  effect.  However, "facts established by stipulations or

9  concessions..., rather than by judicial resolution, are not fully

10 litigated and do not have collateral estoppel effect," *Western*

11 *Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d

12 1052, 1061 (N.D. Cal. 1998)(citing *Sekaquaptewa v. MacDonald*, 575

13 F.2d 239, 247 (9th Cir. 1978)), unless the parties have

14 manifested an intention to that effect, *Sekaquaptewa*, 575 F.2d

15 247.  The stipulation by Mr. Starrh in the Kern County Superior

16 Court may have effect as a judicial admission, even if the

17 parties did not intend it to have collateral estoppel effect.

18 However, counsel for Mr. Starrh represented at oral argument that

19 the stipulation, which was agreed to in principle but never

20 finalized in writing, was to be strictly limited in its effect to

21 the Kern County case.  It is therefore not binding here.

22     It is undisputed that Starrh & Starrh Cotton Growers owns

23 6,441.91 acres in the District, and a total of 15,478.70 AF of

24 entitlement, of which 2,180.31 AF (41%) is Top Contract

25 entitlement.  (UMF 15.)

26     Plaintiffs maintain that the 2,180.31 AF of Top Contract

27 Water held by Starrh & Starrh should be assigned a value of

28 $3,000/AF, which was the price paid by Coachella Valley Water

1  District in a 2005 purchase of water from the Berrenda Mesa Water

2  District.  At $3,000/AF, the 2180.31 AF of Top Contract water

3  held by Starrh & Starrh Cotton Growers would be worth

4  $6,540,930.00.  Plaintiffs argue that the one-quarter interest in

5  Starrh & Starrh Cotton Growers held by Defendant Starrh should

6  therefore be valued at $1,358,684.00.  Plaintiffs then suggest

7  that because this number far exceeds the $20,000 threshold

8  contained in § 18705.1(c)(4), it was reasonably foreseeable that

9  the February 16, 2005 vote would have a material financial effect

10 on Defendant Starrh's economic interests.

11      There are a number of flaws in Plaintiffs' argument.  At the

12 outset, Defendants dispute the $3,000/AF value assigned to the

13 water entitlement.  Defendants maintain that the Barrenda Mesa

14 water right was permanent and freely alienable, unlike the Top

15 Contract entitlement which is subject to reduction, and is not

16 freely alienable, as the District must approve any sales and

17 transfers.  Moreover, Defendants point out that in a January 10,

18 2005 letter, Plaintiffs expressed belief that their NSA

19 entitlement was worth $1,000/AF.  (Hammet Decl. at Ex. G.)

20 Plaintiffs rejoin that at the very least, the entitlements are

21 worth $2,100/AF, the price of an entitlement purchased by

22 Coachella Valley Water District from Tulare Lake Basin Water

23 Storage District, but provide no explanation as to why that water

24 transfer is any more reliable as a measure of the value of the

25 Top Contract water entitlement.

26      Other issues raised by Plaintiffs' analysis make it

27 unnecessary to decide the value of an acre-foot of water.  First,

28 Plaintiffs do not consider Top Contractors' costs as well as

20

benefits.   They are required to pay fees to Belridge regardless

of the volume of Top Contract water available.   Defendants

Phillimore and Starrh assert that the Top Contract water has very

little value because it is not freely alienable, is subject to

reduction, is only a temporary right to water, and in a wet year

may be a burden to their businesses, because Top Contract water

may cost more than water purchased in the open market.

Second, Plaintiffs do not quantify the extent to which,

considering the costs of the Top Contract, the February 16, 2005

vote actually <u>added</u> to the value of the Top Contracts.[3]   The

_____

[3]   Alternatively, Plaintiffs argue that Defendants
"conceded" that Defendant Starrh's economic interest was
materially effected by the February 16, 2005 vote because of the
"strenuous opposition mounted against the transfer requests
pending at the time of the" vote. (Doc. 117-2 at 8.)
Specifically, Plaintiffs point to a letter submitted on
behalf of Starrh & Starrh Cotton Growers which argued that NSA
entitlement only gains value if the Board acts to permit the
entitlement to be moved.   (UMF 22.)   Plaintiffs fail to explain
how this "concession" is relevant to this case, as the letter
only stated the fact that a water entitlement without water
service is valueless, whereas a water entitlement with service
has value.
Plaintiffs also point to a letter submitted to Belridge on
behalf of Defendants Phillimore and Baker, which argued that
because "water prices have recently increased dramatically for
permanent transfers, including those out of the NSA...[p]ermanent
transfers of water entitlement allocated to NSA lands would
result now in a significant financial benefit to NSA landowners
without any significant expenditures on their part."   (UMF 24.)
Plaintiffs appear to suggest that because Defendants acknowledge
that NSA entitlements would have value if they were to be
transferred to SA lands, this is a concession of  as to the Top
Contract entitlements.   However, even if these letters were
interpreted as conceding that the Top Contract entitlements have
value, they do not concede that the February 16, 2005 vote
materially affected the value of the entitlements, nor that any

1  record only reveals that the inability to transfer NSA water to

2  SA lands would likely ensure greater deliveries under the Top

3  Contract.  However, the size of the delivery curtailments that

4  would result from their proposed NSA to SA transfer is not

5  presented.

6      Without information regarding the likely impact of the

7  February 26, 2005 vote on Top Contract deliveries, it is

8  impossible to conclude that the vote resulted in a more than a

9  $20,000 increase in the value of Defendant Starrh's 1/4 interest

10 in Starrh & Starrh Cotton Growers.  Whether the materiality

11 requirement is satisfied remains in dispute.  Summary judgment is

12 inappropriate.

13          7.  Does the Public Generally Exception Apply?

14      The seventh step addresses whether the "reasonably

15 foreseeable financial effect is distinguishable from the effect

16 on the public generally."  The public generally exception was

17 previously addressed in the first motion to dismiss:

18          Defendants argue that Plaintiffs' PRA claim should be
            dismissed as a matter of law because their actions were
19          proper under a provision of the PRA which exempts from
            its prohibitions decisions made by Directors who are
20          affected by the subject matter of their vote in the
            same manner as the "public generally."  Cal. Gov. Code
21          § 87103.  The PRA's implementing regulations contain a
            number of provisions further explaining the application
22          of the "public generally" exception.  Defendants point
            specifically to Title 2 of the California Code of
23          Regulations § 18707.2, titled "Special Rule for Rates,
            Assessments, and Similar Decisions," which provides:
24
25          The financial effect of a governmental decision on
            the official's economic interest is
26          indistinguishable from the decision's effect on
            the public generally if any of the following

27  _____

28 such added value exceeds the expenses incurred under the Top
   Contract.

apply:

    (a)   The decision is to establish or adjust assessments, taxes, fees, charges, or rates or other similar decisions which are applied on a proportional basis on the official's economic interest and on a significant segment of the jurisdiction, as defined in 2 Cal. Code of Regulations, section 18707.1(b).

    (b)   The decision is made by the governing board of a landowner voting district and affects the official's economic interests and ten percent of the landowners or water users subject to the jurisdiction of the district in proportion to their real property interests or by the same percentage or on an "across-the-board" basis for all classes.

    (c)   The decision is made by the governing board of a water, irrigation, or similar district to establish or adjust assessments, taxes, fees, charges, or rates or other similar decisions, such as the allocation of services, which are applied on a proportional or "across-the-board" basis on the official's economic interests and ten percent of the property owners or other persons receiving services from the official's agency.

The decision in question, the February 16, 2005 vote to prohibit the transfer of NSA water to SA lands, is not even arguably an assessment, tax, charge, fee, rate, or other similar decision, so sub-parts (a) and (c) do not apply. Defendant strenuously maintains, however, that subpart (b) does apply to the facts of this case. The parties point to no authority construing the language of §§ 18707.2(b). The applicability of this provision to the facts of this case presents several unique questions that have not yet been addressed by any court.

Specifically, Defendants maintain that the February 16, 2005 vote affected at least ten percent of the other "landowners or water users subject to the jurisdiction of the district in proportion to their real property interests or by the same percentage or on an 'across-the-board' basis for all classes." Defendants make a critical assumption in support of this assertion: that the February 16, 2005 decision, affects all District landowners in the same way, because it prohibits <u>all</u> landowners from transferring their NSA water to SA lands. Operating under this assumption, Defendants present various arithmetical analyses of the individual Defendants' property

23

interests vis-a-vis all other Belridge landowners.
Based on these analyses, Defendants contend that the
decision affects at least ten percent of the non-voting
landowners.   Assuming, arguendo, the validity of
Defendants' fundamental assumption, their calculations
appear to satisfy the ten percent rule.

Plaintiffs argue, however, that Defendants' fundamental
assumption is flawed, and maintain that the February 16
decision does <u>not</u> affect all District landowners in the
same way, because it financially benefits those
district landowners who are parties to the Top Contract
while not providing similar financial benefits to other
district landowners.

Plaintiffs' view of the effect of the February 16
decision is the more persuasive, particularly in light
of the purpose of the PRA.   Here, the Plaintiffs allege
(and Defendants do not appear to dispute) that the
operative effect of individual landowners transferring
NSA entitlement to SA lands is to diminish the amount
of water available under the Top Contract.
Accordingly, prohibiting such transfers (permanently or
temporarily) will ensure that the parties to the Top
Contract have exclusive access to these (valuable)
surplus water entitlements.   The PRA is designed to
ensure that "[n]o public official at any level of state
or local government shall make, participate in making
or in any way attempt to use his official position to
influence a governmental decision in which he knows or
has reason to know he has a financial interest."   Cal.
Gov. Code § 87100.   Although the February 16, 2004
decision does not directly reference the Top Contract,
the beneficial effect of the decision upon parties to
the Top Contract is undeniable as the vote ensures that
Plaintiffs' NSA water is available to be allocated to
the Directors' Top Contract claims.

Assuming that the February 16, 2005 decision affects
the parties to the Top Contract differently from the
remaining landowners, the question then becomes whether
§ 18707.2(b) nevertheless shields Defendants.   With
respect to this inquiry Plaintiffs raise an important
threshold question: Does § 18707.2(b) even apply to a
decision that affects one group of landowners
differently from its effect on other landowners.   The
plain language of the provision, suggest that it does
not.   Section 18707.2(b) provides for an exception from
the PRA when:

> The decision is made by the governing board of a
> landowner voting district and affects the
> official's economic interests and ten percent of
> the landowners or water users subject to the
> jurisdiction of the district in proportion to

their real property interests or by the same
percentage or on an "across-the-board" basis for
all classes.

According to the plain language of the provision, an
official may participate in making a decision, even if
the decision affects the official's economic interests,
if the decision also affects ten percent of the
landowners or water users subject to the jurisdiction
of the district in a proportional manner.  The
provision offers three alternative ways to calculate
whether ten percent of other landowners are affected:
(1) in proportion to their real property interests; (2)
by the "same percentage"; or (3) on an "across the
board basis."  No further definitions or guidance is
provided.  The "across the board" option is fairly
self-explanatory and applies only if all landowners are
affected equally by a decision.  For example, if all
landowners were assessed a flat fee for a particular
administrative service.

Although the wording is not particularly clear, a
similar interpretation is appropriate for the "by the
same percentage" language.  For example, if a fee was
levied at one percent of the value of a landowner's
water entitlement or at a fraction of the total acres
owned.  The February 16, 2005 decision affects parties
to the Top Contract differently from other landowners,
and neither the "by the same percentage" nor the
"across-the-board" language is applicable here.

A more difficult question is whether the February 16,
2005 decision affects the Defendant Directors'
"economic interests and ten percent of the landowners
or water users subject to the jurisdiction of the
district in proportion to their real property
interests...."  § 18707.2(b)(emphasis added).  Both
parties submit sets of calculations addressing whether
or not the ten percent threshold is met, but Plaintiffs
assert that these "various arithmetical scenarios"
assume too much.  (Doc. 45, Pltf's Suppl. Brief, at 2.)
Plaintiffs maintain that the "in proportion to their
real property interests" language of § 18707.2(b) does
not apply because the allocation of benefits under the
Top Contract does not track the parties' proportional
landownership interests in the District.  Plaintiffs
appear to be correct.

The chart below compliles information from various
exhibits in the record.  The first two columns list the
parties to the Top Contract and which, if any,
Defendant is affiliated with those entities.  The third
column lists the various entities' share of water under
the Top Contract.  The Fourth presents the entities'
share of the total land in Belridge, both in Acreage

25

and as a percentage share of the total. Finally, the Fifth column shows the entities' share of the total water entitlement actually used in Belridge, exclusive of any entitlement gained under the terms of the Top Contract.

| | Parties to Top Contract | Share of Top Contract | Share of Total Land in Belridge | Share of Total Belridge Water Entitlement (actually used) |
|---|---|---|---|---|
| Defendants Phillimore & Baker | Paramount Business Entities: | | | |
| | Paramount Land Company | 14.46% | 6,962.71 A (7.26%) | 2,456.17 AF (2.37%) |
| | Paramount Citrus Association | 0 | 2,833.75 A (2.95%) | 8,758.14 AF (8.45%) |
| | Paramount Orchards | 0 | 21,257.33 A (22.16%) | 52,088.69 AF (50.28%) |
| | Paramount Farms | 0 | 396.42 A (0.41%) | 0 |
| | Belridge New Farming LLC | 62.84% | 0 | 0 |
| *Total for Phillimore & Baker* | | *77.3%* | *32.78%* | *61.1%* |
| Defendant Starr | Starrh & Starrh Cotton Growers | 16.61% | 6,444.91 A (6.72%) | 13,289.39 AF (12.84%) |
| Non-Defendant Parties to the Top Contract | BLC Farmlands, LLC | 0.16% | 80.00 A (0.08%) | 159.20 AF (0.15%) |
| | California Pistachio, Inc. | 0.19% | 87.17 A (0.09%) | 190.81 AF (0.18%) |
| | Chaparral Industries, Inc. | 2.02% | 965.93 (1.01%) | 2,047.77 AF (1.98%) |
| | Rod Steifvater | 1.00% | 2,446.90 A (2.55%) | 1,113.83 AF (1.08%) |
| | Steifvater et al. | 1.79% | 1277.06 (1.33%) | 4,256.24 AF (4.11%) |
| | Theta Oil and Land Company | 0.93% | 796.36 (0.83%) | 947.96 AF (0.91%) |

Without even attempting to apply the ten percent rule, it is evident that the Defendants' share of water under the Top Contract (and therefore the parties' share of the benefits of the Top Contract) does not track either their proportional land ownership or their water entitlement.  For example, Defendant Starr holds a 16.61% share of water under Top Contract, but 6.72% of the total land in Belridge and 12.84% of the total used water entitlement.  Similarly, Defendants Pillimore and Baker, who are together affiliated with the Paramount

entities and Belridge New Farming, hold a 77.3% interest in the Top Contract, but (counting all of their related entities) only 32.78% of the total acreage in Belridge and 61.1% of the total used water entitlement.  Some of the non-defendant parties to Top Contract hold shares in the Top Contract that are similar to their overall share of Belridge's used water entitlement (for example, BLC Farmlands, California Pistachio, Chaparral, and Theta Oil), but such is not the case with the Steifvater entities.  Overall, the record reveals that Defendants' collective share in the Top Contract is disproportionately larger than their share of either the land in Belridge or of the used water entitlement.  It is inappropriate to apply § 18707.2(b), which is supposed to exempt officials who make decisions affecting their own economic interests only if the decision also affects "ten percent of the landowners or water users subject to the jurisdiction of the district in proportion to their real property interests...."  (emphasis added).

Under the facts and circumstances of this case, applying the § 18707.3(b) exemption would not comport with the over-arching purpose of the PRA: to ensure that "[n]o public official at any level of state or local government shall make, participate in making or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest."  Cal. Gov. Code § 87100. Although the parties have not pointed to any legislative history, judicial interpretation, or administrative guidance on the intended scope and purpose of § 18707.2(b), it is reasonably inferred that the purpose of the exception is to permit interested directors to only make decisions for landowner voting districts when these decisions affect all landowners in a fair and even-handed manner.  The complaint alleges that Defendants; actions have preferred their economic self-interest to the detriment of other district members.

Defendants' motion to dismiss Plaintiffs' PRA claim is DENIED.

(Doc. 48 at 29-38.)

Plaintiffs assert that this ruling amounts to a dispositive decision on the applicability of the "public generally" exception.  (Doc. 117-2 at 11.)  Defendants rejoin that an order on a motion to dismiss is an "interlocutory order" that cannot constitute a "final dispositive finding of fact or law," and may

27

be reconsidered and ultimately changed.  Defendants are only partially correct.  A motion to dismiss can be dispositive as to matters of law, not matters of fact.  Although interlocutory orders may be reconsidered, Defendants have not moved for reconsideration or presented any grounds for reconsideration of the ruling on this issue.

As to the effect of the above-quoted decision, in evaluating a motion to dismiss, the district court must take the facts presented and view them in the light most favorable to the non-moving party.  In this case, the district court examined the limited factual record and concluded that "[u]nder the facts and circumstances of this case, applying the § 18707.3(b) exemption would not comport with the over-arching purpose of the PRA...."  (Doc. 48 at 38.)  Because the issue was a mixed question of fact and law, it is not appropriate to treat the ruling on the motion to dismiss as dispositive of the applicability of the "public generally" exception.  Defendants will be permitted to present evidence on this issue in later stages of this litigation.

### 8.   Was Starrh's Participation in the Vote Legally Required?

The final step requires a determination of whether "the public official's participation is legally required despite the conflict of interest."  2 Cal. Code Regs. § 18700(b)(8).  If so, the government official can participate in the decision notwithstanding any conflict of interest.  *Id*.  Here, however, there is no assertion that Defendant Starrh was legally required to vote on the February 16, 2005 matter.

28

1        D.   __Other Defenses Asserted__.

2        For the first time in these proceedings, Defendants assert

3    that several new exceptions to the PRA apply here.  First,

4    Defendants argue that an exception to the PRA applies for issues

5    that "will affect a [predominant] industry, trade, or profession

6    [within the jurisdiction] in substantially the same manner as the

7    decision will affect an official's economic interest."  Cal. Code

8    Regs. § 18707.7 (the "Predominant Industry Exception").  This

9    exception applies when an industry that constitutes 50 percent or

10   more of the business entities in the district that the official

11   represents.  Defendants assert that Belridge is largely rural and

12   agriculture is the predominant industry because more than half of

13   the business entities in Belridge are engaged in agricultural

14   activities.  (Doc. 122-4, Hammett Decl. at ¶12.)

15       Second, Defendants maintain that an exception for "Business

16   Entities" applies:

17           For decisions that affect a business entity in which a
             public official has an economic interest, the decision
18           also affects either 2,000 or twenty-five percent of all
             business entities in the jurisdiction or the district
19           the official represents, so long as the effect is on
             persons composed of more than a single industry, trade
20           or profession.

21   Cal. Code Regs. § 18707.1(b)(1)(c).

22       Third, Defendants argue that the following "catch-all"

23   exception applies:

24           The decision will affect a significant segment of the
             population which does not meet any of the standards in
25           subsections (b)(1)(A) or (b)(1)(D), however, due to
             __exceptional circumstances__ regarding the decision, it is
26           determined such segment constitutes a significant
             segment of the public generally.

27
     § 18707.1(b)(1)(E)(emphasis added).  Thus, if exceptional
28
     circumstances exist to define the portion of the population

1   affected by the decision as a "significant" segment and the
2   impact on that portion of the population is substantially the
3   same as the impact on the public official, then the public
4   generally exception applies.  § 18707.1(b).  Defendants
5   acknowledge that the PRA does not contain any further guidance on
6   what constitutes "exceptional circumstances."

7       Plaintiffs maintain that Defendants cannot assert any of
8   these defenses because they failed to plead them as affirmative
9   defenses in their answer.[4]   The Federal Rules of Civil Procedure
10  require a defendant to plead affirmative defenses in the answer;
11  failure to do so constitutes a waiver of that defense.  *James v.*
12  *United States*, 215 F.R.D. 590, 595 (E.D.Cal. 2002)(Fed. R. Civ.
13  Pro. 12(b), 8(c)).  Defendants have not moved for leave to amend
14  their answer, nor have they shown good cause for permitting
15  amendment.  Absent leave to amend, they cannot now assert
16  defenses they failed to plead in their answer.

17
18
19
20

21      [4]   Plaintiffs argue, alternatively, that Defendants are
22  estopped from asserting these claims because they stated in a
    previous motion to dismiss that the defendant directors' vote at
23  the February 16, 2005 meeting was "premised upon the 'public
    generally' rule contained in the PRA."  (Doc. 17, Def. Mot.
24  Dism., filed May 31, 2005, at 7:2-3.)  Plaintiffs claim that this
    statement was an admission, but, upon closer inspection, it
25  appears that Defendants were merely asserting that the Defendants
    were advised, prior to their vote, by legal counsel that the
26  public generally exception applied.  Plaintiffs do not explain
27  why actions of legal counsel would affect the breadth of defenses
28  available in this litigation.

1    **E.    Plaintiffs' Requested Relief.**

2    Plaintiffs request equitable relief under the PRA,

3    specifically requesting (1) that the February 16, 2005 vote be

4    declared void; and (2) that Belridge be ordered to <u>approve</u>

5    Plaintiffs' request to transfer its NSA entitlement to SA lands.

6    Defendants do not dispute that, if Plaintiffs prevail on the

7    merits of this claim, that they would be entitled to have the

8    vote declared null and void.  This is the form of relief

9    specifically provided in the PRA.  *See* Cal. Gov. Code §

10   91003(b)("If it is ultimately determined that a violation has

11   occurred and that the official action might not otherwise have

12   been taken or approved, th court may set the official action

13   aside as void.")

14   However, the requested injunctive relief is a different

15   question.  The PRA does provide for injunctive relief to "enjoin

16   violations of the PRA or to compel compliance with the provisions

17   of the PRA," Cal. Gov. Code § 91003(a), but Plaintiffs do not

18   request this type of injunction.  Rather, they request an order

19   requiring Belridge to take affirmative action to approve a

20   request that is distinct from the allegedly unlawful vote.  This

21   is not an available remedy for two reasons.  First, "[g]enerally,

22   when a new right is created by statute, a party aggrieved by

23   violation of the statute is limited to the statutory remedy if

24   one is provided." *County of San Diego v. State*, --- Cal. Rptr.

25   3d. ---, 2008 WL 2582976, *18 (Cal. App. 4 Dist. 2008)   Here,

26   the PRA provides for nullification of the vote and/or prohibitory

27   injunctive relief to prevent further violations, but not

28   mandatory injunctive relief of any other kind.  In general, the

1  doctrine of separation of powers precludes a court from interfere

2  with the business of a legislative body through the issuance of a

3  writ of mandate or any other mandatory injunctive relief.  *Id*. at

4  *6.

5

6                         V.   CONCLUSION

7        For the reasons set forth above, Plaintiffs motion for

8  summary judgement on the PRA claim is DENIED.

9

10  IT IS SO ORDERED.

11  Dated:   August 1, 2008                 /s/ Oliver W. Wanger
                                      UNITED STATES DISTRICT JUDGE
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28